Law Office of Tanya Brannan
P.O. Box 3064
419 Orchard Street
Santa Rosa, California  95402
(707) 887-0865
brannanlaw@comcast.net

Sanford Wittels & Heisler, LLP
950 Third Avenue, 10th Floor
New York, New York 10022
Telephone: (646) 723-2947
Facsimile: (646) 723-2948
swittels@nydclaw.com
*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE GEORGE, as Administrator and Personal Representative of THE ESTATE OF RYAN GEORGE; VALERIE GEORGE and TAJMAH BEAUCHAMP, as Legal Representatives for Jaida George and Ryan George, Jr.; VALERIE GEORGE, Individually; DONALD GEORGE; and TAJMAH BEAUCHAMP, Individually,<br><br>         Plaintiffs,<br><br>  vs.<br><br>SONOMA COUNTY SHERIFF'S DEPARTMENT; BILL COGBILL; COUNTY OF SONOMA; CALIFORNIA FORENSIC MEDICAL GROUP, INC; JAMES LUDERS, M.D.; MICHAEL E. DAGEY, R.N.; SUTTER HEALTH; SUTTER MEDICAL CENTER OF SANTA ROSA; EDWARD W. HARD, M.D.; RICHARD FLINDERS, M.D.; JOSEPH N. MATEL, M.D.; NORICK JANIAN, M.D.; and DOES 1 through 25, inclusive,<br><br>         Defendants. | Case No. 3:08-cv-02675-EDL<br><br>ECF Case<br><br><br>**FIRST AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**I.**

## SUMMARY OF DEFENDANTS' WRONGFUL ACTIONS
## LEADING TO THE UNTIMELY DEATH OF RYAN GEORGE

1.      Ryan George died a cruel and unnecessary death in July 2007 at the young age of 22 due to the grossly substandard medical care he received while an inmate in the Sonoma County Main Adult Detention Facility (the "Facility" or "Jail").  As a result of the deficient and untimely care Mr. George received, the Plaintiffs, Mr. George's mother and Personal Representative/Administrator, Valerie George, together with his father, Donald George, his fiancée, Tajmah Beauchamp, and his children, Jaida George and Ryan George, Jr. bring this lawsuit for monetary damages caused by his pain and suffering and wrongful death.  Each of the Defendants, including (i) Defendant COUNTY OF SONOMA (the "County"), which owns and operates the Detention Facility, (ii) Defendant SONOMA COUNTY SHERIFF'S DEPARTMENT ("Sheriff's Department"), which operates the Facility, (iii) Defendant CALIFORNIA FORENSIC MEDICAL GROUP ("CFMG"), which contracted to provide medical care to inmates in the Facility, and (iv) Defendant SUTTER MEDICAL CENTER OF SANTA ROSA ("Sutter"), which is contracted to provide general acute care to inmates that cannot be provided within the Facility, contributed to causing Mr. George's untimely suffering and death.

2.      At the time he was taken into custody, employees of the Facility – including the Defendants County, Sheriff's Department, and CFMG, and their medical staff – were made aware that Mr. George had sickle cell anemia and suffered periodic and serious sickle cell "crises" for which urgent medical treatment was required.  Yet, despite this knowledge, when Mr. George suffered the onset of such a crisis on or about June 28, 2007, the Defendants failed to promptly respond to Mr. George's or his family's cries for help.  Defendants' outright disregard for Mr. George's health and safety continued following his much-delayed transfer to Sutter – occurring only after he was found unconscious in his cell – as well his inexplicable discharge back to the Jail just two days later.  As a result of Defendants' egregious inattention and substandard care in failing to attend to Mr. George's basic needs, the young man died a horrible death, alone and naked on rubber

1

bedding in his cell on or about July 9, 2007. Defendants' various actions and omissions violated the United States Constitution as well as California statutory and common law, and the damages resulting from these violations are compensable in this action.

## II.

## JURISDICTION

3.     This action arises under 42 U.S.C. § 1983. Jurisdiction is conferred pursuant to 28 U.S.C. §§ 1331 and 1343. The Court maintains supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. § 1367.

## III.

## VENUE

4.     The claims alleged herein arose at the Sonoma County Main Adult Detention Facility (the "Facility" or "Jail"), Santa Rosa, California, which is located in the County of Sonoma, State of California. Venue for this action lies in the United States District Court for the Northern District of California. 28 U.S.C. § 1391 (b)(2).

## IV.

## PARTIES

5.     This action arises from the wrongful death of RYAN GEORGE, who was at all times mentioned herein a resident of the County of Sonoma, State of California. Plaintiff VALERIE GEORGE is the duly appointed Administrator and Personal Representative of THE ESTATE OF RYAN GEORGE (hereafter "Estate," unless otherwise specified), which is a legal resident of the County of Sonoma. The heirs of the estate are Ryan George's infant children JAIDA GEORGE and RYAN GEORGE JR., who are also residents of Sonoma County.

6.     Plaintiffs VALERIE GEORGE and DONALD GEORGE are the parents of Ryan George. Plaintiff VALERIE GEORGE is a legal resident of Sonoma County; DONALD GEORGE was a legal resident of Sonoma County at all times alleged in the instant complaint.

7.     Plaintiff TAJMAH BEAUCHAMP was the fiancée of RYAN GEORGE prior to his wrongful death and is the mother of JAIDA GEORGE and RYAN GEORGE, JR. TAJMAH

BEAUCHAMP is a resident of Sonoma County.

8.     RYAN GEORGE's family members, including VALERIE GEORGE, DONALD GEORGE, and TAJMAH BEAUCHAMP, regularly visited him in the Facility prior to the events resulting in his death and repeatedly attempted to visit him and intervene on his behalf during those events.

9.     Defendant SONOMA COUNTY SHERIFF'S DEPARTMENT ("Sheriff's Department") is and at all times mentioned herein was a public entity responsible for providing law enforcement and detention services for Defendant COUNTY OF SONOMA (the "County"), including supervising, operating, and managing the Sonoma County Main Adult Detention Facility (hereafter the "Jail," or "Facility").

10.     Defendant BILL COGBILL ("Cogbill") is, and at all times herein mentioned was, Sheriff of Defendant County, and is responsible for supervising, operating, and managing the Facility.

11.      Defendant COUNTY OF SONOMA ("County") is and at all times mentioned herein was a public entity authorized by law to establish certain departments responsible for enforcing the laws and protecting the welfare of the citizens and public employees of Sonoma County.  At all times mentioned herein, Defendant COUNTY was responsible for overseeing the operation, management, and supervision of the Sonoma County Main Adult Detention Facility, DEFENDANT SOMOMA COUNTY SHERIFF'S DEPARTMENT, DEFENDANT SHERIFF COGBILL, as well as the Sheriff's Deputies and Corrections Officers, and contracted entities and employees of the Facility, including without limitation Defendant CFMG and its doctors and nursing staff. Defendant COUNTY is liable for the negligent and reckless acts of all of these aforementioned parties, personnel and entities, as described herein.

12.     Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. ("CFMG"), is and at all times mentioned was a corporation authorized to do business and doing business in the County of Sonoma, State of California, as a contract medical service provider to Defendants Sheriff's Department and County.

3

13.     Upon information and belief, Defendant JAMES LUDERS, M.D. ("Luders") is a physician employed by Defendant CFMG, and provided medical professional services to Defendant Sheriff's Department and County.  Upon further information and belief, Defendant Luders was responsible for overseeing Ryan George's care in the Jail while he experienced his sickle cell crisis.

14.     Upon information and belief Defendant MICHAEL E. DAGEY, R.N. ("Dagey") is a registered nurse employed by Defendant CFMG, and provided medical professional services to Defendant Sheriff's Department and County as the Jail's head nurse.  Upon further information and belief, Defendant Dagey was involved in Ryan George's care and treatment in the Jail.

