1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VALERIE GEORGE, et al.,

      Plaintiffs,

  v.

SONOMA COUNTY SHERIFF'S DEPT.,
et al.,

      Defendants.

_____/

No. C-08-02675 EDL

**ORDER GRANTING IN PART AND
DENYING IN PART SUTTER
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND
GRANTING IN PART AND DENYING IN
PART DEFENDANT NORICK JANIAN'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

      This action arises from the death of Ryan George on July 9, 2007 while he was in the custody of the Sonoma County Sheriff's Department, and after he had received allegedly inadequate medical care from medical staff at the Sonoma County Main Adult Detention Facility and at Sutter Medical Center of Santa Rosa.  Now before the Court are: (1) Sutter Health's and Sutter Medical Center of Santa Rosa's ("the Sutter Defendants") Motion for Summary Judgment or in the Alternative, Summary Adjudication; and (2) Defendant Norick Janian's Motion for Partial Summary Judgment.  Doctor Janian is a physician at Sutter Medical Center who participated in Ryan's medical care in July 2007.  On July 13, 2010, the Court held a hearing on these motions, which were fully briefed.  For the reasons stated at the hearing and below, the Court issues the following Order.

**Legal Standard**

      Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts are those

**United States District Court**
For the Northern District of California

1   which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

2   (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury

3   to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most

4   favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn

5   from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The

6   court must not weigh the evidence or determine the truth of the matter, but only determine whether

7   there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

8        A party seeking summary judgment bears the initial burden of informing the court of the

9   basis for its motion, and of identifying those portions of the pleadings and discovery responses that

10  demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

11  323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively

12  demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue

13  where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

14  merely by pointing out to the district court that there is an absence of evidence to support the

15  nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party "may

16  not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts

17  showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  If the

18  nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to

19  judgment as a matter of law."  Celotex, 477 U.S. at 323.

20  **Facts**

21       On May 31, 2007, Ryan George was incarcerated at the Sonoma County Main Adult

22  Detention Facility.  See Declaration of Steve Wittels Ex. 15.  On June 28 and 29, 2007, Ryan

23  submitted inmate medical request forms seeking medical attention for a sickle cell crisis.  See id. at

24  Ex. 11, 20.  Ryan received some medical attention at the jail, and was transferred to Sutter Medical

25  Center of Santa Rosa for treatment on July 1, 2007.  See id. at Ex. 21, 22, 23.

26       In the emergency department at Sutter Medical Center on July 1, Ryan was examined by Dr.

27  Edward Hard and Dr. Angus Matheson.  See Declaration of Larry Thornton Ex. A at A-4 to A-5, A-

28  36 to A-41.  His heart rate was 144, blood pressure 139/86, respiratory rate 24, oxygen saturation

98% and rectal temperature 100.1.  Id. at A-8.  According to the medical records, he was non-verbal,

diaphoretic and stiff, and his Glascow coma score was 7.[1]  See id. at A-8 to A-10.  He moved all of

his extremities and responded to pain, and his pupils were equal and reactive to light.  See id. at A-4,

A-8, A-37.  Ryan received supplemental oxygen and intravenous hydration, and underwent lab tests,

a brain CT scan, a head MRI, a chest X-ray and a lumbar puncture.  See id. at A-4 to A-5, A-8 to A-

9, A-36 to A-41, A-76 to A-77, A-103.  The brain CT was normal and the chest X-ray and lumbar

puncture were negative.  See id. at 4-5, 74.  Ryan was admitted by Dr. Matheson to the cardiac

telemetry unit at 6:20 p.m. on July 1.  See id. at A-26 to A-28, A-42 to A-44.

When he was admitted to the telemetry unit, his heart rate was 87, blood pressure 118/78,

respiratory rate 16, temperature 36.9, and 100% oxygen saturation on supplemental oxygen.

Thornton Decl. Ex. A at A-42 to A-47.  Gastrointestinal, skin and genitourinary assessments were

normal and he continued on intravenous fluids.  See id. at A-45 to A-50.  His strength was

decreased, he did not verbally respond and he was ordered to take nothing by mouth.  See id. at A-

45- to A-50, A-26.  Dr. Matheson recorded progress notes at 6:47 p.m. and 7:49 p.m., noting that he

discussed Ryan's case with Dr. Janian and Dr. Lamb, that Ryan remained stable, responded to pain,

had a gag reflex and had pupil response.  See id. at A-33.

Nursing notes during the evening of July 1 indicate that Ryan's Glascow coma scores had

decreased to 5 at 9:30 p.m. and 10:30 p.m., and 6 at 11:30 p.m.  See id. at A-66.  Ryan had a condom

catheter in place, and was receiving intravenous fluids.  See id. at A-48 to A-53, A-71.

Upon Ryan's admission to the hospital, Dr. Hard reported that Ryan was somnolent, and

incontinent of stool and urine.  See Wittels Decl. Ex. 28.  Dr. Hard noted that jail staff were

concerned that Ryan could have a seizure, and believed he was having a sickle cell crisis.  See id.

Dr. Hard found Ryan verbally unresponsive, but noted that Ryan withdrew to pain and responded by

opening his eyes to strong auditory stimulation.  See id.  Dr. Hard reported that Ryan moved all

extremities, and that he clenched his teeth.  See id.  Dr. Hard stated that Ryan had remained stable in

the emergency room, but was still unresponsive to questions.  See id.  Dr. Hard diagnostic

_____

[1]     The Sutter Defendants explain in their opening brief that a Glascow coma score is a
numerical value derived from combining patient scores in areas of opening eyes, verbal response and
motor response.

3

impression was: "(1) altered sensorium, etiology unclear; (2) history of sickle cell anemia; possible CVA secondary to sickle cell; (3) infectious etiology unlikely with a negative lumbar puncture." Id. Dr. Hard testified at his deposition that Ryan was "almost in a catatonic-like state" when he was in the emergency room, and that he was "very concerned about him." Wittels Decl. Ex. 10 at 78-79.

Dr. Matheson noted in a dictated report on July 1, 2007 that Ryan had a "dramatically altered level of consciousness," and that there was prior concern about seizures. See Wittels Decl. Ex. 31. Dr. Matheson noted that Ryan had sickle cell anemia, and also stated that Ryan may have vitamin deficiency. See id. Dr. Matheson noted that Ryan was "lying in bed without purposeful movement," and that he did not respond to verbal commands or verbal stimuli. See id. Dr. Matheson stated in the report that he would consult neurology, and would not begin any medications until the diagnosis was clear. See id.

Ryan's mother, Valerie George, testified that she received a telephone call from Dr. Matheson on July 1, and that he was alarmed about Ryan's condition. See Wittels Decl. Ex. 18 at 65-66. Ms. George testified that Dr. Matheson told her to get down to the hospital right away. See id. According to Ms. George, Dr. Matheson also told her that he did not know why the jail did not take Ryan to Kaiser instead of Sutter Medical Center because he would be better off there. See id.; Ex. 44 at 100-101. Dr. Matheson also told Ms. George that Sutter did not know what it was doing and had little experience with sickle cell anemia. See id. Ex.18 at 67-68, 113.

After Ryan's family visited him on July 1, Dr. Matheson told Ms. George that he was going to tell the Sheriff's Department to transfer Ryan to Kaiser, and that the Sutter doctors did not know what they were doing. See id. Ex. 18 at 73, 126-27. Ms. George testified that Dr. Matheson told her that Sutter did not know what was wrong with Ryan, and that they were "fishing in the dark." See id. at 127; see also Ex. 44 at 39. Ms. George testified that Dr. Matheson told her that Ryan could not have intravenous fluids because the doctors did not know what was wrong with him. See id. Ex. 44 at 39, 58-59. Ryan's father, Donald George, testified that Ryan did not have intravenous fluids when Mr. George saw him on July 1. See Wittels Decl. Ex. 44 at 36-37, 58-59.

When Dr. Matheson finished his shift on July 1 at 10:00 p.m., Ryan's condition was essentially the same as at the time Ryan had been admitted. See Wittels Decl. Ex. 6 at 117-120. Dr.

United States District Court
For the Northern District of California

Matheson did not believe it was appropriate to discharge him at that time. See id. He felt that it was important to determine the cause of Ryan's change of consciousness, and to restore him to a higher level of consciousness. See id. Dr. Matheson told the deputy guarding Ryan to: "Please be nice to this family. I think something really bad has happened to this young man." Id. at 129.

On July 2, nursing staff performed neurological checks, which revealed Glascow coma scores of 5 at 12:30 a.m., 9 at 4:30 a.m., 9 at 6:00 a.m., 10 at 8:00 a.m., and 8 at an unspecified time, 12:00 p.m. and 8:00 p.m. See Thornton Decl. Ex. A at A-66. Ryan's vital signs were fairly stable throughout that day. See id. at A-66 to A-67. Hematology tests were drawn six times, and chemistry labs once. See id. at A-80, A-84 to A-85. Heart rhythm strips were printed five times. See id. at A-91 to A-92. Ryan received intravenous fluids all day. See id. at A-54 to A-56, A-72. Nursing notes reveal that Ryan's lungs were clear, he was removed from supplemental oxygen, he was not in pain and he was non-verbal. See id. at A-54 to A-56. He still did not take anything by mouth. See Wittels Decl. Ex. 35. Dr. Matel's progress notes from July 2 show that Ryan would have to verbalize his need for pain medication before it would be administered. See Thornton Decl. Ex. A at A-29.

Dr. Flinders examined Ryan in the morning of July 2. See Thornton Decl. Ex. A at A-33. Ryan was awake, alert and aware, and afebrile. See id. Ryan did not verbalize, but he understood commands and responded. See id. His pupils were reactive and there were no focal abnormalities. See id. A CT scan was normal, metabolic studies were normal, and lumbar puncture indicated no cells. See id.

On the morning of July 2, a Sutter radiologist finalized his report on Ryan's MRI, which among other things, stated that "periventricular white matter signal intensity changes that may be related to micro infarcts from previous episodes of sickle cell crisis," but were "very nonspecific in nature." See Wittels Decl. Ex. 42 at 00047-00048. Ryan's progress notes state that the MRI result was negative, and Dr. Matel's discharge summary states that the MRI had "no evidence of mass, hemorrhage, infarct or other abnormalities." Thornton Decl. Ex. A at A-33 to A-34; A-103.

Physical therapy notes from July 2 state that Ryan was non-verbal, appeared lethargic and distant, unable to follow cues and commands, and had significant weakness, and was non-mobile.

United States District Court
For the Northern District of California

1  See Wittels Decl. Ex. 38.  The therapist was unable to fully assess and determine Ryan's functional

2  status.  See id.