15.     Defendant SUTTER MEDICAL CENTER OF SANTA ROSA ("Sutter") is a hospital affiliate of Defendant SUTTER HEALTH, a network of physician organizations, not-for-profit hospitals, and other health care service providers throughout Northern California.  At all times mentioned, Defendant Sutter was a contract medical provider to Defendant Sheriff's Department and County, and provided general acute care for inmate health needs that could not be met within the County's correctional facilities.

16.     Upon information and belief, Defendant EDWARD W. HARD, M.D. ("Hard") is a physician affiliated with Defendant Sutter in its emergency department.  Upon further information and belief, Defendant Hard was responsible for overseeing Ryan George's care and treatment while he remained in the emergency room.

17.     Upon information and belief, Defendant RICHARD FLINDERS, M.D. ("Flinders") is a physician affiliated with Defendant Sutter.  Upon further information and belief, Defendant Flinders was responsible for overseeing Ryan George's care while he was hospitalized at Sutter.

18.     Upon information and belief, Defendant JOSEPH MATEL, M.D. ("Matel") was or is a visiting physician in residence at Sutter, where he assisted with Ryan George's care and treatment and was responsible for Mr. George's discharge to the Jail.

19.     Upon information and belief, Defendant NORICK JANIAN, M.D. ("Jainian") was or is a neurologist affiliated with Sutter, where he was involved in Mr. George's diagnosis and care.

20.     Upon information and belief, Sutter physicians – including Defendants Flinders,

Matel, and Janian – improperly diagnosed Ryan George with only a "mild" or "very slight," if any, sickle-cell crisis; falsely suspected him of "malingering;" failed to take his condition as seriously as the situation demanded; failed to provide necessary treatment; and caved to pressure from the County and Sheriff's Department to release him back to the Jail despite his critical medical status.

21.     Upon information and belief, Defendants DOES 1 through 25 were each responsible in some manner for the injuries and damages alleged herein.  The true names and capacities of defendants DOES 1 through 25, and each of them, are presently unknown to Plaintiffs.  Plaintiffs therefore designate defendants DOES 1 through 25 by such fictitious names and when their names have been ascertained, Plaintiffs will amend this complaint to allege their true names and capacities.

22.     In committing the acts and/or omissions alleged herein, all Defendants acted under color of authority and/or under color of law.  Plaintiffs sue all public employees named as Defendants in both their individual and official capacities.

## V.

## STATEMENT OF FACTS

23.     On or about May 31, 2007, law enforcement officials of the County and Sheriff's Department took Ryan George into custody at the Sonoma County Main Adult Detention Facility. Mr. George's detention records, including a pre-booking health screening, listed that he had sickle cell anemia and indicated that this disease involved periodic "sickle cell crises," for which Mr. George was treated at Kaiser Permanente Hospital in Santa Rosa.  Mr. George indicated that he had been hospitalized during previous sickle cell crises.  The screening form further stated that Mr. George did not have any current symptoms but would report their recurrence.

24.     Several months earlier, in or about January 2007, when he had been in the custody of the County, Mr. George was taken to the emergency room at Kaiser due to a sickle cell crisis.

25.     Upon information and belief, sickle cell crises commonly cause acute and severe pain and may result in fever, organ damage, and further serious complications.  The basic standard treatment for a sickle cell crisis includes pain management and "excessive" hydration; sickle cell patients are known to suffer and die from dehydration even where exhibiting normal or high urine

output levels.  In many cases, a blood transfusion is required.

26.    At Kaiser, Mr. George had typically been treated with IV fluids, oxygen, antibiotics, and narcotics for pain – including a morphine pump; in addition, the attending physicians closely monitored his blood counts.  During these episodes, Mr. George had been discharged of his own volition after the sickle-cell crisis was determined to be resolved.

27.    Following his detention on May 31, Mr. George's fiancée Tajmah Beauchamp visited him in the Jail approximately four days a week and spoke with him by telephone regularly. Mr. George's parents Valerie and Donald George also visited him during his confinement in the Facility, and also spoke with him by phone regularly.

28.    On or about June 28, 2007, Ryan George suffered the start of a sickle cell anemia crisis that required prompt, appropriate, and responsive medical attention.  Instead, the Facility and its employees, agents, nurses, deputies, guards, and/or corrections officers, and the Defendant Sonoma County Sheriff's Department, the Sheriff's Deputies, and CFMG, (collectively the Defendant "County" or "Detention Facility" unless otherwise specified), and Sutter Medical Center of Santa Rosa ("Sutter") and its physicians, staff, and personnel, failed to properly address Mr. George's need for appropriate medical intervention and care.

29.    Ryan George suffered pain beginning or about June 28, 2007, and his pain and suffering continued and worsened over the next thirteen days -- until he died in custody on or about July 9, 2007 at the Facility.  His suffering and death were caused by the untimely, substandard, inadequate, insufficient, reckless, and egregious lack of treatment and care provided to him for his sickle cell anemia and its related effects while he was in the custody of the County from May 31, 2007 to July 9, 2007, and while under the "care" of the County's agent, Sutter Medical Center of Santa Rosa, where Mr. George was admitted from July 1-3, 2007.

30.    On June 28, 2007, Mr. George submitted an Inmate Health Services Request Form to the County stating that his sickle cell anemia – which had been a longstanding condition – had recently been causing his arms and legs to "break out in pain" and that he needed "***help fast, before it gets worse***…"

6

31.     On or about June 28, 2007, Mr. George spoke with his mother, Valerie George, and told her that he was suffering from a sickle cell crisis and that his jailers were not providing him the medical care he needed despite his requests for urgent medical attention.

32.     Defendant CFMG's records indicate that Mr. George received medical attention beginning on June 29, 2007: he was admitted to the medical unit, prescribed pain medications, and "encouraged" to drink liquids.  These records further indicate that Mr. George was in visible pain, lying in bed and massaging his muscles, and that a wheelchair was needed to transport him to the infirmary.  Upon information and belief, Mr. George was not placed on an IV despite notations in his file that he was periodically "uncooperative," "refusing" water or medication.

33.     Defendant CFMG's records further indicate that Defendant Luders was the physician on the case, and consulted on all medical decisions.

34.     On June 29, 2007, Mr. George submitted an inmate request form seeking to speak with a doctor regarding his pain medication, stating "IT'S VERY IMPORTANT."  The form was not received until the following day and not responded to until July 2, 2007, at which time it was explained that Mr. George's request could not be acted on because he had been transferred to Sutter for outside medical care.

35.     On June 29, 2007, at about 10:00 PM, Mr. George called his mother and told her that he was in great pain, particularly in his back, and that Jail personnel, including medical staff, continued to be inattentive to his medical needs.  Valerie George then spoke to someone in medical records at the Jail and warned that her son could die.  She was told that someone on the medical staff would return her call, which did not occur.

36.     At approximately 2:40 P.M. on June 30, 2007, Valerie George again spoke with her son; he was in obvious pain and distress, crying and barely able to speak or breathe.  He said that he had not been giving anything for pain since 5:00 A.M.  Ryan again pled with her to obtain aid on his behalf as Jail personnel were neglecting to help him, and even mocking his inability to walk due to the sickle cell crisis.

37.     Valerie George then contacted the Jail and spoke to an individual named "Perez."

7

Ms. George reported that her son needed fluids and couldn't walk. "Perez" responded that Mr. George had access to a water faucet and "can walk to the phone to call you, can't he?" Ms. George explained that when he had a sickle-cell crisis of this severity, Ryan needed to be rushed to the hospital and to receive oxygen, IV fluids to thin his blood, and heavy pain medication. She urged that he be hospitalized and given IV fluids instead of cups of water, and warned that he could die. "Perez" said that a medic would return Ms. George's call, which again never happened.

38.    Later on June 30, 2007, Mr. George called his fiancée Ms. Beauchamp. He told her that he was suffering and not getting help. He was crying and kept repeating that he was in really bad pain and that he loved her.

39.    Due to the lack of timely and appropriate care, and implementation of a proper protocol for treatment of his sickle cell crisis, Mr. George's condition worsened. On July 1, 2007, after Mr. George was discovered "unresponsive" in his bed, the County finally transferred him to Sutter, where he continued to receive inadequate and deficient medical care.