3      An EEG was performed on Ryan on July 2, 2007.  Dr. Janian, who was the neurologist on

4  duty, reviewed the EEG results and issued his report on July 3, concluding that "the slowing and

5  disorganization is not specific and may represent mild and diffuse encephalopathy," meaning brain

6  malfunction.  Wittels Decl. Ex. 45; Ex. 46 at 59-60.  He did not recall any particular doctor being

7  concerned about Ryan's EEG.  See id. at 21.  Dr. Janian did not know that Ryan suffered from sickle

8  cell anemia, and testified that he prefers not to know the patient's history when reading an EEG

9  because it helps him better interpret the test.  See id. at 27-28.  At the time he read Ryan's EEG, Dr.

10  Janian was not given any instruction on what to look for, and he was not told of any concerns about

11  the patient.  See id. Ex. 46 at 28-29.  Dr. Matheson indicated in his progress notes on July 1, 2007

12  that Dr. Janian was unable to see Ryan.  See Wittels Decl. Ex. 37; Ex. 6 at 133.  Dr. Janian,

13  however, has no recollection of anyone asking him to see Ryan.  See Wittels Decl. Ex. 46 at 35, 40.

14  Dr. Janian did not recall anyone talking to him about whether Ryan was malingering.  Id. at 37, 47.

15  He testified that Ryan's EEG contained one symptom of sickle cell anemia, but that he could not tell

16  by looking at the EEG whether Ryan had a sickle cell crisis.  See id. at 37-38.  He did not recall any

17  discussion about discharging Ryan.  See id. at 27.  He did not recall any discussion about Ryan's

18  discharge being delayed until the EEG was read.  See id. at 27, 40.  Dr. Janian had no recollection of

19  having any conversations about Ryan with Dr. Matheson or Dr. Flinders.  See id. at 15-16.

20      Dr. Matel told the patrol sergeant on July 2 that Ryan would be in the hospital for another

21  day or so.  See Wittels Decl. Ex. 39 at 49.  Dr. Matel also stated that Ryan should not have visitors.

22  See id.  Dr. Matel told Ms. George that he would try to arrange for her to visit Ryan, and that Ryan

23  was not on pain medication because he had not asked for it.  See Wittels Decl. Ex. 18 at 79-80.  Dr.

24  Matel also told Ms. George that there was a concern that Ryan may have brain damage.  See id. at

25  83.

26      Also on July 2, Dr. Flinders spoke with a nurse at the jail, Michael Dagey, stating that the

27  doctors had not found any new neurological pathology to account for his altered mental status, and

28  that Ryan likely experienced an acute sickle-cell crisis, but that Ryan was improving and that he

may return to the jail in the next day or so.  See Wittels Decl. Ex. 7 at 57-60, 176.  Mr. Dagey testified that Dr. Flinders told him that doctors would do more testing on Ryan, but that if the tests were inconclusive, Ryan would be sent back to the jail.  See Wittels Decl. Ex. 40 at 120.  Mr. Dagey did not remember Dr. Flinders telling Mr. Dagey that any special equipment was needed for Ryan when he returned to the jail.  See id. at 122.  Mr. Dagey testified that Dr. Flinders did not tell Mr. Dagey that Ryan was receiving intravenous fluids at the hospital.  See id.

On July 3, nursing staff performed neurological checks on Ryan, resulting in Glascow coma scores of 8 at 12:00 a.m., 6 at 8:00 a.m., and 7 at 4:00 p.m.  See Thornton Decl. Ex. A at A-60 to A-62, A-66.  Nursing notes also show that Ryan's lungs were clear, that intravenous fluids were being given, and that he did not have pain.  See id. at A-60 to A-62.  Ryan had one incident of liquid stool at 4:00 p.m., and cried out briefly in the afternoon.  See id.  Respiratory, gastrointestinal, genitourinary, oral and skin assessments were normal.  See id. at A-63 to A-65.  Ryan remained non-verbal.  Id. A-63 to A-65, A-98, A-100.  His Braden score on July 3 was 14, including a score of 1 indicating very poor nutrition and a score of 1 indicating that he was bedfast.  See Wittels Decl. Ex. 35 at 00035-36.  Nursing notes indicate that Ryan needed "maximum assist supervise," which is a high level of assistance.  See Thornton Decl. Ex. A at A-64.

A physical therapy note from July 3 states that Ryan was "mostly non-verbal would sometimes respond to questions with 1-2 word answers.  But would speak so softly that he was difficult to understand."  Thornton Decl. Ex. A. at A-98.  The physical therapy note also states that Ryan was able to move his arms and legs with assistance, but that his mobility was low, and the physical therapist marked "N/A" for moving supine to sit, sit to stand, bed to chair and toilet.  See id.

Nurse Nieves Douglass testified that on July 3, she could not rouse Ryan in the morning, but that by 10:00 a.m., he was sitting up, was alert and awake, and followed her with his eyes, but was still non-verbal.  See Thornton Decl. Ex. H at 15-17.  He sat up when she asked him to.  See id.

Nurse Mary Shaw testified that on July 3, Ryan followed some commands, but refused the dinner tray that she brought.  See Thornton Decl. Ex. E at 105.  She testified that he was moving in bed on his own, and that he sat up when she asked him to.  Id. at 110, 115.

1    Dr. Matel examined Ryan several times during the morning of July 3.  <u>See</u> Thornton Decl.

2    Ex. D at 39-40, 41, 67, 148-49.  Dr. Flinders also saw Ryan during the morning.  <u>See</u> Thornton Decl.

3    Ex. C at 82.  Dr. Matel's note at 10:15 a.m. indicates that Ryan opened his eyes on command,

4    withdrew to pain and though generally non-verbal, responded with a moan when told of being

5    discharged to the jail, and nodded affirmatively when asked if he was hungry.  <u>See</u> Thornton Decl.

6    Ex. A at A-34.  The notes state that Ryan turned around to his called name and responded with a

7    groan.  <u>See</u> Thornton Decl. Ex. A at A-34.  His pupils were reactive to light, his vital signs were

8    stable, his abdomen was soft and non-tender, his lungs were clear, and there was no apparent

9    distress.  <u>See id.</u>  Dr. Matel documented that Ryan was medically stable and ordered a regular diet

10   and discharge to the jail that day.  <u>See id.</u> at A-29.  Dr. Matel noted that Ryan's mentation had

11   improved, the head CT scan was negative and the head MRI showed no evidence of mass,

12   hemorrhage or infarct or other abnormalities.  <u>See id.</u> at A-103.  Dr. Matel discharged Ryan with

13   pain medication, and recommendations for oral hydration, nutrition, a regular diet, and an order that

14   Ryan be seen by a jail physician within 24 hours.  <u>See id.</u>

15   In Dr. Matel's discharge notes, he states that he discussed the EEG with Dr. Janian, and that

16   Dr. Janian stated that Ryan could have a mild sickle cell crisis.  <u>See</u> Wittels Decl. Ex. 37.  His notes

17   also indicate a negative MRI and EEG.  <u>See id.</u>  Dr. Matel's discharge report also states that Dr.

18   Janian thought that Ryan had "a very slight sickle cell crisis, versus malingering."  <u>See</u> Thornton

19   Decl. Ex. A at A-103.  Dr. Matel testified that he believed that Ryan had a sickle cell crisis and that

20   he was treated for that crisis, and that there was no organic reason for Ryan's failure to talk.  <u>See</u>

21   Wittels Decl. Ex. 69 at 116-21; <u>see also</u> Wittels Decl. Ex. 7 at 57-58, 93-95, 112-115.  Dr. Matel

22   testified that he and Dr. Flinders thought at the time of discharge that Ryan was potentially

23   malingering.  <u>See</u> Wittels Decl. Ex. 69 at 119.

24   Dr. Matel's discharge report, which was dictated at 10:56 a.m. on July 3, also stated that

25   Ryan was given food and drink before discharge and that he would be discharged if he was able to

26   eat and drink.  Thornton Decl. Ex. A at A-103.  Dr. Matel testified that he received a report from the

27   charge nurse Brian Petker at approximately 1:30 p.m. on July 3 that Ryan had eaten and drank

28   liquids.  <u>See</u> Wittels Decl. Ex. 69 at 96-97.  Nurse Petker told Dr. Matel that Ryan had eaten "almost

all" of his lunch of a cheeseburger and fries.  See id. at 98.  Nurse Petker also told Dr. Matel that Ryan was able to drink.  See id. at 99.  Dr. Matel testified that he asked Dr. Janian if he agreed with Matel and Flinders to discharge Ryan.  See Wittels Decl. Ex. 69 at 136.  Dr. Janian told Dr. Matel that he thought it was important that Ryan be able to eat and drink before he was released.  See id. Dr. Flinders testified that he remembers a verbal report from Dr. Matel and Nurse Petker that Ryan ate lunch on July 3, and that he remembered it because it was critical to Ryan's discharge that he eat. See Wittels Decl. Ex. 7 at 149-50.  Dr. Flinders approved Ryan's discharge contingent on his ability to eat and drink.  See id. at 153.

Ryan's medical file, however, does not indicate that he ate.  See Wittels Decl. Ex. 35; see also Wittels Decl. Ex. 69 at 79.  Moreover, the nurses who treated Ryan did not recall him eating. At his deposition, Nurse Petker did not recall whether or not Ryan ate his lunch.  See Wittels Decl. Ex. 48 at 42-45, 52, 57-62.  Regardless of whether he ate lunch, Nurse Shaw testified that she did not see Ryan eat anything and that he refused dinner on July 3.  See Wittels Decl. Ex. 34 at 107-08. Nurse Douglass testified that Ryan did not eat in front of her, and that being able to eat was a condition of discharge.  See Wittels Decl. Ex. 49 at 28, 30.  She testified that she told Nurse Shaw that Ryan had to eat before he could be discharged.  See id. at 35.

On the afternoon of July 3, Ryan had a Glascow coma score of 7, was non-verbal, refused food, was incontinent of liquid stool and cried out, and continued to require a high level of care.  See Wittels Decl. Ex. 35; Thornton Decl. Ex. A at A-60 to A-64.  The notes also indicate that he had a Braden score that would require a mattress pump.  See id.  The first physician notes from the jail upon Ryan's release indicate that he was giving short answers, laying face down on his bed, and refusing to get up.  See Wittels Decl. Ex. 22.

Dr. Matel's discharge summary indicated that Ryan should be given pain pills and encouraged to drink fluids orally, and that the jail physician should follow up within 24 hours. See Wittels Decl. Ex. 47.  Dr. Matel issued no other orders, placing Ryan on the jail's regular diet and directing no limits on his activity, no referrals, no special care and no special supplies.  See id. The discharge summary states that there the discharge diagnosis was: (1) sickle cell disease; (2) altered mental status, thought to be malingering; and (3) anemia, mild, of chronic disease.