40.    Although Defendant County, Defendant CFMG, and Defendant Sutter were aware that Mr. George had previously been successfully treated for his sickle cell anemia at Kaiser Permanente Hospital, and despite Kaiser's easier proximity to the Facility, the Defendants County, CFMG and/or Sutter required that he be admitted to Sutter. In spite of Sutter's inability to properly treat Mr. George's sickle cell crisis, the Defendants County and Sutter refused numerous requests on the part of Mr. George's family and at least one doctor at Sutter to transfer Mr. George to Kaiser. Additionally, Mr. George's father, Plaintiff Donald George, volunteered to pay both to transport his son to Kaiser and for his subsequent care there if the County or Sutter moved him, but the Defendants still refused.

41.    On the morning of July 1, 2007, Mr. George was taken by ambulance to the emergency room at Sutter, exhibiting a "significantly altered level of consciousness" – he opened his eyes to voice and reacted to pain but could not communicate or respond to commands; in addition, his arms were rigid and he was incontinent. Mr. George was intermittently diaphoretic (sweating profusely), causing Defendant Hard to perform a diagnostic spinal tap.

8

42.    Mr. George's condition did not improve in the emergency room and he was admitted to the hospital.  The examination and intake was performed by Dr. Angus Matheson, who indicated that Mr. George was "lying in bed without purposeful movement;" that he was unresponsive to verbal commands and stimuli; that his eyes were reactive to light but did not follow objects; that he had a rapid heart rate; and that he was at risk of seizures.   Upon information and belief, Dr. Matheson was a member of a rotating group of physicians at Defendant Sutter attending to Mr. George's medical care.

43.    Hospital records indicate that Mr. George was diagnosed and treated primarily for an "altered mental status" rather than for the ongoing and severe sickle cell crisis at the root of these symptoms.   For example, Defendant Hard's Emergency Department Report indicates that his primary diagnosis was "altered sensorium," with its cause "unclear"; as a secondary diagnostic impression, Defendant Hard noted that Mr. George had a "history of sickle cell anemia" and may have sustained a "possible CVA [stroke] secondary to sickle cell."  Mr. George's inpatient problem list states that he had suffered a "recent sickle cell crisis" on June 29 and that the hospital had no management plan for this crisis apart from relying upon treatment originally provided in the Jail. Mr. George's discharge statement – written by Defendant Matel and later re-signed by Defendant Flinders – states that he was admitted to the hospital for "altered mental status," following a possible seizure, as opposed to sickle-cell related complications; however, in the medical staff's judgment (including that of the neurologist Defendant Janian), he might have been experiencing a "mild" or "very slight" sickle-cell crisis.

44.    At about 12:50 P.M. on July 1, 2007, Plaintiff's mother Valerie George and Ms. Beauchamp went to the Jail to visit Mr. George.  The cashier told them that Mr. George was not at the Facility and that she could not say where he was.  Ms. Beauchamp asked a guard if he had been taken to the hospital.  Valerie George and Ms. Beauchamp then went to Kaiser, assuming Mr. George had been taken there.  When he was not present, they returned home and began calling other hospitals including Sutter Medical Center to inquire if he had been admitted.  When they called Sutter, a Sergeant Chang, who apparently had Ryan under his custody there, came on the phone and

said that Mr. George was in Sutter but would not be permitted to receive calls or have visitors.

45.     At about 3:30 PM on July 1, 2007, Valerie George received a telephone call from Defendant Sutter, reporting that Mr. George had been taken there between 9:00 and 9:30 that morning after being found unconscious in his cell.  During this call, Dr. Matheson said he was "very scared for your son;" he couldn't understand why Mr. George had not been transferred to Kaiser, as medical records indicated that Kaiser was where Ryan's own doctors were located and where he ordinarily received sickle-cell treatment.  Dr. Matheson further stated that he had attempted to make County personnel aware of the seriousness of Mr. George's condition and the need to transfer him to Kaiser.  He suggested that Valerie George come to the hospital immediately.

46.     A nurse's report from approximately 5:00 P.M. on July 1, 2007 indicates that Ryan George remained "unchanged" – with "occasional eye opening and minimal leg movement," no verbal communication, and some motor response to pain.  A further intake assessment completed at approximately 6:20 P.M. recorded that he had "very limited," but not completely impaired, sensory perception and mobility and was still "bedfast" and unable to speak.  The assessment form indicated that upon his release from the hospital Mr. George would be handed over to a deputy sheriff and returned to the Jail.

47.     Following hours of telephone calls to the Sheriff's Department and Sutter, Valerie George was finally given permission to visit her son the evening of July 1, 2007; she arrived at the hospital accompanied by Donald George and Tajmah Beauchamp.  After waiting another hour and a half, Valerie George was finally allowed to enter the Emergency Room for about ten minutes; Donald George and Ms. Beauchamp were permitted to accompany her in turn.  Sergeant Chang from the Sheriff's Department told Mr. George's family members that this would be their one and only visit.  They observed that Mr. George  was unresponsive and did not recognize them or know where he was; his eyes were glazed and rolled over; his mouth was encrusted and white inside; he was connected to an IV and oxygen, wore a makeshift diaper, and looked almost dead.  Mr. George's family members were removed from the Emergency Room when Ms. Beauchamp began crying and praying over him.  During their brief visit, family members heard Sergeant Chang and

10

other corrections officers making jokes and laughing.

48.    During their visit, Dr. Matheson told Mr. George's family members that Ryan had suffered three minor strokes, that he had been given a spinal tap, and that he was partially conscious; however, he could not be given any pain medication because he was unable to ask for it. Sutter records confirm that despite Ryan George's inability to speak, Defendant Matel ordered that he "must verbalize" his need for oral pain medications before they could be administered.

49.    Dr. Matheson again advised that Mr. George should be taken to Kaiser and that he had notified the Sheriff's office accordingly.  Again, the Doctor suggested that Defendant Sutter and its medical staff had limited capacity to treat a sickle cell crisis and implied that Mr. George's life was in jeopardy as a result of the inadequate care he was receiving at Sutter and the failure to transfer him to Kaiser.

50.    Valerie George made numerous calls to the hospital and Jail on July 2, 2007, and was repeatedly hung up on.  She finally got to speak to one Lieutenant Toby, who said that there was "no way" that she would be able to see her son and refused to update his condition.  Later, Defendant Matel called from Sutter and said that Mr. George was still in poor physical condition – basically the same, mostly unresponsive, but showed slight improvement in that he moved his finger when pinched.  He reiterated that Mr. George could not be given pain medication because he was unable to ask for it.

51.    One of Mr. George's guards also contacted Valerie George, reporting that her son would be released the next day.  When she objected that Ryan was not fully conscious and that his status was still critical, the sergeant laughed and said "probably."  He reiterated that she was not permitted to see her son.  Ms. George told the sergeant that one of Ryan's long-time physicians had emphasized that he needed to be given lots of fluids and that the hospital should remain in constant contact with a sickle-cell specialist.

52.    A physical therapy consult from July 2, 2007 indicates that Ryan George remained non-verbal, appeared "lethargic" and "distant," was unable to follow cues or commands, and was unable to communicate with the therapist regarding a treatment regime.  In addition, a nurse's note

indicates that he responded to pain by flinching and moaning and that his eyes were open with a "glazed look."

53.    After repeatedly being hung up on by hospital staff, Ms. Beauchamp went to Sutter at approximately 9:30 PM on July 2, 2007 to obtain information on his condition.  She observed Mr. George in bed unable to open his mouth or register her presence and without an IV or oxygen – standard treatment for a sickle cell crisis.  (Hospital records confirm that all IV solutions had been discontinued as of that afternoon).  Upon being discovered, Ms. Beauchamp was made to leave and police officers told her that she would be arrested if she returned to the hospital.   As Ms. Beauchamp left the premises, she encountered the doctor taking over Mr. George's care and implored that he be given fluids and oxygen.