United States District Court
For the Northern District of California

1   <u>See</u> Thornton Decl. Ex. A at A-103.

2       On the afternoon of July 3, jail personnel, Ms. Earlene DeBeni, consulted with Sutter's

3   discharge coordinator, Jeanette Romano, about Ryan.  <u>See</u> Wittels Decl. Ex. 50 at 96-112.  Ms.

4   DeBeni testified that Ms. Romano told Ms. DeBeni that everything was resolved with Ryan, that he

5   had eaten and that he was ready to go back to the jail.  <u>See id.</u>  Ms. DeBeni, however, testified that

6   as a matter of routine practice, Sutter would not write a discharge order that said "no special care or

7   supplies."  <u>See</u> Wittels Decl. Ex. 50 at 107.

8       Ryan was released to the jail on July 3, 2007.  Dr. Flinders stated in his deposition that he

9   believed that the discharge instructions to the jail asked that Sutter be notified if Ryan's

10  improvement did not continue or if he got worse.  <u>See</u> Wittels Decl. Ex. 7 at 61.  The discharge

11  summary does not contain this instruction.  Ryan died six days later, on July 9, 2007.  The autopsy

12  report indicated that the cause of Ryan's death was an "acute sickle cell anemia vaso-occulative and

13  hemolytic crisis," with a contributing factor of severe dehydration, and that early detection may have

14  prevented his death.  <u>See</u> Wittels Decl. Ex. 80.

15  **Discussion**

16  **1.      Procedural issues**

17      Defendant Janian argues that his motion for summary judgment should be granted as

18  unopposed because Plaintiffs' opposition was filed four hours late, at 4:00 a.m. on June 12, 2010

19  instead of on June 11.  However, Dr. Janian cites no prejudice that was caused by the late filing, and

20  did not ask for any extra time to file the reply.  The Court declines to do so.

21      Dr. Janian also argues that Plaintiffs' opposition is not procedurally responsive to Dr.

22  Janian's motion because Plaintiffs oppose summary judgment as to the eighth claim against Dr.

23  Janian, but Dr. Janian did not move for summary judgment on that claim.  To the extent that

24  Plaintiffs have argued about claims that are not at issue, the Court has not considered those

25  arguments.

26  **2.      Summary judgment as to the first, third and sixteenth claims**

27      Plaintiffs first, third and sixteenth claims allege violations of 42 U.S.C. § 1983.  Both the

28  Sutter Defendants and Defendant Janian move for summary judgment of these claims on the grounds

that Defendants are not state actors, that Defendants did not act with deliberate indifference, and that the Sutter Defendants did not have a policy or practice that caused any deprivation of constitutional rights as required by <u>Monell v. New York City Dept. of Soc. Servs.</u>, 436 U.S. 658, 694 (1977).  As stated in <u>Monell</u>, Congress intended municipal corporations and other local government units to be included among those persons to whom § 1983 applies.  <u>Id.</u> at 688-89.  Liability under § 1983 has been extended to private entities that act under color of state law.  <u>See Sable Commc'ns of Cal. Inc. v. Pacific Tel. & Tel. Co.</u>, 890 F.2d 184, 189 (9th Cir.1989) (willful participation of private corporation in joint activity with state or its agent taken under color of state law).  Plaintiffs argue that because there is a contract between the Sutter Defendants and the County, these Defendants are state actors.

### A.    State actors

There are four ways to identify when a private actor's conduct qualifies as state action for purposes of § 1983: (1) the private actor performs a public function; (2) the private actor engages in joint activity with a state actor; (3) the private actor is subject to governmental compulsion or coercion; or (4) there is a governmental nexus with the private actor.  <u>See Gorenc v. Salt River Project Agric Imp. and  Power Dist.</u>, 869 F.2d 503, 507-08 (9th Cir. 1989); <u>Kirtley v. Rainey</u>, 326 F.3d 1088, 1092 (9th Cir. 2002).  "Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." <u>Kirtley</u>, 326 F.3d at 1093 (citing <u>Lee v. Katz</u>, 276 F.3d 550, 553-54 (9th Cir. 2002) (internal quotation marks omitted)).  The public function test is satisfied only on a showing that the function at issue is "both traditionally and exclusively governmental."  <u>Id.</u>

A private physician or hospital that contracts with a public prison system to provide treatment for inmates performs a public function and acts under color of law for purposes of § 1983.  <u>See West v. Atkins</u>, 487 U.S. 42, 56 n.15 (1988) ("[A]lthough the provision of medical services is a function traditionally performed by private individuals, the context in which respondent performs these services for the State (quite apart from the source of remuneration) distinguishes the relationship between respondent and West from the ordinary physician-patient relationship.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Respondent carried out his duties at the state prison within the prison hospital. That correctional

setting, specifically designed to be removed from the community, inevitably affects the exercise of

professional judgment.'); see also Lopez v. Dep't of Health Servs., 939 F.2d 881, 883 (9th Cir.

1991) ("Here the district court's sua sponte dismissal was improper because Lopez's complaint

alleges that defendants Maryvale Samaritan Hospital ("Maryvale") and Southwest Ambulance

Service ("Southwest") are under contract with the state of Arizona to provide medical services to

indigent citizens. These allegations are sufficient to support a section 1983 action because under

either the joint action or the government nexus analysis they set forth a claim that defendants

Southwest and Maryvale act under color of state law."); Dixon v. Baptist South Medical Hospital,

2010 WL 431186, at *5 (M.D. Ala. Feb. 1, 2010) ("The law is well settled that "a private physician

... under contract with a state to provide medical care to inmates 'acts under color of state law for

purposes of section 1983 when undertaking his duties' to treat an inmate." . . .  It likewise follows

that a private hospital under contract with a state to provide medical services to inmates acts under

color of state law for § 1983 purposes.") (internal citations omitted); Ayala v. Andreason, 2007 WL

1395093, at *3 (E.D. Cal. May 10, 2007) ("His employer-Queen of the Valley Hospital-was under a

contract with state prison authorities for inmate referrals. As an agent of the hospital, defendant

Klingman performed the catheter removal surgery pursuant to that contract and a referral approved

by state prison officials. There is nothing to meaningfully distinguish these facts from West, where a

private physician performed medical services under a contract to do so.").

In West, the defendant, a physician under a part-time contract to provide medical services to

inmates, examined a prisoner for an orthopedic consultation at the Central Prison Hospital.  In

determining that the defendant, Dr. Atkins, acted under color of state law for purposes of § 1983, the

court stated: "It is only those physicians authorized by the State to whom the inmate may turn.

Under state law, the only medical care West could receive for his injury was that provided by the

State.  The fact that the State employed respondent pursuant to a contractual arrangement that did

not generate the same benefits or obligations applicable to other 'state employees' does not alter the

analysis." West, 487 U.S. at 55; id. at 51 ("Doctor Atkins' professional and ethical obligation to

make independent medical judgments did not set him in conflict with the State and other prison

United States District Court
For the Northern District of California

1   authorities.  Indeed, his relationship with other prison authorities was cooperative. 'Institutional

2   physicians assume an obligation to the mission that the State, through the institution, attempts to

3   achieve.'") (quoting Polk County v. Dodson, 454 U.S. 312, 320 (1981)).  Further, the West Court

4   stated:

5       It is the physician's function within the state system, not the precise terms of his
        employment, that determines whether his actions can fairly be attributed to the State.
6       Whether a physician is on the state payroll or is paid by contract, the dispositive issue
        concerns the relationship among the State, the physician, and the prisoner.
7       Contracting out prison medical care does not relieve the State of its constitutional
        duty to provide adequate medical treatment to those in its custody, and it does not
8       deprive the State's prisoners of the means to vindicate their Eighth Amendment
        rights.  The State bore an affirmative obligation to provide adequate medical care to
9       West; the State delegated that function to respondent Atkins; and respondent
        voluntarily assumed that obligation by contract.

10

11  Id. at 55-56.

12      Here, Sonoma County contracts with the Sutter Defendants for Sutter Medical Center to

13  provide medical services to inmates.  See Wittels Decl. Ex. 1.  The contract specified that the

14  County owned the facility, and maintained and supported its residency program, and that the Sutter

15  Defendants leased and operated the hospital on behalf of the County for its residents.  See id. at 1.

16  Under the contract, the Sutter Defendants agreed to undertake certain obligations, including the

17  assumption of hospital operations and of physician contracts.  See id. at 1, 3, Ex. 2.2 to Contract.

18  The Sutter Defendants were also obligated to provide inpatient care for inmates in the custody of the

19  Sonoma County Sheriff's Department, and the County was obligated to pay a rate not to exceed a

20  certain percentage of the billed charges.  See id. at § 10.5(d); § 10.11.4(b); Ex. 2.

21      Further, County jail policies confirm that Sutter Medical Center is the designated off-site

22  facility for treatment of inmates.  See Wittels Decl. Ex. 3 ("Those patients who require health care

23  beyond the resources available in the facility or whose adaption to the correctional environment is

24  significantly impaired will be transferred to Sutter Medical Center."); Ex. 4 ("inmates requiring

25  medical/surgical inpatient care will be transferred to Sutter Medical Center as deemed necessary by

26  the responsible physician. . . . CFMG's physician will refer all patients requiring inpatient care to

27  Sutter Medical Center. . . Physician/medical staff at Sutter Medical Center will be responsible for

28  inmates in the hospital.").

13

**United States District Court**
For the Northern District of California

1        As in <u>Ayala</u>, there is nothing in this case to meaningfully distinguish it from <u>West</u>.  It is

2   undisputed that the Sutter Defendants and their physicians were contractually obliged to undertake

3   medical treatment of inmates like Ryan.  The fact that the Sutter Defendants and their doctors

4   perform their services at a location other than the jail is not dispositive.  <u>See, e.g.</u>, <u>Dixon</u>, 2010 WL

5   431186, at *5.  Similarly, the fact that Sutter Medical Center is a privately owned facility that cares

6   for patients other than inmates does not preclude a finding of state action.  As described in <u>West</u>, a

7   hospital or physician does not have to be exclusively involved in providing medical services to

8   inmates at a prison to be found to be a state actor.  Further, even though there is some evidence that

9   there were other hospitals to which Ryan could potentially have been sent (<u>see, e.g.</u>, Thornton Reply

10  Decl. Ex. A at 47 (Ms. DeBani testified that: "We have a contract with both Memorial Hospital and

11  Sutter Hospital, and . . . we don't have a contract with Kaiser, but that doesn't mean in an emergency

12  we wouldn't send them to Kaiser.")), <u>West</u> and its progeny do not foreclose a finding of state action

13  where the hospital may take other patients or the jail may use other providers.