54.    On the morning of July 3, 2007, a corrections officer contacted Valerie George – in response to her repeated calls to Sutter and the Sheriff's Department to seek information about her son's condition – and told her that they were not allowed to divulge any information because Mr. George had not signed a waiver.  Ms. George replied that her son was physically unable to sign a waiver in his present state and that she was listed as his emergency contact.

55.    At approximately 1 PM on July 3, 2007, a family minister was able to visit Mr. George at Sutter.  The minister reported that Mr. George had no IV or oxygen and did not recognize him.  No other visits to Mr. George were permitted at either the hospital or Jail, despite increasingly desperate requests from his loved ones and supporters.

56.    Although Mr. George remained in a precarious condition – uncommunicative, incontinent, and bed-ridden -- Defendants County and Sutter transferred Mr. George back to the Jail on July 3, 2007.  Ryan George's neurological observation chart and progress notes and Defendant Matel's discharge summary indicate that his level of activity had "improved somewhat": he responded to pain and to some commands with moans, groans, and head-nodding.  While Sutter medical staff, including Defendants Matel, Janian, and Flinders, continued to diagnose Mr. George with an "altered mental status," they suspected him of "malingering."

57.    Upon Mr. George's discharge, Defendant Matel instructed that he be given pain pills

and encouraged to drink fluids, and that the jail physician should follow-up within 24 hours; Defendant Matel issued no other orders, placing Mr. George on the Jail's "regular diet" and directing "no limits on activity, no referrals, no special care, no special supplies."

58.     Ryan George was transported back to the Jail on the afternoon of July 3 and readmitted to the infirmary at Defendant Luders' instructions.  Again, Dr. Luders and the Jail's medical staff – including Defendant Dagey – prescribed pain killers but did not order an IV, despite notations that Mr. George was "uncooperative" and repeatedly "refused" fluids and medication. Mr. George remained incontinent and was fitted with a condom catheter.  CFMG's records further indicate that it took four men to lift him to his bunk.

59.     In addition, Mr. George's CFMG chart notes an issue – as indicated in Sutter's discharge summary – regarding whether he was experiencing an actual sickle crisis as opposed to "malingering."  Unfortunately, Mr. George was not "faking it," and his discharge from Sutter and subsequent treatment in the Jail resulted in his tragic death.

60.     Mr. George's family members contacted Defendant Sutter at about 6:30 P.M. on July 3, and were told that he had been "gone a while."  Valerie and Donald George and Ms. Beauchamp then went to the Jail to file official "letters of concern" – which they were told would be given to Defendant Dagey – but were not allowed to visit Mr. George.

61.     In their letters, Ryan George's family members stated that they had been trying to find out information about his status, as he had not called to let them know he was ok, and that no one had been willing to tell them anything.  Furthermore, Mr. George had been released from the hospital "still incoherent" and his family was concerned that he was not receiving the "proper treatment."  Mr. George's family members implored that he be given the necessary hydration and that Dr. Luders contact them to update his condition.  The following day, July 4, Valerie George's letter was sent to CFMG for follow-up.

62.     Mr. George's chart for July 4, 2007 contains a notation indicating that his catheter had leaked and that he was lying naked in his own urine; in addition, Mr. George was moaning and groaning and had not eaten that day.

13

63.     On July 4, 2007, Valerie George, Ms. Beauchamp, and Mr. Ben Terry, head of NAACP Sonoma County chapter, sought to visit Mr. George at the Jail and to inquire about his condition.  The staffer at the entrance desk informed them that Mr. George couldn't be seen as he was refusing visits.  When the family pressed to see Mr. George, a Sergeant Williams came down and reiterated that Mr. George refused to see them.  After Mr. Terry asked for this "refusal" in writing, Sergeant Williams went back into the jail, returning later to change her story and report that Ryan was not refusing the visit, but was unable to come down to see them.  We can't "make him come," the Sergeant added.  The family and Mr. Terry then implored the Detention Center to administer IV fluids to Ryan, to which the sergeant replied "This is a jail, not a hospital, and we're not set up like that."  Sergeant Williams also told the family and Mr. Terry that there were no doctors on hand due to the holiday and no medical treatment being given; furthermore, Mr. George was "property of the County" and could not be sent to Kaiser.  Mr. George's family members filed further letters of concern, stating that they had not been given any information about his status and pleading that they be updated on his condition.

64.     During the morning of July 5, Ms. Beauchamp contacted the Jail and was told by a nurse that Mr. George was doing "fine."  Then, at approximately 9 AM, Defendant Dr. Luders called Valerie George; he told her that Ryan was getting worse; Luders then asked Mrs. George, "What should I do?"  She responded that he needed to be taken to the hospital and Dr. Luders answered that that "wasn't a possibility."  Valerie George then urged him to call Ryan's doctor at Kaiser, stating, "you guys are going to kill my son."  Dr. Luders hung up.  Dr. Luders later called back and said that he had unsuccessfully attempted to contact Mr. George's regular physician.  He again hung up on Valerie George.

65.     Mr. George's file contains a notation on July 5 that Valerie George had requested that medical personnel consult with his doctor at Kaiser and that it seemed reasonable under the circumstances.  Upon information and belief, Dr.  Luders  finally spoke to a physician from Kaiser, Dr. Kodia, on or about the evening of July 5, reporting that Ryan was okay.  Dr. Kodia stated that he needed to Mr. George immediately; Dr. Luders responded that he would be unable to bring Mr.

14

George out of the Jail until at least the following week.

66.    On or about July 6, 2007, a lawyer for the family spoke to Defendant Dagey, who said that Mr. George did not have a sickle-cell crisis, as confirmed by Sutter; nevertheless, Mr. George would soon be given a consultation at Kaiser.

67.    On occasions not limited to those described above, Mr. George's mother, his fiancée, family members, and other concerned citizens, including Mr. Ben Terry, the local NAACP President, repeatedly tried to visit and contact Mr. George from the time they first learned he was suffering on or about June 28, 2007. Moreover, attorneys acting the at the request of Ryan's family also contacted Defendant County's Jail personnel in order to ascertain whether the County was providing Mr. George with needed care. The Defendant County and Defendant Sheriff's Department, including Defendant CFMG and its staff, and Defendant Sutter repeatedly refused to allow the family, concerned citizens and attorneys to see Mr. George and communicate with him. Invariably, the Defendant County and hospital employees were dismissive or openly hostile, and refused to divulge information about Mr. George's condition.

68.    Nevertheless, following his return to the Jail, Mr. George's family members learned that he was still unable to walk and largely unable to move; was lying naked in his cell; was not eating, drinking, or speaking; was in pain; and remained incontinent. In at least one instance, Mr. George's mother was told that he was not permitted to accept visitors because he could not get up and get himself dressed.

69.    Various notations in Mr. George's chart confirm that he remained incontinent, that he was lying in his own urine, that he had limited mobility, and that he was having difficulty eating and drinking. One such notation indicates that Mr. George's urine was dark amber in color.

70.    Upon information and belief, the guards repeatedly taunted Mr. George, telling him over and over that he was faking.

71.    The various efforts and pleas of Mr. George's family members and other concerned interveners went rebuffed or ignored. Instead, under Defendants' neglect and disregard, Mr. George continued to deteriorate to the point where he was lying naked, alone on a rubber bed sheet without

proper medical care or assistance. Mr. George died alone in his cell on or about July 9, 2007.

72.    On the morning of July 9, 2007, Mr. George was found dead in his cell with a dark green fluid coming from his eyes and mouth. Mr. George's death certificate indicates that he died of dehydration caused by sickle cell anemia.

73.    The Defendant County failed to provide adequate medical care for Ryan George. The Defendant County and Sheriff's Department, and their Deputies, Corrections Officers, physicians and nurses, did not heed and respond appropriately to Ryan George's requests for medical attention, despite his intense pain and complaints. All Defendants, including the County's agent Defendant CFMG did not provide Mr. George adequate, proper and sufficient care when it became aware of his complaints and condition, and therefore, failed to timely and adequately provide him satisfactory medical care for his sickle cell anemia condition. Defendant County, which is responsible for the acts of the Detention Center and Defendant Sheriff's Department, and Defendant CFMG, improperly transferred Mr. George to Defendant Sutter Medical Center, where he continued to receive substandard and negligent treatment and to be neglected in his basic medical and personal needs. Instead of promptly transferring him to a facility that could properly treat him, such as Kaiser, Defendants returned Mr. George to the Detention Center on July 3 in a non-communicative and incapacitated state. Mr. George continued to rot in the detention center – with his family prevented by the County from seeing him or communicating with him – until he died alone and unattended in his jail cell.