14        The Sutter Defendants rely on <u>Scott v. Eversole Mortuary</u>, 522 F.2d 1110 (9th Cir. 1975), but

15  <u>Scott</u> is factually distinguishable and pre-dates <u>West</u>.  In <u>Scott</u>, the plaintiffs sued Eversole, which

16  had contracted with Mendocino County to provide morgue services and facilities, alleging that

17  Eversole discriminated in refusing to provide funeral services for American Indians.  <u>See Scott</u>, 522

18  F.2d at 1113.  Under the facts of <u>Scott</u>, the court examined the degree of state involvement in

19  Eversole's allegedly discriminatory activities.  The court found that the contract for morgue services

20  between Eversole and the County was not by itself sufficient to show an interdependent relationship

21  for purposes of finding state action.  <u>Scott</u>, 522 F.2d at 1114-15.  The court further noted that the

22  acts complained of in the lawsuit did not directly occur as a result of the contract between Eversole

23  and the County because Eversole performed its contractual obligations to provide morgue services

24  without regard to race.  Rather, its subsequent refusal to provide funeral services was the issue in the

25  lawsuit.  More importantly, in <u>Scott</u>, unlike in this case regarding the provision of medical treatment

26  to prisoners, the "appellants do not claim that providing funeral services is a public function

27  traditionally performed by government agencies."  <u>Scott</u>, 522 F.2d at 1114.  Under the circumstances

28  of that case, the <u>Scott</u> court determined that Eversole was not a state actor under § 1983.  Other cases

**United States District Court**
For the Northern District of California

1   cited by the Sutter Defendants are similarly inapposite.  See, e.g., Sutton v. Providence St. Joseph

2   Medical Center, 192 F.3d 826 (9th Cir. 1999) (hospital was not a state actor where a prospective

3   employee sued the hospital for refusal to hire); Briley v. California, 564 F.2d 849 (9th Cir. 1977)

4   (physician, who did not serve as the medical examiner for the jail, and the hospital were not state

5   actors, but the physician who was the medical examiner at the jail was a state actor); Taylor v. St.

6   Vincent's Hospital, 523 F.2d 75 (9th Cir. 1975) (in a pre-West case, the hospital, which did not have

7   a contract with the government, was not state actor even though the plaintiff argued that the hospital

8   performed an essential public service and it was the only maternity ward where the plaintiff could

9   receive a tubal ligation at the time of her cesarean section); Coles v. Eagle, 2009 WL 2700210 (D.

10  Haw. Aug. 27, 2009) (no state action by hospital that did not have contract with government entity

11  and that refused to treat arrestee because of his race for injuries sustained during the arrest).

12      The Sutter Defendants also argue that treating the Sutter Defendants as state actors could

13  lead to increased operating expenses, which might, in turn, lead to it ceasing medical treatment at

14  that site sometime in the future.  However, this policy argument is speculative and runs contrary to

15  Ninth Circuit authority.

16      Accordingly, there is no triable issue of fact that the Sutter Defendants and Dr. Janian were

17  state actors for purposes of § 1983 by virtue of the Sutter Defendants' medical services contract with

18  the County.

19      **B.      Deliberate indifference**

20      "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary

21  and wanton infliction of pain' proscribed by the Eighth Amendment.  Estelle v. Gamble, 429 U.S.

22  97, 104 (1976); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  This may be shown in the

23  medical context by "acts or omissions sufficiently harmful to evidence deliberate indifference to

24  serious medical needs."  Id. at 105-06.  Further, deliberate indifference occurs when an official

25  "knows of and disregards an excessive risk to inmate health or safety."  Farmer v. Brennan, 511 U.S.

26  825, 837 (1994).  "In determining deliberate indifference, we scrutinize the particular facts and look

27  for substantial indifference in the individual case, indicating more than mere negligence or isolated

28  occurrences of neglect. . . . While poor medical treatment will at a certain point rise to the level of

15

**United States District Court**
For the Northern District of California

1    constitutional violation, mere malpractice, or even gross negligence, does not suffice." Wood v.

2    Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).  Deliberate indifference can be shown where

3    there has been denial, delay or intentional interference with medical treatment.  Wood, 900 F.2d at

4    1334.  However, a difference in medical opinion does not constitute deliberate indifference.

5    Sanchez .v Vild, 891 F.2d 240, 242 (9th Cir. 1989).  The due process clause is not implicated by

6    negligence or even gross negligence, but is by deliberate indifference.  See Daniels v. Williams, 474

7    U.S. 327, 328 (1986); L.W. v. Grubbs, 92 F.2d 894, 896-97, 900 (9th Cir. 1986).

8            Deliberate indifference may include "a failure to respond to a known medical problem, a

9    failure to provide a system of ready access to adequate medical care, and a failure to provide a

10   medical staff competent to examine and diagnose inmate's problems."  Eres v. County of Alameda,

11   1999 WL 66519, at *8 (N.D. Cal. Feb. 1, 1999).  Deliberate indifference may be "inferred when a

12   doctor's treatment decisions are so far afield of accepted professional standards that no inference can

13   be drawn that the decisions were actually based on medical judgment."  See, e.g., Vann v.

14   Vandenbrook, 596 F. Supp. 2d 1238, 1243 (W.D. Wisc. 2009) (doctor failed to treat 133 cuts on a

15   suicidal inmate).  Deliberate indifference may be "established by a showing of grossly inadequate

16   care as well as by a decision to take an easier but less efficacious course of treatment." See, e.g.,

17   McElligot v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (failure of doctor to diagnose cancer even

18   when prisoner was in tremendous pain and lost weight).  Finally, medical care that is "so cursory as

19   to amount to no treatment at all" can satisfy a deliberate indifference standard.  See, e.g., Parzyck v.

20   Prison Health Servs., Inc., 290 Fed. Appx. 289, 291 (11th Cir. 2008) (failure of prison medical staff

21   to provide an orthopedic consultation on two occasions even though consultations had been

22   recommended and prisoner in obvious pain).

23           Evidence of an improper or ulterior motive can support a conclusion that a defendant failed

24   to exercise sound medical judgment but instead acted with a culpable state of mind.  See, e.g.,

25   Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (". . . Jackson has alleged the doctors chose to

26   deny him the opportunity for a kidney transplant, not because of an honest medical judgment, but on

27   account of personal animosity. If Jackson proves that claim at trial, and he has shown that the delay

28   in performing the kidney transplant was medically unacceptable, he will have shown that the doctors

United States District Court
For the Northern District of California

1   were deliberately indifferent to his serious medical needs."); <u>Chance v. Armstrong</u>, 143 F.3d 698,

2   704 (2d Cir. 1998) ("Crucially, [the plaintiff] has also alleged that Dr. Moore and Dr. Murphy

3   recommended extraction not on the basis of their medical views, but because of monetary incentives.

4   This allegation of ulterior motives, if proven true, would show that the defendants had a culpable

5   state of mind and that their choice of treatment was intentionally wrong and did not derive from

6   sound medical judgment."); <u>Ancata v. Prison Health Servs.</u>, 769 F.2d 700, 704 (11th Cir. 1985)

7   ("Furthermore, if necessary medical treatment has been delayed for non-medical reasons, a case of

8   deliberate indifference has been made out. Plaintiff alleged that Ancata was indigent and that the

9   defendants put the financial interest of Prison Health Services ahead of the serious medical needs of

10  Ancata.") (internal citations omitted).

11      Suspicions of malingering may also be considered an indication of an ulterior motive

12  whereby a defendant failed to take a plaintiff's condition seriously and thus acted recklessly in

13  failing to provide proper care.  <u>See, e.g., Thomas v. Arevalo</u>, 1998 WL 427623, at *9 (S.D. N.Y.

14  July 28, 1998) ("There is evidence sufficient to support an inference that the State Defendants and

15  defendant Kalnins considered plaintiff a possible malingerer. A reasonable jury could infer that

16  defendants had a motive for failing to take plaintiff's complaints seriously based on this

17  characterization.") (internal citations to evidence omitted); <u>Walker v. Benjamin</u>, 293 F.3d 1030,

18  1040 (7th Cir. 2002) ("The fact that Nurse Dunbar and Dr. Benjamin may have based their refusal to

19  treat Walker's pain on a good-faith belief that he was malingering, that he was not in pain but was

20  merely trying to get high with the narcotic painkiller, is an issue for the jury.")

21      Here, there is circumstantial evidence suggesting that non-medical motives may have

22  influenced both Ryan's treatment and his discharge.  First, the contract between the Sutter

23  Defendants and the County provides that the County receives a billing discount for treatment of

24  inmates.  Second, there is evidence that doctors expected Ryan to remain at the hospital for a short

25  time.  A note from the patrol division guards dated July 1 stated that Ryan would likely be kept at

26  Sutter Medical Center for at least 48 hours, and in fact that Ryan was discharged about 48 hours

27  later.  Further, Dr. Flinders stated that Ryan would be transferred back to jail as long as the tests

28  were inconclusive.  Although Dr. Matel testified that he believed that Ryan had a sickle cell crisis

that was treated, and there were no more tests available to determine an organic cause for his failure to speak, the medical evidence shows that Ryan was not much improved when he was discharged. Further, the discharge instructions did not include any special provisions for Ryan even though there is evidence that he was not fully recovered.  For example, although doctors performed numerous tests on Ryan that were all normal or negative, the medical records on the day of Ryan's release create a triable issue of fact that he was sufficiently recovered to be transferred back to jail, especially without special conditions, because even though nurses reported that Ryan moved his arms and legs on his own, he was also incontinent of liquid stool, non-verbal, had low Glascow coma scores and a Braden score that indicated he needed a mattress pump.  Further, Ryan's discharge summary, which was dictated on the morning of his discharge, states that Ryan was given food and drink, although he had not been given his lunch at that time and there is evidence that he refused dinner before his discharge.  Although Dr. Matel states that he was told by Nurse Petker that Ryan ate, there is no evidence in Ryan's medical records to that effect and no nurse who was involved with Ryan's case remembers him eating.  In addition, there is evidence that Dr. Matheson told Ms. George that Sutter Medical Center was ill-equipped to handle Ryan's case.  Further, Dr. Matel testified that he and Dr. Flinders thought at the time that Ryan was potentially malingering.  Thus, viewed in the light most favorable to Plaintiffs, this evidence raises a triable issue of fact that the Sutter Defendants had an ulterior financial motive, had predetermined the length of Ryan's hospital stay and had no intention of fully treating Ryan, all in violation of his constitutional rights.