74.    Ryan George would not have suffered and died had Defendant County and its employees and agents, including Defendants CFMG and Sutter, provided him the necessary, adequate, and timely medical attention and intervention he required and was entitled to for his sickle cell anemia.

## VI.

## STATEMENT OF DAMAGES

75.    As a result of the acts and/or omissions of Defendants, Ryan George was deprived of various constitutional and statutory rights; and was further hurt and injured in his health, strength,

and activity, sustaining injury to his person, all of which injuries caused Ryan George great mental, physical, and nervous pain and suffering and severe emotional distress. The injuries resulted in Ryan George's death.

76. As a further result of the acts and/or omission of defendants, Ryan George's family, including his mother, father, fiancée, infant son, and then-unborn child have been deprived of the care, companionship, and support of their loved one and have experienced and continue to experience great mental and emotional pain and suffering.

77. The acts and/or omissions of Defendants, as alleged in this complaint were malicious and/or oppressive -- done with a willful and conscious disregard for the constitutional rights and basic welfare and safety of Ryan George and for the emotional well-being of his family members, and subjecting Mr. George and his family to cruel and unjust hardship. Furthermore, Defendants' actions in intentionally misrepresenting or concealing essential facts about Mr. George's condition were fraudulent and caused his family members injury. Plaintiffs therefore pray for an award of punitive and exemplary damages in an amount that will be stated according to proof.

78. Plaintiffs retained counsel to represent them in this matter and are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 as well as Cal. Civ. Code § 52, Cal. Welfare and Institutions Code § 15657, and Cal. Health and Safety Code § 1317.6(j).

## VII

## NOTICE TO PUBLIC ENTITIES FOR STATE TORT CLAIMS

79. On December 18, 2007, Plaintiff Valerie George – seeking to provide notice of the family's and estate's claims arising from the mistreatment and wrongful death of Ryan George – presented a written COUNTY OF SONOMA claim form pursuant to California Government Code § 910, *et seq.* Plaintiffs duly amended this claim form on February 20, 2008, in order to clarify the identity of the claimants, without changing the substance of the claims and allegations. Plaintiffs have complied with all applicable claim statutes.

80. Defendant COUNTY OF SONOMA rejected Valerie George's claim on April 4, 2008, providing notice that she had six months to commence a legal action. Defendant County

further rejected the amended claim form – asserting claims by (1) Ms. George on behalf of the Estate of Ryan George, (2) Ms. George on behalf of Mr. George's children and heirs Jaida George and Ryan George Jr., (3) Donald George, and (4) Ms. Beauchamp – as untimely.

81.     On May 8, 2008, without conceding that their claims were untimely, Plaintiffs petitioned the County for leave to submit late claims pursuant to Cal. Govt. Code § 911.4.  The County rejected the application without explanation on June 20, 2008, specifying that Plaintiffs had six months to file a court petition pursuant to Cal. Govt. Code § 945.6 for leave to file their claims.

82.     Despite the County's determination, Plaintiffs have timely filed their Notice of Claim and the Complaint in this matter within all applicable time limitations.   Alternatively, Plaintiffs will submit a petition to this Court pursuant to Cal. Govt. Code § 945.6 for leave to file their Notice of Claim.

## COUNTS ON BEHALF OF THE ESTATE

### FIRST CAUSE OF ACTION

**(42 U.S.C. §1983 – Cruel and Unusual Punishment:**
**Deliberate Indifference to Serious Medical Needs)**
**(All Defendants)**

83.     Plaintiffs incorporate by reference and reallege each allegation made in all prior paragraphs as if alleged in full herein.

84.     In doing the acts and/or omissions alleged herein, Defendants were deliberately indifferent to the serious medical needs of Ryan George, which caused unnecessary and wanton infliction of pain and physical injury on Mr. George, resulting in his death, and resulted in the violation of his rights under the Eighth Amendment of the United States Constitution.

85.     By failing to properly screen, train, supervise, and/or discipline its personnel, Defendants COUNTY OF SONOMA, SHERIFF'S DEPARTMENT, and the SHERIFF BILL COGBILL subjected Ryan George to unnecessary and wanton infliction of pain and physical injury, resulting in his death, thereby violating his rights under the Eighth Amendment of the United States Constitution.

86.     By authorizing, ratifying, and/or condoning the acts and omissions of their co-Defendants, Defendants COUNTY OF SONOMA, SHERIFF'S DEPARTMENT, and SHERIFF BILL COGBILL subjected Ryan George to the unnecessary and wanton infliction of pain and physical injury, resulting in his death, thereby violating his rights under the Eighth Amendment of the United States Constitution.

87.     The acts and omissions complained of herein were done pursuant to customs and policies authorized, condoned, ratified and carried out by all Defendants that resulted in delayed and denied medical care for the purposes of saving money at the risk of inmates' health, and/or for inflicting physical and mental abuse on inmates as retribution in furtherance of a policy of misuse of power over inmates incarcerated in Sonoma County.

88.     The wanton and callous disregard of Ryan George's obvious and known serious medical needs – including, but not limited to, unreasonable delays in providing treatment; the refusal to transfer and release him to an appropriate medical facility even after his continued degeneration in the Jail and lack of sufficient improvement at Sutter; the transfer of Mr. George back to the Jail despite his incapacitated and critical condition; and the subsequent abandonment of Mr. George in his cell until his demise – essentially transformed a jail term of several months into a death sentence.   All Defendants subjected Ryan George to cruel and unusual punishment in violation of his rights under the Eighth Amendment to the United States Constitution.

89.     WHEREFORE, Plaintiffs pray for compensatory damages, and for punitive damages as allowed by law.

## SECOND CAUSE OF ACTION

### (42 U.S.C. §1983 – Inhumane Conditions of Confinement:

### Deprivation of Basic Necessities of Life)

### ( Defendants County, Sheriff's Department, Cogbill, CFMG, Luders)

90.     Plaintiffs incorporate by reference and reallege each allegation made in all prior paragraphs as if alleged in full herein.

91.     In addition to failing to respond to Ryan George's serious need for medical care and

treatment, Defendants were deliberately indifferent to his health and safety in neglecting his fundamental human needs for food, water, clothing, and basic hygiene. For example, CFMG's records indicate that Ryan George was given only one shower following his return to the Jail – during which he urinated and defecated on himself and was unable to assist the guards washing him. Furthermore, despite Defendants' awareness that Mr. George was unable to dress himself, they simply dropped clean blankets and/or clothing on or near his bunk without providing assistance.

92.    As a result, all Defendants named above and such Does as were employed by these Defendants subjected Ryan George to unnecessary and wanton infliction of pain and physical injury in violation of his rights under the Eighth Amendment.

93.    WHEREFORE, Plaintiffs pray for compensatory damages, and for punitive damages as allowed by law.

### THIRD CAUSE OF ACTION

### (42 U.S.C. § 1983 – Deprivation of Life Without Due Process)

### (All Defendants)

94.    Plaintiffs incorporate by reference and reallege each allegation made in all prior paragraphs as if alleged in full herein.

95.    By the acts and omissions described above – including wantonly and callously allowing Ryan George to degenerate, suffer, and die instead of adopting simple life-saving measures and procedures – the Defendants deprived Ryan George of his health, strength, and activity, and ultimately his life, without due process of law in violation of the Fourteenth Amendment to the Untied States Constitution.