As to Dr. Janian, he interpreted Ryan's EEG and was consulted by Dr. Flinders and Dr. Matel regarding the discharge decision.  There is no dispute that Dr. Janian provided an assessment of the EEG that his expert, as well as Plaintiffs' expert, opines was appropriate.  See Andino Decl. Ex. J; Wittels Decl. Ex. 66 at Rebuttal Report to Dr. Kenneth Laxer.  However, there is evidence regarding Dr. Janian's involvement in Ryan's care, which, when viewed in the light most favorable to Plaintiffs, raises a triable issue of fact as to whether Dr. Janian violated Ryan's constitutional rights.  According to Dr. Matel's progress notes, Dr. Matel specifically asked Dr. Janian if he agreed that it was okay to discharge Ryan.  See Wittels Decl. Ex. 69 at 136.  While Dr. Janian told Dr. Matel that he thought it was important that Ryan be able to eat and drink before being discharged,

**United States District Court**
For the Northern District of California

the discharge summary also states that Dr. Janian believed that Ryan "has a normal sleep pattern

with possibly a somewhat slowed awake pattern consistent with which might be a very slight sickle

cell crisis, versus malingering."  Thornton Decl. Ex. A at A-103.  Further, Plaintiffs' hematology

expert opined that Dr. Janian believed that Ryan was malingering.  See Declaration of Ralph Andino

Ex. L ("It is my understanding from the information that Dr. Janian -- who was initially consulted in

ER -- communicated and supported the diagnosis of 'malingering' to the medical team.").  A

reasonable jury could find that Dr. Janian thought that Ryan was malingering and therefore failed to

provide adequate care.  See, e.g., Thomas, 1998 WL 427623, at *9.  Accordingly, Dr. Janian's

motion for summary judgment as to Plaintiffs' first, third and sixteenth claims is denied.

## C.     Policy of deliberate indifference

The Sutter Defendants argue, and Plaintiffs dispute, that in order to find the Sutter

Defendants liable pursuant to § 1983, Plaintiffs must prove that an official policy or custom of Sutter

caused the constitutional violation pursuant to Monell v. New York City Dep't of Soc. Servs., 436

U.S. 658, 694 (1978).  Although there is no binding Ninth Circuit authority on this issue, the weight

of authority from other circuit courts and other district courts in this circuit supports the Sutter

Defendants' position.  See, e.g., Buckner v. Toro, 116 F.3d 450 (11th Cir. 1997) (affirming the

district court's decision that the Monell policy and practice requirement applies in suits against

private entities performing functions traditionally within the exclusive prerogative of the state, such

as the provision of medical care to inmates); Street v. Corrections Corp. of Am., 102 F.3d 810, 817-

18 (6th Cir. 1996) (granting summary judgment as to publicly held corporation providing jail

services because there was no evidence of a policy or custom attributable to the private entity);

Rojas v. Alexander's Dep't Store, Inc., 924 F.2d 406, 408 (2d Cir. 1990) ("Private employers are not

liable under § 1983 for the constitutional torts of their employees, unless the plaintiff proves that

'action pursuant to official ... policy of some nature caused a constitutional tort.'") (internal citations

omitted); Lux by Lux v. Hansen, 886 F.2d 1064, 1067 (8th Cir. 1988); (affirming summary

judgment where there was no evidence of a policy or custom by private entities); Iskander v. Village

of Forest Park, 690 F.2d 126, 128-29 (7th Cir. 1982) ("Moreover, just as a municipal corporation is

not vicariously liable upon a theory of respondeat superior for the constitutional torts of its

employees, a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights."); <u>Draeger v. Grand Central, Inc.</u>, 504 F.2d 142, 146 (10th Cir. 1974) ("We are of the opinion then that the appellant department store cannot be held liable solely as a master or principal."); <u>see also</u> <u>Hayes v. Corrections Corp. of Am.</u>, 2010 WL 2867821, at *2-3 (D. Idaho July 20, 2010); <u>Carrea v. California</u>, 2008 WL 3931182, at *9 (C.D. Cal. Aug. 26, 2008); <u>Nash v. Lewis</u>, 2007 U.S. Dist. LEXIS 50120 (D. Or. July 6, 2007); <u>but see, e.g.</u>, <u>Groom v. Safeway, Inc.</u>, 973 F. Supp. 987, 992 n. 4 (W.D. Wash. 1997) (stating in dicta that: "This Court sees no reason why the private employer of a police officer should not be vicariously liable for the officer's acts committed within the scope of his employment."); <u>Segler v. Clark County</u>, 142 F. Supp. 2d 1264, 1268-69 (D. Nev. 2001) ("Therefore, this Court finds that EMSA [a private corporation] is not a municipality. Segler does not need to show a policy or custom by EMSA in order to show liability under § 1983.").

The reasoning of the Supreme Court's decision in <u>Monell</u> interpreting the language of the statute and its legislative history supports the weight of authority.  The <u>Monell</u> Court concluded that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  <u>Monell</u>, 436 U.S. at 691.  In reaching this conclusion, the <u>Monell</u> Court noted that the language of the original version of § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights."  <u>Monell</u>, 436 U.S. at 691-92.  Further, the Court examined the legislative history of the Civil Rights Act and concluded:

> Strictly speaking, of course, the fact that Congress refused to impose vicarious liability for the wrongs of a few private citizens does not conclusively establish that it would similarly have refused to impose vicarious liability for the torts of a municipality's employees. Nonetheless, when *Congress' rejection of the only form of vicarious liability presented to it is combined with the absence of any language in § 1983 which can easily be construed to create respondeat superior liability*, the inference that Congress did not intend to impose such liability is quite strong.

<u>Monell</u>, 436 U.S. at 692, n. 57 (emphasis added).  Based on the causation language from <u>Monell</u>, the Fourth Circuit held that plaintiffs must prove that an official policy or custom of a private entity caused the constitutional violation to show liability under § 1983:

> In <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipal corporation

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

> cannot be saddled with section 1983 liability via respondeat superior alone. We see this holding as equally applicable to the liability of private corporations. Two aspects of <u>Monell</u> exact this conclusion. The Court found section 1983 evincing a Congressional intention to exclude the imposition of vicarious answerability. For a third party to be liable the statute demands of the plaintiff proof that the former "caused" the deprivation of his Federal rights. 436 U.S. at 691-92, 98 S.Ct. at 2036. Continuing, the Court observed that the policy considerations underpinning the doctrine of respondeat superior insufficient to warrant integration of that doctrine into the statute. <u>Id.</u> at 694, 98 S.Ct. at 2037. No element of the Court's ratio decidendi lends support for distinguishing the case of a private corporation.

<u>Powell v. Shopco Laurel Co.</u>, 678 F.2d 504, 506 (4th Cir. 1982).  Accordingly, even though there is a triable issue of fact regarding violations of constitutional rights by the Sutter Defendants, they can only be liable under § 1983 if Plaintiffs raise a triable issue of fact that the violations occurred as a result of a policy, decision, or custom promulgated or endorsed by the private entity.  Plaintiffs have not done so.

Plaintiffs contend that they have introduced evidence of the Sutter Defendants' policies that satisfy the <u>Monell</u> requirement.  Specifically, Plaintiffs argue that Dr. Hard testified to a default policy that inmates are treated at Sutter Medical Center and that transfer to other hospitals is discouraged.  <u>See</u> Wittels Decl. Ex. 10 at 94-95.  However, Dr. Hard testified that Sutter Medical Center is the receiving hospital for inmates, but that if there were extraordinary circumstances that the Sutter doctors could not treat an inmate or the jail wanted him transferred elsewhere, the inmate would be transferred.  In addition, Dr. Matheson testified that he considered transferring Ryan to Kaiser, even going so far as calling Kaiser to determine if Ryan was a Kaiser member.  <u>See</u> Wittels Decl. Ex. 6 at 166.  He also testified that he would not have been "adverse to transfer."  <u>Id.</u> at 172. He continued that a transfer "wasn't in my power," and that he "didn't initiate a transfer," but it appears that he was referring to his earlier testimony about his understanding that Kaiser would not accept a non-Kaiser member as a transfer, and Ryan was not a Kaiser member.  <u>See id.</u> at 166-170.

Plaintiffs also argue that the discounted billing rate in the contract between the Sutter Defendants and the County provided an incentive to discharge inmates quickly.  However, the discount by itself is not sufficient, absent a showing of a regular practice of skimping on inmates' care compared to that of other patients -- or any showing that other patients' reimbursement rates did not provide similar discounts.  <u>See</u> <u>McRorie v. Shimoda</u>, 795 F.2d 780, 784 (9th Cir. 1986) (to

satisfy the theory that a single instance may constitute an official policy, an act must "reflect a disposition to disregard human life and safety so prevalent as to be policy or custom."); cf. City of Oklahoma City v. Tuttle, 471 U.S. 808, 821 (1985) (finding that proof of random acts or isolated incidents of unconstitutional behavior by a non- policymaking employee are insufficient to establish the existence of a municipal policy or custom).  Rather, the Patient Care Director at Sutter Medical Center, Kim Sparacio, testified that the policy with respect to inmates is the same as for any other patient, except the policy provides for heightened safety measures.  She also testified that there is no policy that differentiates inmate patients from other patients regarding cost containment, insurance or discharge, and that law enforcement is not involved in discharge decisions.  See Thornton Decl. Ex. F at 11, 15-19.  In addition, Sutter Medical Center has a policy for Patients in Police Custody, which briefly addresses discharge planning and transportation of an inmate upon discharge, and does not involve financial considerations.  See Wittels Decl. Ex. 73 (Patients in Police Custody policy).

Plaintiffs argue that the Sutter Defendants lack numerous policies that Plaintiffs believe should be in place, such as policies for selection of hospital personnel and handling EEGs, and relevant training manuals, but cite no authority where such a purported lack of policies satisfied Monell.  Moreover, the Sutter Defendants had policies addressing at least some of these issues.  See, e.g., Wittels Decl. Ex. 73 (Recruitment and Selection policy).

Accordingly, Plaintiffs having failed to raise a triable issue of fact as to the existence of a policy or practice by the Sutter Defendants as required under Monell, the Sutter Defendants' motion for summary judgment is granted as to Plaintiffs' first, third and sixteenth claims.