96.    WHEREFORE, Plaintiffs pray for compensatory damages, and for punitive damages as allowed by law.

## FOURTH CAUSE OF ACTION

### (42 U.S.C. § 1983—Violation of Bodily Privacy/

### Unnecessary and Wanton Infliction of Pain/ Deprivation of Liberty Interest)

### (Defendant County, Sheriff's Department, Cogbill, CFMG, Luders, Dagey)

97.    Plaintiffs incorporate by reference and reallege each allegation made in all prior paragraphs as if alleged in full herein.

98.    As alleged above, Defendants abandoned Ryan George naked and incontinent in his cell for several days leading to his death.  Defendants were aware that Mr. George was unable to dress himself and merely tossed blankets or clothing into his cell without providing assistance.

99.    Upon information and belief, during this entire period, Mr. George was visible to and observed by other inmates and Jail employees, including members of the opposite sex.

100.    Defendants' actions and omissions therein were excessive, vindictive, harassing, and wholly unrelated to institutional security or any other legitimate penological objective.  Reasonable and readily available alternatives existed to protect Mr. George's privacy and dignity, including but not limited to providing bodily coverage consistent with his condition and/or transferring him to an outside medical facility where he could be cared for and attended to properly.

101.    As a result, Defendants callously, maliciously, and gratuitously subjected Mr. George to extreme degradation, humiliation, anguish, brutality and the unnecessary and wanton infliction of pain and accordingly violated his rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

102.    WHEREFORE, Plaintiffs pray for compensatory damages, and for punitive damages as allowed by law.

## FIFTH CAUSE OF ACTION

### (Negligence – California Government Code § 844.6(d)- Defendant Cogbill)

### (Negligence- Defendants CFMG, Luders, Dagey, Sutter, Hard, Flinders, Matel, and Janian)

103.    Plaintiffs incorporate by reference and reallege each allegation made in all prior paragraphs as if alleged in full herein.

104.    Defendants BILL COGBILL, CALIFORNIA FORENSIC MEDICAL GROUP., INC., JAMES LUDERS, M.D., MICHAEL E. DAGEY, R.N., SUTTER HEALTH, SUTTER MEDICAL CENTER OF SANTA ROSA, EDWARD W. HARD, M.D., RICHARD FLINDERS, M.D., JOSEPH N. MATEL, M.D., NORICK JANIAN, M.D., and DOES 1 through 25, owed Ryan George, as an inmate in Defendants' custody, care and control, a duty of due care to protect his health and physical safety.

105.    Defendants were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as custodians and/or health care providers to Ryan George. It was foreseeable that as a result of Defendants' acts and omissions, as described above, Ryan George's sickle cell crisis would worsen, resulting in his physical injury, incapacitation, suffering, and death.

106.    WHEREFORE, Plaintiffs pray for compensatory damages, and for punitive damages as allowed by law.

## SIXTH CAUSE OF ACTION

**(Failure to Summon Medical Care for Inmate – Cal. Government Code § 845.6)**
**(Defendants County, Sheriff's Department, Cogbill)**

107.    Plaintiffs incorporate by reference and reallege each allegation made in all prior paragraphs as if alleged in full herein.

108.    Defendants had a mandatory duty under California Government Code § 845.6 to summon medical care for inmates whom they knew, or had reason to know, required immediate medical care.

109.    Defendants failed to discharge their duty imposed by California Government Code § 845.6.

110.    As a direct and proximate result of Defendants' acts and/or omissions, hereinabove described, Ryan George suffered severe physical injury and trauma, resulting in his painful and untimely death.

111.    Defendants COUNTY OF SONOMA, SONOMA COUNTY SHERIFF'S

DEPARTMENT, and BILL COGBILL are liable for their employees' breach of their duty to summon required immediate medical care while acting in the course and scope of their employment under the doctrine of *respondeat superior*.

112.    WHEREFORE, Plaintiffs pray for compensatory damages, and for punitive damages as allowed by law.

## SEVENTH CAUSE OF ACTION

### (Failure to Discharge Mandatory Duty – California Government Code § 815.6)

### (Defendants County, Sheriff's Department)

113.    Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

114.    California Government Code § 815.6 makes a public entity liable for its failure to discharge a mandatory duty imposed by an enactment designed to protect against the risk of a particular kind of injury.

115.    California Government Code § 845.6 imposes such a mandatory duty.  The purpose of § 815.6 is, in part, to ensure the safety and health of inmates and to provide inmates with medical care when the need for medical care becomes apparent.

116.    Defendants breached the mandatory duty owed to Ryan George pursuant to California Government Code § 845.6.  As set forth herein, Defendants' breach of said duty causes the type of harm to Ryan George that the enactment was designed to prevent.

117.    Furthermore, Defendants had a duty to provide reasonable and adequate medical services to inmates within their care and custody.  Upon information and belief, despite actual or constructive knowledge of the inadequacy of its health services, including numerous avoidable injuries and inmate deaths,  Defendants retained CFMG as the Jail's medical provider and failed to sufficiently staff and equip its medical facilities.  Moreover, Defendants enacted, enforced, and/or ratified a custom, practice, or policy of declining to refer inmates for outside medical care in all but the most extreme circumstances, and requiring that outside care be provided at Sutter even for those conditions – such as Ryan George's sickle-cell crisis – that it knew or should have known Sutter

23

was unequipped to handle. In addition, Defendants interfered with the independent medical judgment of Sutter and its personnel, urging or requiring that inmates such as Mr. George be returned to the Jail as soon as possible, even where they remained in need of hospital treatment.

118.    Defendants' failure to provide both sufficient health services inside the Jail and necessary outside care was for the purposes of saving money at the risk of inmates' health, and/or for inflicting physical and mental abuse on inmates as retribution in furtherance of a policy of misuse of power over inmates incarcerated in Sonoma County.

119.    WHEREFORE, Plaintiffs pray for all damages allowed by law.

## EIGHTH CAUSE OF ACTION

### (Medical Malpractice)

### (Defendants CFMG, Luders, Sutter, Hard, Flinders, Matel, Janian)

120.    Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

121.    Defendants CALIFORNIA FORENSIC MEDICAL GROUP., INC., JAMES LUDERS, M.D., MICHAEL E. DAGEY, R.N., SUTTER HEALTH, SUTTER MEDICAL CENTER OF SANTA ROSA, EDWARD W. HARD, M.D., RICHARD FLINDERS, M.D., JOSEPH N. MATEL, M.D., NORICK JANIAN, and all medical DOES, owned a duty to Ryan George to use the care and skill ordinarily exercised in like cases by reputable members of their medical professions. Said Defendants owned a further duty to Ryan George to use reasonable diligence and their best judgment in the exercise of their professional skills.

122.    Defendants breached their duty of care to Ryan George. Defendants were negligent and their conduct fell below a reasonable standard of care in their medical care and treatment of Ryan George. Defendants' breaches include, but are not limited to, unreasonable delays or denials of necessary care and treatment, failure to transfer Mr. George to an appropriate medical facility or to consult with his regular physicians, improper diagnoses and treatment regimes, failure to take Mr. George's condition sufficiently seriously either due to his status as a prisoner or to a false sense that he was faking, transferring Mr. George back to the Jail while still in a precarious or critical

condition and without proper instructions, and outright neglect of his medical and personal needs.

123.    It was foreseeable that as a result of such conduct, Ryan George would suffer harm. As a direct and proximate result of such conduct, Ryan George suffered severe physical injury and trauma, resulting in his painful and untimely death.

124.    WHEREFORE, Plaintiffs pray for compensatory damages and punitive damages as allowed by law.

## NINTH CAUSE OF ACTION

**(42 U.S.C. § 1395dd—Emergency Medical Treatment and Active Labor Act ("EMTALA") -- "Patient Anti-Dumping Act")**
**(Defendant Sutter)**

125.    Plaintiffs incorporate by reference and reallege each allegation made in all prior paragraphs as if alleged in full herein.

126.    Ryan George came to Sutter for emergency treatment relating to his life-threatening sickle-cell crisis.  Hospital personnel determined that he had an emergency medical condition which placed his life and health in serious jeopardy and which created a serious risk of bodily impairment or dysfunction.