**3.      Summary judgment as to the twelfth claim**

Plaintiffs' twelfth claim is for reckless or malicious neglect of a dependent adult pursuant to California Welfare and Institutions Code § 15657, pursuant to the Elder Abuse and Dependent Adult Civil Protection Act ("EADACPA").  See Cal. Welf. & Inst. Code § 15600, et seq.  Specifically, Plaintiffs allege that Defendants' conduct rose to the level of reckless, oppressive or malicious neglect that is actionable under California Welfare & Institutions Code § 15657:

> Where it is proven by clear and convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63, or neglect as defined in Section 15610.57, and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse, the following shall apply, in addition to all

United States District Court
For the Northern District of California

other remedies otherwise provided by law:

(a) The court shall award to the plaintiff reasonable attorney's fees and costs. The term "costs" includes, but is not limited to, reasonable fees for the services of a conservator, if any, devoted to the litigation of a claim brought under this article.

(b) The limitations imposed by Section 377.34 of the Code of Civil Procedure on the damages recoverable shall not apply. However, the damages recovered shall not exceed the damages permitted to be recovered pursuant to subdivision (b) of Section 3333.2 of the Civil Code.

(c) The standards set forth in subdivision (b) of Section 3294 of the Civil Code regarding the imposition of punitive damages on an employer based upon the acts of an employee shall be satisfied before any damages or attorney's fees permitted under this section may be imposed against an employer.

Cal. Welf. & Inst. Code § 15657.  Neglect is defined as:

(a) "Neglect" means either of the following:

(1) The negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise.

(2) The negligent failure of an elder or dependent adult to exercise that degree of self care that a reasonable person in a like position would exercise.

(b) Neglect includes, but is not limited to, all of the following:

(1) Failure to assist in personal hygiene, or in the provision of food, clothing, or shelter.

(2) Failure to provide medical care for physical and mental health needs. No person shall be deemed neglected or abused for the sole reason that he or she voluntarily relies on treatment by spiritual means through prayer alone in lieu of medical treatment.

(3) Failure to protect from health and safety hazards.

(4) Failure to prevent malnutrition or dehydration.

(5) Failure of an elder or dependent adult to satisfy the needs specified in paragraphs (1) to (4), inclusive, for himself or herself as a result of poor cognitive functioning, mental limitation, substance abuse, or chronic poor health.

Cal. Welf. & Inst. Code § 15610.57.

The EADACPA excludes liability for acts of professional negligence (see Cal. Welf. & Inst. Code § 15657.2; Delaney v. Baker, 20 Cal.4th 23, 32 (1999)), and does not apply to simple or gross negligence by health care providers.  Sababin v. Superior Court, 144 Cal.App.4th 81, 88 (2006).  To obtain the remedies provided by EADACPA, "'a plaintiff must demonstrate by clear and convincing

23

evidence that defendant is guilty of something more than negligence; he or she must show reckless, oppressive, fraudulent, or malicious conduct.'" Sababin, 144 Cal.App.4th at 89 (quoting Delaney, 20 Cal.4th at 31). Recklessness refers "'to a subjective state of culpability greater than simple negligence, which has been described as a "deliberate disregard" of the "high degree of probability" that an injury will occur.'" Id. Oppression, fraud and malice involve intentional or conscious wrongdoing of a despicable or injurious nature. Id. The Sababin court further stated:

> Our Supreme Court teaches that neglect under the Act "refers not to the substandard performance of medical services but, rather, to the 'failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations.' [Citation.] Thus, the statutory definition of 'neglect' speaks not of the undertaking of medical services, but of the failure to provide medical care. [Citation.]" (Covenant Care, supra, 32 Cal.4th at p. 783, 11 Cal.Rptr.3d 222, 86 P.3d 290.)

Sababin, 144 Cal.App.4th at 89; see also Wolk v. Green, 516 F. Supp. 2d 1121, 1133 (N.D. Cal. 2007) ("A civil cause of action under the Elder Abuse statute is governed by the California Welfare and Institutions Code section 15657, which requires that a plaintiff demonstrate 'by clear and convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63, or neglect as defined in Section 15610.57, and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse . . . .'") (internal citation omitted).

The Sutter Defendants argue that there is no triable issue of fact as to whether Ryan's treatment rose to the level of neglect for purposes of the EADACPA. See Delaney, 20 Cal.4th 23 (neglect found where woman had stage III and IV pressure ulcers); Sababin, 144 Cal.App.4th 81 (neglect found where 38-year-old woman was found with skin sores, ulcers and lacerations); Norman v. Life Care Centers of America, 107 Cal.App.4th 1233 (2003) (neglect found where elderly woman repeatedly fell after climbing out of her bed). The Sutter Defendants note that Ryan was seen by four doctors, and that his doctors had two consultations with specialists. The Sutter Defendants also note that Ryan had his vital signs checked constantly as reflected in nursing notes. They emphasize that when Ryan was discharged, he was alert, aware and responsive, he moved and sat up, his vital signs were stable and normal, imaging studies were negative, organ systems were normal, and he was hydrated. Dr. Matel determined that Ryan's sickle cell crisis had passed and that it was safe to return Ryan to the jail, with instructions that he be seen by jail physicians within 24

United States District Court
For the Northern District of California

1   hours.  Dr. Matel had been told by a charging nurse that Ryan had eaten almost all of his lunch on

2   July 3.

3          Plaintiffs, on the other hand, point to the Sutter Defendants' failure to provide basic

4   treatment, including their failure to make sure Ryan was well enough to be transferred back to the

5   jail.  Plaintiffs emphasize the improper discharge instructions, specifically the instruction that Ryan

6   did not need special care.

7          For the same reasons discussed above with respect to deliberate indifference, Plaintiffs have

8   raised a triable issue of fact as to whether there is clear and convincing evidence of neglect by the

9   Sutter Defendants.  In particular, in contrast to the Sutter Defendants' evidence based on Dr. Matel's

10  observations and notes, there is evidence that Dr. Matheson told Ms. George that Sutter Medical

11  Center was not equipped to treat Ryan, and there are medical records on the day of his release that

12  do not show marked improvement.  Further, although Dr. Matel testified that Nurse Pekter told him

13  that Ryan had eaten almost all of his lunch of a cheeseburger, fries and soda, that is not reflected in

14  any medical records and no nurse remembers it.  Further, Nurse Shaw testified that Ryan refused

15  dinner on the day of his discharge.  Accordingly, the Sutter Defendants' motion for summary

16  judgment of the twelfth claim is denied.

17         Dr. Janian seeks summary judgment of this claim on the grounds that he is not a care

18  custodian under the Act, which is defined as "an administrator or an employee of . . . public or

19  private facilities or agencies, or persons providing care or services for elders or dependent adults,

20  including members of the support staff and maintenance staff" in certain enumerated facilities.  See

21  Cal. Welf. & Inst. Code § 15610.17.  However, the term "care custodian" does not appear in the

22  definition of "neglect," but instead is primarily used to designate individuals who are mandatory

23  reporters of elder abuse under California Welfare & Institutions Code section 15630 and section

24  15659 and those who are barred from receiving donative transfers under Probate Code section

25  21350.  Further, Dr. Janian argues that there has been no showing that he engaged in neglect

26  pursuant to the statute.  See Benun v. Superior Court, 123 Cal.App.4th 113, 123 (2004) (stating that

27  the goal of the EADACPA was "to provide heightened remedies for 'acts of egregious abuse'

28  against elder and dependent adults, while allowing acts of negligence in the rendition of medical

25

United States District Court
For the Northern District of California

services to elder and dependent adults to be governed by laws specifically applicable to such negligence.").  However, Plaintiffs have raised a triable issue of fact that he acted with neglect as required under the statute for liability based on the same reasons that the Court found that there was a triable issue of fact regarding deliberate indifference.  Thus, Dr. Janian's motion for summary judgment as to the twelfth claim is denied.

**4.      Summary judgment as to the tenth claim**

Plaintiffs' tenth claim is for violation of California Health & Safety Code § 1317 based on the alleged denial of emergency services and care, and improper transfer of an emergency patient for non-medical reasons.  Only the Sutter Defendants moved for summary judgment on this claim.

California Health and Safety Code § 1317 states in relevant part:

(a) Emergency services and care shall be provided to any person requesting the services or care, or for whom services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness, at any health facility licensed under this chapter that maintains and operates an emergency department to provide emergency services to the public when the health facility has appropriate facilities and qualified personnel available to provide the services or care.

(b) In no event shall the provision of emergency services and care be based upon, or affected by, the person's ethnicity, citizenship, age, preexisting medical condition, insurance status, economic status, ability to pay for medical services, or any other characteristic listed or defined in subdivision (b) or (e) of Section 51 of the Civil Code, except to the extent that a circumstance such as age, sex, preexisting medical condition, or physical or mental disability is medically significant to the provision of appropriate medical care to the patient.

(c) Neither the health facility, its employees, nor any physician and surgeon, dentist, clinical psychologist, or podiatrist shall be liable in any action arising out of a refusal to render emergency services or care if the refusal is based on the determination, exercising reasonable care, that the person is not suffering from an emergency medical condition, or that the health facility does not have the appropriate facilities or qualified personnel available to render those services.

In Jackson v. East Bay Hospital, 246 F.3d 1248 (9th Cir. 2001), the court examined the reasonable care standard contained in section 1317(c).  In that case, a man with a history of mental illness and use of antidepressants, who was examined in a hospital emergency department several times over a four-day period for various mental and physical symptoms, was transferred to a psychiatric facility after being found medically stable.  A few hours after the transfer, he died of an undiagnosed antidepressant toxicity.  The court in Jackson denied recovery, stating that the duty of reasonable care under section 1317(c) applies in two situations: (1) when the hospital fails to provide a medical

26

United States District Court
For the Northern District of California

1    examination, evaluation, or screening to determine whether the patient has an emergency medical

2    condition; and (2) when a condition is diagnosed by the physician, but the physician does not

3    provide treatment because either it has been determined that an emergency medical condition does

4    not exist or the hospital does not have the appropriate personnel or facilities to provide care.  If

5    neither situation is present, liability is determined by section 1317(a).

6         Here, the two situations under section 1317(c) as interpreted in Jackson do not apply.  It is

7    undisputed that Ryan was given medical examinations, evaluations and screenings through the time

8    he was in the hospital.  Second, the evidence shows that there was a diagnosis of sickle cell disease

9    and altered mental status, which were treated, although there is a triable issue of fact as to the extent

10   they were treated given the limited improvement reflected in the medical records.  But even if

11   doctors did not properly treat Ryan, there is no evidence that any lack of treatment was due to the

12   doctors determining that he had no emergency medical condition or that the Sutter Medical Center

13   lacked appropriate personnel or facilities.  Thus, the duty of reasonable care under section 1317(c)

14   does not apply, and instead section 1317(a) applies.