127.    At the time of his release from Sutter, Ryan George clearly remained in an emergency medical condition as defined by 42 U.S.C. § 1395dd(e)(1).  Defendant Sutter and its personnel knew or should have known that Ryan George's condition was not yet stabilized within the meaning of 42 U.S.C. § 1395dd(e)(3) and that allowing him to be released to the Jail would likely result in the material deterioration of his condition and a substantial risk of death or serious bodily harm.

128.    Furthermore, Defendant knew or should have known that the Jail's medical facilities lacked the capacity to treat Ryan George's ongoing sickle cell emergency and that the Jail was not an appropriate facility for him to be transferred to under the statute.

129.    Nevertheless, despite Defendant's better judgment, it allowed Mr. George to be discharged and transferred back to the Jail in violation of 42 U.S.C. § 1395dd(c).  Moreover,

Defendant failed to follow the statute's protocol for the transfer of a patient in a non-stabilized emergency medical condition.

130.    Upon information and belief, acting under pressure or directions from County and Sheriff's Department personnel, Defendant intended to discharge Mr. George to the Jail after a certain time period and/or following minimal improvement in his mental status, regardless of whether or not his sickle-cell crisis – manifested largely in neurological symptoms – was sufficiently stabilized within the meaning of the statute.

131.    These statutory violations give rise to strict liability for Ryan George's resulting injuries.

132.    As a result of Defendant's denial of essential emergency care, Ryan George suffered severe physical injury and trauma, resulting in his painful and untimely death.

133.    WHEREFORE, Plaintiffs pray for all relief provided by 42 U.S.C. § 1395dd(d)(2), including compensatory damages and punitive damages as allowed by law.

## TENTH CAUSE OF ACTION

**(Cal. Health & Safety Code §§ 1317, et seq. —Denial of Emergency Services and Care/**
**Improper Transfer of Emergency Patient for Non-Medical Reasons)**
**(Defendant Sutter)**

134.    Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

135.    Ryan George came to Sutter for treatment of an emergency medical condition within the meaning of Cal. Health & Safety Code § 1317.1(b) and was diagnosed by Sutter personnel as having such a condition.

136.    Nevertheless, Defendant cut short Ryan George's treatment without relieving, eliminating, or stabilizing his sickle cell crisis and while his health and safety remained at serious and immediate risk.    Instead, for non-medical reasons, Defendant improperly discharged and transferred Ryan George to the Jail despite knowing that the transfer created a medical hazard to

Ryan George and that the Jail's health facilities were unequipped to treat his condition.

137.    Defendant's actions as described herein violated Cal. Health & Safety Code §§ 1317 and 1317.2, and caused Ryan George severe physical injury and trauma, resulting in his painful and untimely death.

138.    WHEREFORE, Plaintiffs pray for all relief provided by Cal. Health & Safety Code § 1317.6(j), including compensatory and punitive damages and reasonable attorney's fees.

### ELEVENTH CAUSE OF ACTION
#### (Patient Abandonment/Improper Withdrawal of Treatment)
#### (Defendants Sutter, Flinders, Matel)

139.    Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

140.    Defendants undertook an obligation to provide treatment for Ryan George's life-threatening sickle cell medical emergency.

141.    At the time of his discharge, Ryan George remained in critical and unstable condition and at grave risk of serious physical injury or death.  Upon information and belief, Defendants knew or should have known that Ryan George required continued medical attention, that he was not in a suitable state to be transferred back to the Jail, that his ongoing sickle cell crisis could not be properly treated within the Jail, and that he faced severe and potentially lethal consequences as a result of the termination of hospital-based acute care and transfer back to the Jail.

142.    Pursuant to California common law, Defendants are liable for withdrawing treatment from their patients without due notice and the opportunity to secure alternative care.  Under the circumstances, releasing Mr. George to the Jail without stabilizing and alleviating his sickle cell crisis offered *no* possibility of an adequate substitute but became an effective death sentence.

143.    As a direct and proximate result of such conduct, Ryan George suffered severe

physical injury and trauma, resulting in his painful and untimely death.

144.    WHEREFORE, Plaintiffs pray for compensatory damages and punitive damages as allowed by law.

## TWELFTH CAUSE OF ACTION

### (Reckless or Malicious Neglect of Dependent Adult –
### California Welfare and Institutions Code § 15657)
### (All Defendants)

145.    Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

146.    Ryan George was known by Defendants to have sickle cell anemia, as a result of which he experienced periodic "crises" involving acute pain and incapacitation.

147.    During the sickle cell crisis lasting from approximately June 28, 2007 until his death on or about July 9, 2007, including his July 1-3 admission to Sutter Medical Center (a 24-hour hospital within the meaning of Cal. Health and Safety Code § 1250), Ryan George was a "dependent adult" as defined by Cal. Welfare and Institutions Code § 15610.23.

148.    Defendants' conduct described herein constitutes "neglect" (as defined in Cal. Welfare and Institutions Code § 15610.57) of a dependent adult within their care or custody.

149.    The actions and omissions on the part of Defendants rise to the level of reckless, oppressive, or malicious neglect, independently actionable under Cal. Welfare and Institutions Code § 15657. In failing to provide care to Mr. George and to attend to his basic needs, Defendants consciously disregarded the high degree of danger to his health, safety, and wellbeing and ultimately the serious risk to his life.

150.    As a result of this egregious misconduct, Mr. George experienced extreme physical and mental pain and suffering, including severe emotional distress, prior to his death.

151.    WHEREFORE, Plaintiffs pray for compensatory damages, and for punitive damages as allowed by law.

## THIRTEENTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress)

### (Defendants Cogbill, CFMG, Luders, Dagey Sutter, Hard, Flinders, Matel, Janian)

152.    Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

153.    Defendants owed Ryan George a duty of care to avoid exposing him to foreseeable harm.  Defendants were negligent and fell below a reasonable standard of care when they did the acts described in the previous causes of action.

154.    It was foreseeable that as a result of Defendants' actions and inactions Ryan George would suffer psychological and physical harm, and as a result, would suffer extreme emotional and psychological distress and trauma.

155.    In fact, and as a direct and proximate result of Defendants' actions and inactions, suffered psychological and physical harm – resulting in his painful and untimely death – and extreme emotional and psychological distress and trauma in the days prior to his death.

156.    Plaintiffs' claim is not precluded by Cal. Code of Civ. Pro. § 377.34 as it piggybacks plaintiffs' Twelfth Cause of Action or, in the alternative, proceeds solely for economic and/or punitive damages.

157.     WHEREFORE, Plaintiffs pray for compensatory damages and punitive damages as allowed by law.

## FOURTEENTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

### (Defendants Cogbill, CFMG, Luders, Dagey, Flinders, Matel)

158.    Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

159.    The above described conduct of Defendants was calculated to cause or stood in reckless disregard of the possibility of causing, and did in fact, cause Ryan George substantial mental anguish, grief, humiliation, and extreme mental and emotional distress.

160.    As a proximate result of the outrageous conduct of Defendants, Mr. George suffered extreme mental and emotional distress.

161.    The acts and omissions of defendants were done intentionally and/or in callous disregard for the comfort, safety, health and wellbeing of Mr. George and were further done for the purpose of saving costs at the expense of his obvious medical needs and distress and/or for the purpose of humiliating, oppressing, and inflicting emotional and mental distress upon Mr. George, and such conduct was done with the intent to deprive him of his constitutional rights or in willful and wanton disregard for those rights.

162.    Plaintiffs' claim is not precluded by Cal. Code of Civ. Pro. § 377.34 as it piggybacks plaintiffs' Twelfth Cause of Action or, in the alternative, proceeds solely for economic and/or punitive damages.

163.    WHEREFORE, Plaintiffs pray for compensatory damages and punitive damages as allowed by law.

### FIFTEENTH CAUSE OF ACTION

### (Cal. Civ. Code § 52.1—Bane Civil Rights Act)

### (Defendants County, Sheriff's Department, Cogbill, CFMG)

164.    Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

165.    As alleged above, Defendants violated various constitutional and statutory rights belonging to Ryan George.

166.    Such violations were accompanied by threats, intimidation, or coercion on the part of Defendants.  Defendants interfered with or attempted to interfere with Mr. George's rights through threats, intimidation, or coercion.