15        Under section 1317.1(a)(1), emergency care and services is defined as:

16        (a)(1) "Emergency services and care" means medical screening, examination, and
          evaluation by a physician, or, to the extent permitted by applicable law, by other
17        appropriate personnel under the supervision of a physician, to determine if an
          emergency medical condition or active labor exists and, if it does, the care, treatment,
18        and surgery by a physician necessary to relieve or eliminate the emergency medical
          condition, within the capability of the facility.

19   Here, for the reasons stated above, there is a triable issue of fact as to whether Ryan received the

20   "care [and] treatment ... necessary to relieve or eliminate the emergency medical condition"

21   diagnosed by Sutter physicians.  See Jackson, 246 F.3d at 1260 (citing Cal. Health & Safety Code §

22   1317.1(a)(1)).  For example, there is evidence that the ability to eat and drink was a condition of

23   Ryan's discharge, yet there is no evidence in the medical records that he ate or drank, and evidence

24   that he did not eat dinner.  Accordingly, the Sutter Defendants' motion for summary judgment as to

25   Plaintiffs' tenth claim is denied.

26   **5.    Summary judgment as to the eleventh claim**

27        The Sutter Defendants move for summary judgment of Plaintiffs' eleventh claim alleging

28   patient abandonment and improper withdrawal of treatment.  A physician may abandon a patient

**United States District Court**
For the Northern District of California

"after due notice, and an ample opportunity afforded to secure the presence of other medical attendance." Payton v. Weaver, 131 Cal.App.3d 38, 45 (1982) (finding no patient abandonment where physician gave patient notice that he would no longer provide treatment and gave patient a list of other potential care providers); Hongsathavij v. Queen of Angels/Hollywood Presbyterian Medical Ctr., 62 Cal.App.4th 1123, 1138 (1998) (finding patient abandonment where physician refused to provide treatment to patient in premature labor because she was not a County-referred or County-insured patient).

Here, there is no triable issue of fact as to patient abandonment because the Sutter Defendants provided for subsequent medical care for Ryan, and did not leave him without care in the interim. See, e.g., Hongsathavij, 62 Cal.App.4th at 1138 (stating that the physician abandoned his patient when he, among other things, failed to call for a substitute physician). Dr. Matel discharged Ryan directly to the medical providers at the jail and stated in his discharge summary that Ryan should be examined there within 24 hours. See Thornton Decl. Ex. A at A-103. Dr. Flinders testified that he spoke with Michael Dugey at the jail regarding Ryan's status, and gave him notice of when Ryan would return to the jail. See Thornton Decl. Ex. C at 56-58, 64; Ex. M at 19-20, 117-20. Dr. Matel testified that he left a message for the jail medical unit that included Ryan's hospital course, discharge to the jail medical unit and recommendations for follow up care. Dr. Matel believed that, consistent with the discharge instructions, Ryan would be examined within 24 hours. See Thornton Decl. Ex. D at 105-07, 112. Dr. Luders, a physician at the jail, testified that he spoke with Dr. Flinders, who told Dr. Luders that Ryan would be returned to the medical unit. See Thornton Decl. Ex. K at 307-08. Dr. Luders saw Ryan in the jail medical unit on July 5. See id. at 172-73. Further, Earlene DeBeni, the Director of Nursing at the jail, testified that she spoke with Jeanette Romano, a discharge planner at Sutter Medical Center, several times during Ryan's hospitalization, was told when Ryan would be discharged, and received faxed records from Romano. See Thornton Decl. Ex. L at 96-100. 104, 108-09.   In this case, the Sutter Defendants actually provided for Ryan to have medical services upon the cessation of Ryan's medical care at Sutter Medical Center.  While there is a genuine dispute as to whether the discharge occurred without sufficient precautions to ensure adequate medical care thereafter at the jail, there is no triable issue

as to patient abandonment.

Plaintiffs argue that this case is like <u>Scripps Clinic v. Superior Court</u>, 108 Cal.App.4th 917, 931 (2003), in which the clinic terminated its relationship with a patient who sued for malpractice. The patients in <u>Scripps</u> were left for two weeks without access to any non-emergency services, although they did have access to emergency services and prescription refills. The court determined that there was a triable issue of fact as to whether the patients were given ample opportunity to retain alternative care. Unlike Ryan's case, however, in <u>Scripps</u>, there was a triable issue of fact as to the opportunity to obtain alternative medical care because there was a two week period in which the plaintiffs in that case were without access to any non-emergency medical care while they were in the process of being assigned to another doctor. Here, by contrast, Sutter provided for care directly upon Ryan's discharge.

Accordingly, the Sutter Defendants' motion for summary judgment on this claim is granted.

**6.    Summary judgment as to the thirteenth and eighteenth claims**

Plaintiffs' thirteenth and eighteenth claims allege negligent infliction of emotional distress ("NIED"). The Sutter Defendants move for summary judgment as to the thirteenth claim as to Ryan's estate on the ground that the claim abates on death, and as to the eighteenth claim on the ground that Ryan's parents cannot prove contemporaneous awareness of injury. Dr. Janian moves for summary judgment as to both claims on the grounds that Ryan's family cannot show contemporaneous awareness of injury caused by Dr. Janian.

Plaintiffs clarify in their opposition that the eighteenth claim for NIED brought by Ryan's parents is not premised on the denial of appropriate care, but on the denial of visitation. Plaintiffs point to the evidence in the record showing that Ryan's parents were denied visitation with Ryan. For example, Ms. George testified that she did not see Ryan at all after July 1 when he was admitted to the hospital. <u>See</u> Wittels Decl. Ex. 18 at 87, 220. The Prisoner Guard Activity Log for July 1-2 states that Dr. Matel from Sutter Medical Center stated that there should be no visitors because Ryan needed rest. <u>See</u> Wittels Decl. Ex. 30. A prison guard testified that Dr. Matel told him that Ryan needed to rest and so there should be no visitors. <u>See</u> Wittels Decl. Ex. 39 at 47-50, 65. The guard also testified that he denied Ms. George visitation with Ryan because Dr. Matel had ordered it, and

**United States District Court**
For the Northern District of California

also because the hospital guards were barring visitors due to the nature of the charges against Ryan and the possibility of violence.  See id. at 63; Thornton Reply Decl. Ex. D at 39.  Plaintiffs did not present any evidence to the contrary.  Plaintiffs argue that the Sutter Defendants lack a visitor policy, but the record shows that Sutter has a visitor policy, which states that visitors can be prohibited based on treatment needs or safety.  See Wittels Decl. Ex. 73.

Plaintiffs conclude that the Sutter Defendants knew or should have known that Ryan's family was distraught and that the denial of visitation caused severe emotional distress.  However, Plaintiffs cite no authority that the denial of visitation due to Ryan's need to rest and a possibility of violence breached any duty or standard to allow visitation.  There is no evidence that Ryan's family was denied visitation for any illegitimate reason.  Plaintiffs have failed to raise a triable issue of fact as to the eighteenth claim as to either the Sutter Defendants or Dr. Janian.

The thirteenth claim is brought by the estate for NIED.  The Sutter Defendants argue that this claim abated with death and that they did not commit a wrongful act to which the claim can attach to survive.  California Code of Civil Procedure section 377.34 states that:

> In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement.

See also Neal v. Farmers Ins. Exch., 21 Cal.3d 910, 920 n.3 (1978) (no damages for emotional distress available where the plaintiff died before trial); Capelouto v. Kaiser Found. Hosp., 7 Cal.3d 889, 892-93 (1972) (". . . the unitary concept of "pain and suffering" has served as a convenient label under which a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal.").  Therefore, the Sutter Defendants argue that the NIED claim as to the estate fails.

However, both sides recognize that the thirteenth claim can piggyback on a statutory claim, here, the twelfth claim for violation of California Welfare and Institutions Code section 15657.  Quiroz v. Seventh Avenue Center, 140 Cal.App.4th 1256, 1263 (2006) ("But there is at least one exception to the rule that damages for the decedent's predeath pain and suffering are not recoverable

30

United States District Court
For the Northern District of California

in a survivor action. Such damages are expressly recoverable in a survivor action under the Elder Abuse Act if certain conditions are met."). Because, as described above, there is a triable issue of fact as to the twelfth claim with respect to the Sutter Defendants and Dr. Janian, the thirteenth claim also survives as to both Defendants. Thus, the Court need not reach Plaintiffs' arguments regarding punitive damages relating to this claim.

**7.      Summary judgment as to the eighth claim**

Plaintiffs' eighth claim is for medical malpractice. Only the Sutter Defendants seek summary judgment as to this claim and only as to the alleged malpractice of the nursing staff. Plaintiffs argue that the nurses facilitated Ryan's premature discharge despite the attending physician's orders that Ryan demonstrate his ability to eat and drink on his own before being sent back to the jail. Plaintiffs also argue that the Sutter Defendants are liable under this claim for the actions of its administrator.

To show medical malpractice, a plaintiff must establish: "'(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.'" Hanson v. Grode, 76 Cal.App.4th 601, 606 (1999) (quoting Gami v. Mullikin Medical Center, 18 Cal.App.4th 870, 877 (1983)). The care that is due under the circumstances is the standard of conduct. Flowers v. Torrance Memorial Hospital Medical Center, 8 Cal.4th 992, 997 (1994). More specifically, the standard of care for nurses is tested with reference to the degree of skill, knowledge and care of other nurses in similar circumstances. Alef v. Alta Bates Hospital, 5 Cal.App.4th 208, 215 (1992) ("It is also established that a nurse's conduct must not be measured by the standard of care required of a physician or surgeon, but by that of other nurses in the same or similar locality and under similar circumstances."). Usually, the standard of care is shown by expert testimony. See, e.g., Hanson, 76 Cal.App.4th at 606 ("The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations] ....California courts have incorporated the expert evidence requirement into their standard for summary judgment in medical

31

malpractice cases. When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence.") (internal citations and quotations marks omitted); see also Judicial Council of California Civil Jury Instructions 504.

When the professional medical conduct required in the particular circumstances is within the common knowledge of a layperson, however, expert testimony is not required.  See Flowers, 8 Cal.4th at 1001 ("The 'common knowledge' exception is principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.'  The classic example, of course, is the X-ray revealing a scalpel left in the patient's body following surgery.") (internal citations omitted); Alef, 5 Cal.App.4th at 215 ("The standard of care against which the acts of a medical practitioner are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of laymen."). Further, in Massey v. Mercy Med. Ctr., 180 Cal.App.4th 690 (2009), the court applied the common knowledge exception where the plaintiff was a postoperative patient who fell from a walker when he was left unattended and sustained serious injuries.  The court stated that the nurse's conduct posed a question of common knowledge: "We think the alleged negligence (standard of care and breach) involving Nurse O'Bar's conduct as to plaintiff's fall is within the sphere of common knowledge and obvious to laymen: insufficiently attending to a fall-risk patient who needed assistance to walk short distances with a walker."  Massey, 180 Cal.App.4th at 696.  The court concluded: "Nurse O'Bar was engaged here in a routine, nontechnical task of assisting a fall-risk patient to walk a short distance to the bathroom. The common knowledge exception applies to this task."  Massey, 180 Cal.App.4th at 697.