167.    As a result, Plaintiffs pray for all damages allowable under Cal. Civ. Code § 52.1 (incorporating by reference Cal. Civ. Code § 52), including but not limited to actual damages,

exemplary damages, civil penalties, and attorney's fees.

<u>COUNTS ON BEHALF OF RYAN GEORGE'S FAMILY MEMBERS</u>

<u>SIXTEENTH CAUSE OF ACTION</u>

**(42 U.S.C. § 1983 – Due Process – Deprivation of Familial Relationships)**

**(On Behalf of Valerie George, Donald George, Tajmah Beauchamp,**

**Jaida George, and Ryan George Jr.)**

**(All Defendants)**

168.    Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

169.    By virtue of Defendants' egregious conduct as alleged above, including Defendants' deliberate indifference to Ryan George's serious medical needs and their refusal to provide timely and adequate care as well as food, water, clothing, and basic hygiene, Ryan George suffered an untimely, unnecessary, and easily preventable death.

170.    As a result, Ryan George's immediate family members were deprived of their constitutional right to familial association, society, and companionship, in violation of the Fourteenth Amendment to the United States Constitution.

171.    In doing the alleged acts and omissions, Defendants were deliberately indifferent to Plaintiffs' constitutional familial rights, demonstrating reckless and callous disregard for such rights.  Furthermore, Defendants acted maliciously, wantonly, and oppressively pursuant to the customs and policies asserted above.

172.    WHEREFORE, Plaintiffs pray for compensatory damages, and for punitive damages as allowed by law.

<u>SEVENTEENTH CAUSE OF ACTION</u>

**(Wrongful Death- California Code of Civil Procedure § 377.60)**

**(On Behalf of Jaida George and Ryan George, Jr.)**

**(All Defendants)**

173.    Plaintiffs incorporate by reference and reallege each allegation made in all prior

31

paragraphs as if alleged in full herein.

174.    As alleged above, Mr. George died as a result of Defendants' various wrongful acts and omissions including the unlawful and egregious failure to provide proper and adequate medical attention and care and to provide for his basic needs during his incapacitating health crisis.

175.    Mr. George's heirs, namely his two infant children, Jaida George and Ryan George, Jr., have suffered and continue to suffer loss of society, companionship, comfort, care, guidance, financial support, and other parental services as a result of their father's preventable death.

176.    WHEREFORE, Plaintiffs pray for all damages as allowed by law.

## EIGHTEENTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)
### (On Behalf of Valerie George, Donald George, and Tajmah Beauchamp)
### ((Defendants Cogbill, CFMG, Luders, Dagey, Sutter, Hard, Flinders, Matel, Janian)

177.    Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

178.    Defendants blatantly and egregiously neglected the urgent medical and personal needs of Ryan George, resulting in his foreseeable and preventable death.

179.    During this episode, Mr. George communicated his serious health condition, Defendants' ongoing and callous misconduct in responding to his sickle cell crisis, and his severe pain, distress, and anxiety in pleas for help to his family members, including his mother Valerie George, father Donald George, and fiancée (and his children's mother) Tajmah Beauchamp.

180.    On July 1, 2007, these family members visited Mr. George at Sutter, where they observed him in a severely debilitated condition.  They were informed that Mr. George had not been given any pain medication, including for a notoriously painful spinal tap procedure.  One doctor also told them that he was scared for Ryan, who should be immediately transferred to Kaiser, implying that Ryan's life was in danger as a result of the continuing failure to do so (and the corresponding failure to provide equivalent and proper care at Defendant Sutter).

181.    Mr. George's family members and others including concerned citizens and attorneys

32

repeatedly attempted to intervene on his behalf. However, their requests to visit Mr. George were refused, as well as their demands that Mr. George be given appropriate medical care and attention. Ordinarily, these family members would have been responsible for treatment decisions during his incapacitating health crisis; however, even their offers to pay for life-saving measures were flatly rejected. Instead of being permitted to aid Mr. George, his family was forced to sit helplessly by, with Defendants' knowledge, while he was unlawfully abandoned and jettisoned by the Sutter Defendants and while he rotted and died under all Defendants' sorely lacking care.

182. It was eminently foreseeable that Mr. George's immediate relatives, who had visited and contacted him on a regular basis prior to his sickle cell crisis and who desperately and vainly sought to help him, would suffer extreme emotional distress during his painful convalescence, during their harrowing and frantic ordeal to save his life, and as a result of his untimely death.

183. Mr. George's closest family members were percipient witnesses to his pain, suffering, and incapacitation at the time of its occurrence as well as to the Defendants' ongoing and continuous tortious acts or omissions responsible for his distress, degeneration, and ultimate demise. Alternatively, under the circumstances of this case, Defendants owed them a direct duty of care.

184. WHEREFORE, Plaintiffs pray for compensatory damages and punitive damages as allowed by law.

<u>**NINETEENTH CAUSE OF ACTION**</u>

**(Intentional Infliction of Emotional Distress)**

**(On Behalf of Valerie George, Donald George, and Tajmah Beauchamp)**

**(Defendants Cogbill, CFMG, Luders, Dagey, Flinders, Matel)**

185. Plaintiffs incorporate by reference and reallege herein each allegation in all prior paragraphs as if alleged in full herein.

186. The above described conduct of Defendants – encompassing but not limited to the refusal of his family members' numerous requests to visit Ryan George while he was at significant risk of death, to verify his safety and wellbeing, and to ensure proper and effective treatment including palliative care, as well Mr. George's unlawful and shocking discharge and transfer back

to the Jail – was extreme and outrageous and was calculated to cause Mr. George's family members or in reckless disregard for the likelihood of causing them substantial mental anguish, grief, humiliation, and extreme mental and emotional distress.

187.   As a proximate result of the conduct of Defendants, Mr. George's family members suffered extreme mental and emotional distress to their damage in a sum that will be stated according to their proof.

188.   The acts and omissions of Defendants were done intentionally and in callous disregard for the comfort, health and wellbeing of Ryan George and for the purpose of humiliating, oppressing, and inflicting emotional and mental distress upon Ryan George and his known family members.

189.   WHEREFORE, Plaintiffs pray for compensatory damages and punitive damages as allowed by law.

## JURY DEMAND

190.   Plaintiffs hereby demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants, as follows:

1.   Compensatory damages in the amount of $15,000,000, as allowed by law;

2.   Nominal damages on all counts;

3.   Punitive damages in the amount of $10,000,000, as allowed by law;

4.   Costs of suit herein incurred;

5.   Attorneys' fees pursuant to applicable law; and

6.   For such other and further relief as this Court deems just and proper.

Date: September 2, 2008

Sanford Wittels & Heisler, LLP

By: _____/s/ Steven L. Wittels_____
      Steven L. Wittels

Sanford Wittels & Heisler, LLP
950 Third Ave, 10th Floor
New York, New York 10022
Telephone: (646) 723-2947
Facsimile: (646) 723-2948
swittels@nydclaw.com
*Admitted Pro Hac Vice*

David W. Sanford
Sanford Wittels & Heisler, LLP
1666 Connecticut Ave, N.W., Suite 310
Washington, D.C. 20009
Telephone: (202)742-7780
Facsimilie: (202) 742-7776
dsanford@nydclaw.com
*Admitted Pro Hac Vice*

*Lead Counsel for Plaintiffs*

Law Office of Tanya Brannan
419 Orchard Street
Santa Rosa, California  95402
(707) 887-0865
brannanlaw@comcast.net
*Co-Counsel for Plaintiffs*

Law Offices of Grant Morris
1666 Connecticut Ave., N.W., Suite 310
Washington, DC 20009
Telephone: (202) 742-7777
Facsimile: (202) 742-7776
grantmorris@grantmorrislaw.com
*Pending Pro Hac Vice Admission*
*Co-Counsel for Plaintiffs*