The Sutter Defendants have submitted the expert opinion of Constance Paine, R.N., a registered and acute care nurse, regarding the nursing standard of care.  See Thornton Decl. Ex. O at

1. Nurse Paine opines that the nursing standard of care was followed in Ryan's case, as evidenced by the tests performed while he was at Sutter Medical Center.  See id. at 2.  She notes that Ryan received large volumes of intravenous fluids, which is a treatment for sickle cell crisis.  See id. at 4.  She states that he was admitted to the telemetry unit so that he could be closely monitored.  See id.  She reports that Ryan had an individualized treatment plan, that the medical staff gave him oxygen, performed blood tests, and monitored him for changes, and that his blood pressure was within the expected range for a person of his age.  See id. at 2-5.  Nurse Paine concluded that:

> When referring to the records, Mr. George actually became more verbal in the days he was hospitalized versus when he first arrived in the emergency room.  Since his condition did not worsen from admission as evidenced by the neurological assessments done by nursing and this information was also available to the physicians attending him, it was reasonable for him to be discharged back to the facility infirmary where hospital personnel believed he would be attended to properly.  Hospital personnel were also under the belief that they would be contacted by the receiving facility if Mr. George's condition deteriorated or Mr. George would be sent back to Sutter Medical Center for further treatment.  It is my opinion that the staff at Sutter Medical Center of Santa Rosa showed true diligence in evaluating Mr. George and provided professional and compassion care to him while he was at their facility.

See id. at 2-3.

Plaintiffs did not provide a declaration from an expert witness specifically on the nursing standard of care.  Accordingly, the Sutter Defendants argue that Plaintiffs cannot raise a triable issue of fact that the nursing staff at Sutter Medical Center breached their duty of care.  Plaintiffs respond that their other medical witnesses have opined on the standard of care in their reports.  See, e.g., Wittels Decl. Ex. 67 (expert witness Dr. Robert Rubenstein opined that approving Ryan's discharge was below the standard of care, and noted separately that "no compelling evidence exists that Mr. George was able to take either oral hydration or food at the time he was discharged back to jail on July 3, 2007.").  Moreover, Plaintiffs rely on the common knowledge exception.

The Court agrees with Plaintiffs that the common knowledge exception applies under the circumstances here, viewing the evidence in the light most favorable to Plaintiffs.  Nurse Douglass knew that eating and drinking was a condition of Ryan's release, but she did not observe him eat or drink.  See Wittels Decl. Ex. 49 at 28.  Nurse Shaw knew that Ryan's release was contingent upon him eating and drinking, yet she did not make sure that he did so.  Wittels Decl. Ex. 34 at 28-33, 100, 102-04, 107-08, 117, 119, 131-32.  Although according to Dr. Matel, Nurse Petker told him that

United States District Court
For the Northern District of California

Ryan finished almost all of his lunch, that information, which was critical to Ryan's discharge according to Dr. Flinders, was not noted in Ryan's medical record.  Further, Nurse Shaw testified that Ryan refused dinner on July 3.  It is within the common knowledge of a layperson that if Ryan's release was conditioned on eating and drinking, and the nurses attending Ryan did not see him eat or drink, then the nurses should have brought that fact to the doctor's attention prior to facilitating Ryan's release.  Accordingly, the Sutter Defendants' Motion for Summary Judgment on this claim is denied.

Plaintiffs also argue that the Sutter Defendants are liable under the eighth claim for the actions of its administrators, specifically, its discharge coordinator, Ms. Romano, who Plaintiffs claim failed to "observe and know" Ryan's condition and act in a reasonable fashion to safeguard his interests.  Plaintiffs argue that hospitals have a duty to "observe and know the condition of the patient."  Rice v. California Lutheran Hosp., 27 Cal.2d 296, 299, 302 (1945).  However, Plaintiffs point to no evidence that Ms. Romano did not observe and know Ryan's condition.  According to the Sutter Defendants, Ms. Romano was not deposed.  Therefore, there is no triable issue of fact as to the eighth claim based on conduct by the Sutter Defendants' administration.

**8.      Summary judgment as to the seventeenth claim**

Plaintiffs' seventeenth claim is for wrongful death.  Only the Sutter Defendants move for summary judgment on this claim.  California Code of Civil Procedure § 377.60 permits a claim for wrongful death "for the death of a person caused by the wrongful act or neglect of another."  "'The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs.'"  Quiroz, 140 Cal.App.4th at 1263.

The Sutter Defendants argue that Plaintiffs cannot prove that the Sutter Defendants committed negligence or a wrongful act, and therefore cannot prove the elements necessary for wrongful death.  For the reasons stated above with respect to Plaintiffs' twelfth claim for violation of California Welfare & Institutions Code section 15657, among others, summary judgment is denied on Plaintiffs' wrongful death claim.

**9.      Summary judgment as to punitive damages**

34

Because the Court has granted summary judgment as to Plaintiffs' First, Third and Sixteenth claims against the Sutter Defendants, there are no § 1983 claims against those Defendants to which punitive damages would attach. The Sutter Defendants argue because only state law claims remain, they are entitled to summary judgment as to punitive damages because Plaintiffs have not complied with California Code of Civil Procedure section 425.13, which states in relevant part:

> In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed.

Cal. Code Civ. P. § 425.13(a). Plaintiffs argue that section 425.13 does not apply in federal court. See, e.g., Jackson v. East Bay Hospital, 980 F. Supp. 1341, 1351-53 (N.D. Cal. 1997); but see, e.g., Thomas v. Hickman, 2006 WL 2868967, at *41 (E.D. Cal. Oct. 6, 2006).

This Court finds more persuasive the reasoning in Jackson that section 425.13 is a procedural rule that does not apply in federal court. In Jackson, the district court addressed the application of section 425.13 to the plaintiff's state law claims, not the federal law claims. Jackson, 980 F. Supp. at 1351 ("The parties have fully briefed the application of state punitive damages requirements on plaintiff's state claims in federal court. The court will now resolve that issue."). The Jackson court determined that section 425.13 was procedural, and "essentially a method of managing or directing a plaintiff's pleadings, rather than a determination of substantive rights." Id. at 1352. Further, the court found that section 425.13 was not so "intimately bound up" with state substantive law that it must be applied. Id. at 1352 (citing Wray v. Gregory, 61 F.3d 1414 (9th Cir. 1995) (holding that "where a state evidence rule is 'intimately bound up' with the rights and obligations being asserted, Erie mandates the application of a state rule in a diversity suit."). Finally, the court noted that the California Supreme Court had explained that the legislative intent behind section 425.13 was to provide a pretrial mechanism by which the court could determine whether a punitive damages claim could proceed, whereas the federal courts can readily accomplish this through case management procedures. Id. at 1352-53. Thus, the Jackson court determined that section 425.13 did not apply to the state law claims asserted in the federal case.

The Thomas court distinguishes Jackson on the grounds that the plaintiff in Thomas did not

United States District Court
For the Northern District of California

1   bring a claim for punitive damages under the federal Emergency Medical Treatment and Active

2   Labor Act.  The <u>Jackson</u> court, however, only ruled on the question of whether state punitive

3   damages requirements applies to the plaintiff's state law claims.  See <u>Jackson</u>, 980 F. Supp. at 1351.

4   Further, the <u>Thomas</u> court did not consider the legislative intent behind section 425.13 to provide

5   "additional protection [against unsubstantiated claims for punitive damages] by establishing a

6   pretrial hearing mechanism by which the court would determine whether an action for punitive

7   damages could proceed."  <u>Central Pathology Serv. Medical Clinic, Inc. v. Superior Court</u>, 3 Cal.4th

8   181, 189 (1992).

9        Additionally, the California Supreme Court has held that section 425.13 does not apply to

10  claims brought under the Elder Abuse and Dependant Adult Civil Protection Act, California Welfare

11  & Institutions Code section 15600, <u>et seq.</u>  See <u>Covenant Care Inc. v. Superior Court</u>, 32 Cal.4th

12  771, 783, 788-90 (2004).  The Supreme Court distinguished claims for neglect under EADACPA

13  from professional negligence:

14       But as we explained in <u>Delaney</u>, "neglect" within the meaning of Welfare and
    Institutions Code section 1560.27 covers an area of misconduct distinct from

15       "professional negligence."  As used in the Act, neglect refers not to the substandard
    performance of medical services but, rather, to the "failure of those responsible for

16       attending to the basic needs and comforts of elderly or dependent adults, regardless of
    their professional standing, to carry out their custodial obligations."  Thus, the

17       statutory definition of "neglect" speaks not of the *undertaking* of medical services,
    but of the failure to *provide* medical care.  Notably, the other forms of abuse, as

18       defined in the Act – physical abuse and fiduciary abuse . . . – are forms of intentional
    wrongdoing also distinct from "professional negligence."

19  <u>Covenant Care</u>, 32 Cal.4th at 783 (internal citations omitted and emphasis in original).  Here, the

20  Court has denied the Sutter Defendants' motion for summary judgment as to Plaintiffs' twelfth claim

21  under the EADACPA, so section 425.13 does not apply to that claim.  Thus, because section 425.13

22  is procedural and therefore does not apply to Plaintiffs' state law claims against the Sutter

23  Defendants, and also because section 425.13 does not apply to claims under the EADACPA, the

24  Sutter Defendants' motion for summary judgment as to Plaintiffs' punitive damages claim is

25  denied.[2]

26

27       [2]    The Sutter Defendants also argued that if the Court grants summary judgment as to the
    twelfth claim, Plaintiffs would have to comply with California Civil Code section 3294 in order to be

28  entitled to punitive damages.  The Court has denied the Sutter Defendants' motion for summary
    judgment as to the section 15657 claim, so this argument is moot.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dr. Janian also moves for summary judgment as to the claims for punitive damages, arguing that Plaintiffs have failed to make adequate allegations to support an award of those damages.  The Court has denied Dr. Janian's motion for summary judgment as to Plaintiffs' first, third, twelfth and sixteenth claims, which could support an award of punitive damages, so Dr. Janian's motion for summary judgment as to the punitive damages claim is also denied.

**Conclusion**

Accordingly, the Sutter Defendants' motion for summary judgment is granted in part and denied in part, and Dr. Janian's motion for summary judgment is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: August 9, 2010

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge