1

2

3

4

5

6

7          IN THE UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10    VALERIE GEORGE, et al.,                    No. C-08-02675 EDL

11              Plaintiffs,                      **ORDER GRANTING IN PART AND
                                                 DENYING IN PART COUNTY**
12        v.                                     **DEFENDANTS' MOTION FOR
                                                 SUMMARY JUDGMENT AND**
13    SONOMA COUNTY SHERIFF'S DEPT.,             **GRANTING IN PART AND DENYING IN
      et al.,                                    PART DEFENDANT BILL COGBILL'S**
14                                               **MOTION FOR SUMMARY JUDGMENT**
15              Defendants.
      _____/

16

17        This action arises from the death of Ryan George on July 9, 2007 while he was in the

18    custody of the Sonoma County Sheriff's Department, and after he had received allegedly inadequate

19    medical care from medical staff at the Sonoma County Main Adult Detention Facility ("MADF")

20    and at Sutter Medical Center of Santa Rosa.  Now before the Court are: (1) County Defendants'

21    Motion for Summary Judgment; and (2) Defendant Sheriff Bill Cogbill's Motion for Summary

22    Judgment.[1]  On September 24, 2010, the Court held a hearing on these motions, which were fully

23    _____

24          [1]      The County Defendants move for partial summary judgment of the following claims: (1)
      Violation of § 1983 deliberate indifference to serious medical needs (first claim); (2) Violation of § 1983
25    deprivation of basic necessities of life (second claim); (3) Violation of § 1983 deprivation of life without
      due process (third claim); (4) Violation of § 1983 violation of bodily privacy/unnecessary and wanton
26    infliction of pain/deprivation of liberty interest (fourth claim); (5) Violation of Government Code §
      845.6 failure to summon medical care (sixth claim); (6) Violation of Government Code § 815.6 failure
27    to discharge mandatory duty (seventh claim); (7) Violation of California Welfare & Institutions Code
      reckless or malicious neglect of dependent adult (twelfth claim); (8) Violation of California Civil Code
28    § 52.1 Bane Civil Rights Act (fifteenth claim); (9) Violation of § 1983 deprivation of familial
      relationships (sixteenth claim); and (10) Violation of California Code of Civil Procedure § 377.60
      wrongful death (seventeenth claim).

          Defendant Sheriff Bill Cogbill moves for partial summary judgment of the following claims: (1)

1  briefed.  For the reasons stated at the hearing and below, the Court issues the following Order.

2  **Legal Standard**

3        Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on

4  file, and any affidavits show that there is no genuine issue as to any material fact and that the

5  movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts are those

6  which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

7  (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury

8  to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most

9  favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn

10 from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The

11 court must not weigh the evidence or determine the truth of the matter, but only determine whether

12 there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

13       A party seeking summary judgment bears the initial burden of informing the court of the

14 basis for its motion, and of identifying those portions of the pleadings and discovery responses that

15 demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

16 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively

17 demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue

18 where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

19 _____

20 Violation of § 1983 deliberate indifference to serious medical needs (first claim); (2) Violation of § 1983
   deprivation of basic necessities of life (second claim); (3) Violation of § 1983 deprivation of life without
21 due process (third claim); (4) Violation of § 1983 violation of bodily privacy/unnecessary and wanton
   infliction of pain/deprivation of liberty interest (fourth claim); (5) Violation of California Government
22 Code § 844.6 negligence (fifth claim); (6) Violation of Government Code § 845.6 failure to summon
   medical care (sixth claim); (7) Violation of California Welfare & Institutions Code reckless or malicious
23 neglect of dependent adult (twelfth claim); (8) Negligent Infliction of emotional distress (thirteenth and
   eighteenth claims); (9) Intentional Infliction of emotional distress (fourteenth and nineteenth claims);
24 (10) Violation of California Civil Code § 52.1 Bane Civil Rights Act (fifteenth claim); (11) Violation
   of § 1983 deprivation of familial relationships (sixteenth claim); and (12) Violation of California Code
25 of Civil Procedure § 377.60 wrongful death (seventeenth claim).

26       On October 1, 2010, Plaintiffs withdrew their failure to summon medical care claim against
   Cobgill, and their negligent and intentional infliction of emotional distress and Bane Act claims against
27 all County Defendants.  The remaining state law claims are: (1) negligence (fifth claim) against Cogbill;
   (2) failure to summon medical care (sixth claim) against County and Sheriff's Department; (3) failure
28 to discharge mandatory duty (seventh claim) against County and Sheriff's Department; (4) neglect of
   dependent adult (twelfth claim) against all County Defendants; and (5) wrongful death (seventeenth
   claim) against all County Defendants.

United States District Court
For the Northern District of California

merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250. If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

**Facts**

**1.      Ryan's history while at Sonoma County Main Adult Detention Facility (MADF)**

**A.      May 31, 2007 - July 1, 2007**

Ryan was admitted to MADF on May 31, 2007. Wittels Decl. Ex. 15. The medical staff noted that Ryan had sickle cell disease and that he stated that he had been seen at Kaiser when he had a sickle cell crisis. Id. Ryan had a medical chart at the jail from a previous incarceration where it was noted that he had sickle cell disease. Wittels Decl. Ex. 21. Ryan completed a Jail Re-Admission Health Appraisal on June 10, 2007 indicating that he had been hospitalized for sickle cell anemia in 2004 and that he had been prescribed painkillers by Kaiser doctors for this condition. Wittels Decl. Ex. 16.

At 2:30 a.m. on June 28, 2007, Ryan submitted a request for urgent medical attention for the onset of a sickle cell crisis. Wittels Decl. Ex. 20 ("I have sickle cell anemia and recently I've been hurting - My arms & legs would break out in pain . . . it would be greatly appreciated if I get help fast, before it gets worse. . . ."); see also Wittels Decl. Ex. 18 at 52 (Ryan's mother, Valerie George, stating that she talked to Ryan on June 28 and he was having pain in his back and legs). A doctor saw Ryan at 10:15 a.m. on June 29, 2007, after which he was moved to the jail's outpatient housing unit (I-Mod) and prescribed pain medication. Wittels Decl. Ex. 22. Dr. Luders gave telephone orders for pain medications, admitted him to the I-Mod and ordered staff to "push fluids." Sterling Decl. Ex. A at C-053-54. At the end of the day on June 29, 2007, nursing notes show that Ryan's pain was "much better." Sterling Decl. Ex. A at C-090.

On June 29, 2007, Ryan completed an authorization for Kaiser to release his records, but the authorization was not received until July 10, 2007, after Ryan's death. Wittels Decl. Ex. 49. On

3

June 29, 2007, Ryan submitted an Inmate Request form stating that he had a complaint which needed to be referred to a doctor. Wittels Decl. Ex. 11 ("It is very important that I talk with you . . . regarding pain meds."). This request was received on June 30, 2007 and not acted on until July 2, 2007. Id.

In the afternoon of June 30, 2007, Ryan called his mother Valerie and his fiancé Tajmah Beauchamp, stating that he was still hurting badly, that no one was doing anything to help him and that he was not receiving pain medication in a timely manner. Wittels Decl. Ex. 18 (Valerie George testified that Ryan was not getting his medication); Ex. 19 (Tajmah Beauchamp testified that Ryan told her he was in severe pain and was not getting his medication); Ex. 93 (transcript of calls between Ryan and his mother); Ex. 94 (transcript of call between Ryan and Tajmah Beauchamp). Nursing notes reflect that he did not feel well. Sterling Decl. Ex. A at C-090.

Another inmate, Erick Copeland, testified that in late June, he observed Ryan being chastised for pressing the emergency call button in his cell. Wittels Decl. Ex. 71 at 19-22 (testifying that correctional officer told Ryan, after Ryan had pressed the emergency button twice, not to push the button again, and that if he did, the officer would put Ryan in the "hole"). Ryan had defecated on himself, but the officer would not help him clean up or give him to out of his cell to have a shower at that time. Id. at 20-22; Wittels Decl. Ex. 106 at ¶ 7. Copeland testified that the correctional officers were laughing at Ryan and the fact that he had defecated on himself. Wittels Decl. Ex. 71 at 22; Ex. 106 at ¶ 9.

MADF records from June 29-30 confirm that Ryan was complaining of and receiving treatment for a sickle cell crisis. Wittels Decl. Ex. 21, 22, 23 (medical records). Plaintiffs' experts testified that the jail's treatment was inadequate and caused an escalation in Ryan's sickle cell crisis. Wittels Decl. Ex. 62 at 1 (Saylor expert report). Ryan and his family warned jail personnel that his condition was very serious and that he needed proper treatment including regular and adequate pain medication and intravenous hydration. Wittels Decl. Ex. 18 at 57-58 (Valerie George's testimony that she called jail); Ex. 32 (Valerie George's notes as to what she told jail personnel); Supp. Wittels Decl. Ex. K (declaration of attorney Okler noting that he called jail on Ryan's behalf).

The medical records show that Ryan was not seen by a doctor from June 29 through July 1.

4

**United States District Court**
For the Northern District of California

1   Wittels Decl. Ex. 22, 23.  Notes on a Treatment and Vital Sign Flow Sheet state that Ryan "did not

2   feel well," that he was calm and cooperative, but also that he refused medications and urinanalysis,

3   and that he was yelling.  Wittels Decl. Ex. 29.  There is also evidence that he had a "poor attitude"

4   toward medical personnel, and that he could walk around and make phone calls during this time

5   even though he told his mother that he could not walk.  Wittels Decl. Ex. 51.

6          On July 1, 2007, Ryan was found in an unresponsive condition in his cell and was taken to

7   Sutter Medical Center.  Wittels Decl. Ex. 24 (incident reports); Ex. 25 (CFMG on-site emergency

8   response record).  A jail report states on July 1 that jail personnel were informed that Ryan's

9   condition was "very serious."  Wittels Decl. Ex. 26 at 08-0040.  A prisoner activity log from July 1

10  states that Ryan would remain hospitalized for at least 48 more hours, and that his condition was

11  "guarded - not grave!"  Wittels Decl. Ex. 30.

12              **B.     July 3, 2007 - July 9, 2007**

13         Ryan was discharged from Sutter Medical Center and returned to MADF on July 3, 2007.

14  Jail records (incident reports, supervisor logs, inmate management notes) show the following:  On

15  July 4, 2007, on two occasions, Ryan would not get up and get dressed for a visit, even though he

16  stated that he was not in pain and that he wanted the visit.  Wittels Decl. Ex. 24 at 08-0021 to 08-

17  0022; 08-0024; Ex. 26 at 08-0045-08-0047; 08-0050; Ex. 51.  Treatment notes show that he was

18  awake and uncooperative.  Wittels Decl. Ex. 29.  He refused breakfast, lunch and dinner.  Wittels

19  Decl. Ex. 51; Ex. 59.  He also refused medication.  Wittels Decl. Ex. 52; Ex. 47 at 08-0067.  Ryan

20  responded "no" when asked if he was in pain, but lying naked on the bed without sheet, blanket or

21  pillow.  Wittels Decl. Ex. 29.

22         On July 5, 2007, officers observed Ryan drink water, but he did not touch his dinner plate.

23  Wittels Decl. Ex. 26 at 08-0052.  Also, Ryan would not get dressed for a family visit.  Wittels Decl.

24  Ex. 51.  Ryan removed his catheter and refused his morning medication.  Wittels Decl. Ex. 51; Ex.

25  29; Ex. 47.  He refused breakfast, lunch and dinner, but drank some liquid.  Witels Decl. Ex. 51; Ex.

26  59; Ex. 47 at 08-0069.   He was not responsive to questions when Dr. Luders visited him.  Wittels

27  Decl. Ex. 51.

28         Dr. Luders called Ryan's mother and told her that Ryan was getting worse and that he did

United States District Court
For the Northern District of California

1    not know what to do.  Wittels Decl. Ex. 18 at 186-87.  Dr. Luders told Valerie George that taking

2    Ryan to the hospital was "not an option."  Id. at 188.  Valerie George testified that Dr. Luders agreed

3    to call Ryan's doctor, Dr. Miller.  Id. at 189-90.  Valerie George testified that Dr. Luders told her

4    that: "I am willing to talk to the doctor, and I haven't done that in 11 years, so that should tell you

5    something.  And that is all that I am willing to do."  Id. at 193.  Dr. Luders testified that he doesn't

6    usually involve outside family members.  Wittels Decl. Ex. 41 at 270.  Dr. Luders spoke with Dr.

7    Koida at Kaiser, who had been Ryan's doctor, and did not convey a sense of urgency about Ryan's

8    condition, nor did he ask for Dr. Koida's evaluation.  Wittels Decl. Ex. 112.  Dr. Koida offered to

9    see Ryan in his office the next week, but no appointment was made.  Id.

10       On July 6, 2007, Ryan refused breakfast, and would not drink water or juice.  Wittels Decl.

11    Ex. 51; Ex. 47 at 08-0073.  He also refused medication.  Wittels Decl. Ex. 52.  Ryan refused an

12    interview with the doctor, and refused the visit with his lawyer.  Wittels Decl. Ex. 51; Ex. 47 at 08-

13    0074.  Officers left his cell door open for time out of the cell, but Ryan never came out.  Id.

14    Officers found Ryan in his cell lying undressed in urine.  Wittels Decl. Ex. 24 at 08-0029; Ex. 26 at

15    08-0053; Ex. 51.  Ten minutes later, officers opened his cell to clean him up and give him a shower.

16    Id.  He showered, obtained assistance getting dressed and then was given dinner.  Id.  Ryan ate a

17    small amount of dinner and drank three to four cups of water.  Id.  Also on July 6, 2007, a

18    Classification/Health Services Input Form states that Ryan was seen by mental health staff and that

19    puzzles and word games were recommended because Ryan needed more stimulation.  Wittels Decl.

20    Ex. 56; see also Wittels Decl. Ex. 78 at 21-22, 33 (deposition of Benwell, from mental health

21    services, stating that she did not know the psychological symptoms of sickle cell anemia, and that

22    the diagnosis of sickle cell anemia in Ryan was "background noise.").

23       On July 7, 2007, Ryan stated that he wanted to eat, and was given lunch.  Wittels Decl. Ex.

24    51.  He drank some milk.  Wittels Decl. Ex. 59.  He refused dinner, saying that he "couldn't" eat.

25    Wittels Decl. Ex. 51; Ex. 59.  Later, Ryan was found in his cell lying in urine.  Wittels Decl. Ex. 24

26    at 08-0031-0032; Ex. 26 at 08-0056.  Within about thirty minutes, his mattress and clothes were

27    exchanged, and he was given a shower.  Id.  Ten minutes later, he defecated and urinated in his

28    underwear.  Id.  When he got to the shower chair, Ryan stated that he would shower, but did not

**United States District Court**
For the Northern District of California

1  move. Id.; Ex. 29  Shortly thereafter, officers attempted to get Ryan to shower himself, and

2  succeeded in getting Ryan's underwear off of him.  Wittels Decl. Ex. 24 at 08-0031-0032.  Finally,

3  with assistance, Ryan showered, and then he was returned to his cell.  Id.

4        On July 8, 2007, Ryan refused a visit with his mother and fiancé.  Wittels Decl. Ex. 26 at 08-

5  0057.  Also on July 8, 2007, Ryan was assisted to the shower where he would not shower himself,

6  but then urinated on himself as he was being taken back to his cell.  Wittels Decl. Ex. 24 at 08-0036;

7  Ex. 26 at 08-0058; Ex, 47 at 08-0081.  About fifteen minutes later, he was showered and returned to

8  his cell.  Id.  Ryan refused breakfast, was given lunch but did not eat it, and refused dinner.  Wittels

9  Decl. Ex. 59; Ex. 47 at 08-0079-0080.

10        At approximately 8:30 p.m. on July 8, 2007, Sergeant Merchen at the jail wrote an email to

11  his supervisor, expressing concerns about Ryan's condition.  Wittels Decl. Ex. 60.  Merchen

12  concluded that:

13        Medical staff believes that he is faking his symptoms.  I am obviously not a medical
      professional, but I do not believe this inmate is faking.  He is scheduled to see the
14        doctor on Monday 7/9 - I think we need to monitor this inmate, from what I saw
      tonight, I do not know if we can provide appropriate treatment for him.  We may need
15        to consider a nurses aid for him.

16  Id.

17        A fellow inmate, Jason Molina, testified that Ryan looked very sick, and that he could not

18  walk and he needed help getting up from a sitting position.  Wittels Decl. Ex. 38 at 12.  Molina

19  testified that Ryan urinated and defecated on himself.  Id.  Molina testified that some of the guards

20  mocked Ryan and humiliated him because he could not get to the restroom in time.  Id. at 14.

21  Molina testified that the guards said that Ryan was faking it.  Id. at 16; 23 (stating that faking it

22  was a common occurrence in jail).  Molina also testified that Ryan consistently asked for help, and

23  that sometimes guards helped him, but other times, they did not.  Id. at 17, 22.  Molina testified that

24  the only words that jail medical staff listen to are "I'm going to kill myself," and that they brushed

25  Ryan off.  Id. at 50.  Molina stated that he overheard mental health staff visiting Ryan, and after

26  Ryan asked for help, the mental health staff left his cell and told a guard that Ryan was faking it.  Id.

27  at 43-48.

28        On July 9, 2007, Ryan was found unresponsive in his cell.  Wittels Decl. Ex. 24 at 08-0037;

Ex. 26 at 08-0060.  His family had not been able to visit him since July 1 when he was at Sutter

1   Medical Center.  Wittels Decl. Ex. 32.  The last notation in his MADF records that he was alive was

2   at 1:30 a.m. when he drank six ounces of water.  Wittels Decl. Ex. 59.  The Intake and Output

3   Record for that day show that he refused breakfast at 6:17 a.m.  Wittels Decl. Ex. 59.  Ryan,

4   however, was pronounced dead at 6:17, after CPR had been performed for about 10 minutes.

5   Sterling Decl. Ex. A at C-055.

6         The autopsy report determined that the cause of death was "acute sickle cell anemia vaso-

7   occulative and hemolytic 'crisis,' (hours)" due to "complications of sickle cell thalassemia disease,

8   (years)."  Wittels Decl. Ex. 80.  A significant contributing factor was severe dehydration.  Id.  The

9   forensic pathologist concluded: ". . . the decedent was severely dehydrated, the gastro-intestinal

10  system was virtually empty, and he was severely anemic.  It is likely that early diagnosis of this

11  relatively common disease, with rapid therapy (including vigorous rehydration, adequate analgesia

12  and blood transfusion) may have prevented this death."  Id.  The report indicated that Ryan weighed

13  118 pounds (Wittels Decl. Ex. 80 at 00003), and just eight days before, upon his admission to Sutter,

14  he was recorded as weighing 162 pounds (Wittels Decl. Ex. 35).

15  **2.      Medical care for inmates at MADF**

16        The County contracts with California Forensic Medical Group ("CFMG") for the provision

17  of medical care to MADF inmates.  Toby Decl. ¶ 3; Ex. A.  CFMG employs or contracts with

18  medical staff who provide health care for inmates at the jail.  Toby Decl. ¶ 3.  While CFMG retains

19  the medical staff, the County employs correctional officers who are not medically trained

20  professionals.  Toby Decl. ¶ 4.  The correctional officers are not qualified to provide, and do not

21  provide, medical care to inmates with the exception of first aid and CPR.  Toby Decl. ¶ 4.

22        The CFMG contract sets forth the County's expectations regarding the quality of the medical

23  care to be provided to inmates. Toby Decl. ¶ 9; Ex. A at Part A, § 7, Part B, § 8(a).  Lieutenant Toby

24  acted as a liaison between the County and the providers of inmate medical care, including CFMG,

25  during the applicable time period.  Toby Decl. ¶ 7.  The provision of medical care to inmates is

26  monitored, and issues relating to inmate health care are addressed at monthly administrative

27  meetings and quarterly quality assurance meetings that are attended by representatives of the

28  County, CFMG, and Sonoma County Mental Health.  Toby Decl. ¶ 5.  Quarterly meetings may

**United States District Court**
For the Northern District of California

include a peer review component, which County representatives do not attend, and CFMG annually conducts an audit of the care it provides at the jail. Toby Decl. ¶ 5. The County's medical care program for inmates is periodically reviewed by the Institute for Medical Quality Assurance, a subsidiary of the California Medical Association, which has accredited the County's program following each review. Toby Decl. ¶ 6.

**Discussion**

**County Defendants' Motion for Summary Judgment**

**1.      County Defendants are immune under California Government Code section 844.6 for state law claims against them**

On October 1, 2010, Plaintiffs withdrew their claims based on negligent infliction of emotional distress, intentional infliction of emotional distress, and the Bane Act against the County Defendants. The remaining state law claims against the County Defendants are: (1) failure to summon medical care; (2) failure to discharge mandatory duty; (3) neglect of dependent adult; and (4) wrongful death.

County Defendants argue that they are immune from liability pursuant to Government Code section 844.6(a)(2) for Plaintiffs' seventh claim (failure to discharge a mandatory duty to summon medical care pursuant to Government Code section 815.6), twelfth claim (dependent adult neglect under California Welfare & Institutions Code section 15657), and seventeenth claim (wrongful death). Government Code section 844.6(a)(2) states:

> (a) Notwithstanding any other provision of this part, except as provided in this section and in Sections 814, 814.2, 845.4, and 845.6, or in Title 2.1 (commencing with Section 3500) of Part 3 of the Penal Code, a public entity is not liable for: . . . (2) An injury to any prisoner.

Plaintiffs have not opposed summary judgment of the seventh, twelfth and seventeenth claims against the County Defendants based on immunity under California Government Code section 844.6. Because the immunity applies, summary judgment is granted in favor of the County Defendants on these claims.

**2.      Plaintiffs have raised a triable issue of fact as to County Defendants' liability for violation of California Government Code section 845.6**

County Defendants move for summary judgment of Plaintiffs' sixth claim for violation of California Government Code section 845.6 for failure to summon medical care. Section 845.6

provides:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care. Nothing in this section exonerates a public employee who is lawfully engaged in the practice of one of the healing arts under any law of this state from liability for injury proximately caused by malpractice or exonerates the public entity from its obligation to pay any judgment, compromise, or settlement that it is required to pay under subdivision (d) of Section 844.6.

Liability under section 845.6 has been limited to "serious and obvious medical conditions requiring immediate care." Watson v. State of California, 21 Cal. App. 4th 836, 841 (1993) (citing Kinney v. Contra Costa County, 8 Cal. App.3d 761, 770 (1970) (no liability for failure to provide medical care when prisoner complained of a bad headache and requested medication)); see also Kodimer v. County of San Diego, 2010 WL 2645548, at *11 (S.D. Cal. June 30, 2010) ("In the words of one court, 'section 845.6 ... could not be clearer. It creates liability both in the county and its agents, under the circumstances specified, in unambiguous language.' This section 'creates liability ... which does not otherwise exist under the common law.'") (internal citations omitted).  "Generally, this type of claim is not ripe for summary judgment. Questions of a jail employee's knowledge of an inmate's need for immediate psychiatric care and the nature of the care which should have been summoned, 'are questions of fact to be determined at trial.'" Kodimer, 2010 WL 2645548, at *11 (quoting Johnson, 143 Cal.App.3d at 317).

To state a claim under section 845.6, a prisoner must establish three elements: "(1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care." Jett v. Penner, 439 F.3d 1091, 1099 (9th Cir. 2006) ("This section does not impose a duty to monitor the quality of care provided."); Watson, 21 Cal.App.4th at 842-43 ("Section 845.6 does not require that a prison guard be a better medical diagnostician" than the medical personnel).  The Jett court held that: ". . . 'immediate medical care' as used in the statute includes both diagnosis and treatment and therefore conclude the need for 'immediate medical care' can arise more than once in relation to an ongoing serious medical condition." Jett, 439 F.3d at 1099.

**United States District Court**
For the Northern District of California

County Defendants argue that County jail personnel contacted CFMG whenever they had reason to believe that Ryan might be in need of medical care. Specifically, on June 29, 2007, correctional staff contacted CFMG after Ryan complained of sickle cell pain. Sterling Decl. Ex. A at C-069. Later that day, Ryan was transferred to I-Mod, the jail's medical unit, where he could be monitored by CFMG medical staff. Sterling Decl. Ex. A at C-053-054. On July 1, 2007, when officers found Ryan unresponsive, they called CFMG for assistance and Ryan was transferred to Sutter. Sterling Decl. Ex. A at C-054. When Ryan returned from Sutter, he was housed in I-Mod, and on numerous occasions until his death on July 9, he was seen by CFMG staff. Sterling Decl. Ex. A at C-055-58, C-087-90. Officers requested help at least once per day when Ryan was in I-Mod. Id.; see also Toby Decl. Ex. T at MADF-08-0070; 08-0033. Officers sought assistance from Mental Health Services. Sterling Decl. Ex. C at 08-0470.

Plaintiffs, however, point to instances in which jail personnel did not reasonably summon medical care for Ryan. First, former MADF inmate Copeland testified that he heard Ryan tell the jail guard that Ryan was "burning up" and that he needed his medication and that he had defecated on himself, but that the guard would not let him come out of his cell or clean up until the regular out of cell activity time. Wittels Decl. Ex. 71 at 19-20. Copeland further testified that he did not believe that the guards called for medical care, and that no one from the medical staff came to Ryan after that. Wittels Decl. Ex. 71 at 22. Former MADF inmate Molina testified about conversations he overheard between Ryan and the guards during which, among other things, guards mocked Ryan for urinating and defecating on himself, and between Ryan and medical staff regarding Ryan's medical condition during which Ryan told medical staff that he did not belong in jail and the medical staff replied that he had been cleared from the hospital. See Wittels Decl. Ex. 38 at 14, 49. Plaintiffs also point to a jail report of an incident on July 4 when Ryan would not get dressed for a family visit, but was only lying face down on his bed. Sergeant Skinner tried to get Ryan to dress himself for the visit, but he would not, even though he said he wanted to. Wittels Decl. Ex. 24 at 08-0024. There has been no showing that Skinner called for medical care. Finally, Plaintiffs point to Merchen's email on July 8 stating that Ryan was not doing well, and that he did not think that jail could provide the necessary treatment for Ryan. Wittels Decl. Ex. 60. There is no evidence that Merchen, or his

1   supervisor to whom he wrote, called medical staff about his grave concerns.  Thus, Plaintiffs have

2   raised a triable issue of fact as to the failure to summon medical care pursuant to California

3   Government Code section 845.6.  See Hart v. Orange County, 254 Cal.App.2d 302, 308-09 (1967)

4   (holding that "it was squarely for the jury whether he came within and had met the conditions and

5   standards of section 845.6" where the jail personnel had placed the plaintiff in a drunk cell even

6   though he was unconscious and did not smell of alcohol).

7        County Defendants argue for the first time in the reply that they are immune for this claim

8   under California Government Code section 855.8.  Because this argument was raised for the first

9   time in the reply, it is improper.  County Defendants' motion for summary judgment of the claim for

10  violation of section 845.6 is denied.

11  **3.    Plaintiffs have raised a triable issue of fact as to County Defendants' liability under**
        **42 U.S.C. § 1983 claims against County**

12        Plaintiffs allege five claims against the County Defendants for violation of § 1983: (1)

13  deprivation of adequate medical care by acting with deliberate indifference to his serious medical

14  need (first claim); (2) deprivation of the basic necessities of life (second claim); (3) deprivation of

15  life with due process (third claim); (4) deprivation of bodily privacy (fourth claim); and (5)

16  deprivation of familial relationship with Ryan (sixteenth claim).  The County Defendants first

17  contend that all of Plaintiffs' § 1983 claims against the County are barred because Plaintiffs have

18  presented no evidence of an unconstitutional policy as required by Monell v. Dept. of Social

19  Services, 436 U.S. 658, 691 (1978).  Generally, a city or county may not be held vicariously liable

20  for the unconstitutional acts of its employees under the theory of respondeat superior.  Board of the

21  County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997); Monell, 436

22  U.S. at 691.  Instead, "it is when execution of a government's policy or custom, whether made by its

23  lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the

24  injuries that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 694.

25  Alternatively, liability may be based on a policy, practice or custom of omission amounting to

26  deliberate indifference." See Gibson v. City of Washoe, Nevada, 290 F.3d 1175 (9th Cir. 2002).

27        There are three ways to show an affirmative policy or practice of a municipality:  (1) by

28  showing "a longstanding practice or custom which constitutes the "standard operating procedure" of

12

United States District Court
For the Northern District of California

1   the local government entity;" (2) "by showing that the decision-making official was, as a matter of

2   state law, a final policymaking authority whose edicts or acts may fairly be said to represent official

3   policy in the area of decision;" or (3) "by showing that an official with final policymaking authority

4   either delegated that authority to, or ratified the decision of, a subordinate." Menotti v. City of

5   Seattle, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting Ulrich v. City and County of San Francisco,

6   308 F.3d 968, 984 (9th Cir. 2002)). To establish a policy of omission, Plaintiffs must show that "the

7   municipality's deliberate indifference led to its omission and that the omission caused the employee

8   to commit the constitutional violation." Gibson, 290 F.3d at 1186. Plaintiffs can establish deliberate

9   indifference only by showing that "the municipality was on actual or constructive notice that its

10  omissions would likely result in a constitutional violation." Id. An "improper custom may not be

11  predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration,

12  frequency and consistency that the conduct has become a traditional method for carrying out

13  policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996). Plaintiffs contend that there is

14  sufficient evidence of both types of municipal policies (affirmative acts and omissions) to establish

15  liability of the County in this case.

16          "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary

17  and wanton infliction of pain' proscribed by the Eighth Amendment. Estelle v. Gamble, 429 U.S.

18  97, 104 (1976); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). This may be shown in the

19  medical context by "acts or omissions sufficiently harmful to evidence deliberate indifference to

20  serious medical needs." Id. at 105-06. Further, deliberate indifference is found where an official

21  "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S.

22  825, 837 (1994). "In determining deliberate indifference, we scrutinize the particular facts and look

23  for substantial indifference in the individual case, indicating more than mere negligence or isolated

24  occurrences of neglect. . . . While poor medical treatment will at a certain point rise to the level of

25  constitutional violation, mere malpractice, or even gross negligence, does not suffice." Wood v.

26  Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) (claims of deliberate indifference by prison

27  doctors). Deliberate indifference is shown where there has been denial, delay or intentional

28  interference with medical treatment. Wood, 900 F.2d at 1334. However, a difference in medical

13

United States District Court
For the Northern District of California

1  opinion does not constitute deliberate indifference.  Sanchez .v Vild, 891 F.2d 240, 242 (9th Cir.

2  1989).  The due process clause is not implicated by negligence or even gross negligence, but is by

3  deliberate indifference.  See Daniels v. Williams, 474 U.S. 327, 328 (1986); L.W. v. Grubbs, 92 F.2d

4  894, 896-97, 900 (9th Cir. 1986).

5  Scenarios that may constitute deliberate indifference include "a failure to respond to a

6  known medical problem, a failure to provide a system of ready access to adequate medical care, and

7  a failure to provide a medical staff competent to examine and diagnose inmate's problems." Eres v.

8  County of Alameda, 1999 WL 66519, at *8 (N.D. Cal. Feb. 1, 1999).  Deliberate indifference may

9  be "inferred when a doctor's treatment decisions are so far afield of accepted professional standards

10 that no inference can be drawn that the decisions were actually based on medical judgment." See,

11 e.g., Vann v. Vandenbrook, 596 F. Supp. 2d 1238, 1243 (W.D. Wisc. 2009) (doctor failed to treat

12 133 cuts on a suicidal inmate).  Deliberate indifference may be "established by a showing of grossly

13 inadequate care as well as by a decision to take an easier but less efficacious course of treatment."

14 See, e.g., McElligot v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (failure of doctor to diagnose

15 cancer even when prisoner was in tremendous pain and lost weight).  Finally, medical care that is

16 "so cursory as to amount to no treatment at all" satisfies a deliberate indifference standard.  See, e.g.,

17 Parzyck v. Prison Health Servs., Inc., 290 Fed. Appx. 289, 291 (11th Cir. 2008) (failure of prison

18 medical staff to provide an orthopedic consultation on two occasions even though consultations had

19 been recommended and prisoner in obvious pain).

20 In addition, evidence of an improper or ulterior motive can support a conclusion that a

21 defendant failed to exercise sound medical judgment but instead acted with a culpable state of mind.

22 See, e.g., Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (dismissing appeal for lack of

23 jurisdiction: ". . . as Jackson has alleged the doctors chose to deny him the opportunity for a kidney

24 transplant, not because of an honest medical judgment, but on account of personal animosity. If

25 Jackson proves that claim at trial, and he has shown that the delay in performing the kidney

26 transplant was medically unacceptable, he will have shown that the doctors were deliberately

27 indifferent to his serious medical needs."); Chance v. Armstrong, 143 F.3d 698, 704 (2d Cir. 1998)

28 (denying motion to dismiss: "Crucially, he has also alleged that Dr. Moore and Dr. Murphy

14

**United States District Court**
For the Northern District of California

1    recommended extraction not on the basis of their medical views, but because of monetary incentives.

2    This allegation of ulterior motives, if proven true, would show that the defendants had a culpable

3    state of mind and that their choice of treatment was intentionally wrong and did not derive from

4    sound medical judgment."); Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir. 1985)

5    ("Furthermore, if necessary medical treatment has been delayed for non-medical reasons, a case of

6    deliberate indifference has been made out. Plaintiff alleged that Ancata was indigent and that the

7    defendants put the financial interest of Prison Health Services ahead of the serious medical needs of

8    Ancata.") (internal citations omitted).

9          Suspicions of malingering may also be considered an ulterior motive supporting an

10   inference that a defendant failed to take a plaintiff's condition seriously and thus acted recklessly in

11   failing to provide proper care.  See, e.g., Thomas v. Arevalo, 1998 WL 427623, at *9 (S.D. N.Y.

12   July 28, 1998) ("There is evidence sufficient to support an inference that the State Defendants and

13   defendant Kalnins considered plaintiff a possible malingerer. A reasonable jury could infer that

14   defendants had a motive for failing to take plaintiff's complaints seriously based on this

15   characterization.") (internal citations to evidence omitted); Martin v. County of Sacramento, 2010

16   WL 670784, at *16-17 (E.D. Cal. Feb. 19, 2010) (denying summary judgment where there was no

17   evidence that a prison doctor had obtained prisoner's past medical records in order to fully evaluate

18   the medical needs that could be deliberate indifference); Walker v. Benjamin, 293 F.3d 1030, 1040

19   (7th Cir. 2002) ("The fact that Nurse Dunbar and Dr. Benjamin may have based their refusal to treat

20   Walker's pain on a good-faith belief that he was malingering, that he was not in pain but was merely

21   trying to get high with the narcotic painkiller, is an issue for the jury.").  Plaintiffs have also cited

22   two cases in which deliberate indifference claims have been sustained for alleged failures to treat

23   sickle-cell anemia.  See Barksdale v. King, 699 F.2d 744, 748 (5th Cir. 1983); Hampton v. St. Clair

24   County Jail, 2009 WL 666428, at *1-2 (S.D. Ill. Mar. 10, 2009).

25         **A.  Liability based on CFMG policy or practice**

26         Plaintiffs argue that certain state regulations demonstrate that County Defendants are liable

27   for the policies and practices promulgated by CFMG or contained in its manual by virtue of the

28   contract between the parties for medical care.  According to 15 California Code of Regulations

section 1200:

> In Type I, II, III and IV facilities, the facility administrator shall have the responsibility to ensure provision of emergency and basic health care services to all inmates. Medical, dental, and mental health matters involving clinical judgments are the sole province of the responsible physician, dentist, and psychiatrist or psychologist respectively; however, security regulations applicable to facility personnel also apply to health personnel.

Further, "[t]he health authority shall, in cooperation with the facility administrator, set forth in writing, policies and procedures in conformance with applicable state and federal law, which are reviewed and updated at least annually" and shall include certain topics listed in the regulation. 15 Cal. Code Regs. § 1206. A "facility administrator" is defined as "the sheriff, chief of police, chief probation officer, or other official charged by law with the administration of a local detention facility/system." 15 Cal. Code Regs. § 1006.

Plaintiffs, however, have cited no binding authority for the position that these regulations would impose liability on the County Defendants based on CMFG policies, practices and manuals. Accordingly, Plaintiffs have failed to raise a triable issue of fact as to County Defendants' liability based on actions by CFMG employees.

**B. Liability based on County policy, practice or custom**

Plaintiffs argue that there are eleven policies and practices under which the County Defendants are liable for violation of 42 U.S.C. § 1983.

**1.    Inadequate medical care**

Plaintiffs contend that the County Defendants made affirmative policies and failed to implement appropriate policies and procedures to ensure that Ryan received treatment that was not deliberately indifferent to his serious medical needs. Plaintiffs rely in large part on evidence from other inmates describing what those inmates believe to be inadequate medical care. For example, in 2004, inmate Anthony Duarte experienced delays in treating an appendicitis, which caused severe pain and disability  See Wittels Decl. Ex. 90; Ex. 91 (declaration of David Elliot, Mr. Duarte's doctor). In 2006, inmate Erick Copeland experienced severe swelling in his feet and legs, but was misdiagnosed with cellulitis and given antibiotics, which did not work and eventually, Copeland was unable to walk and paid to see his personal doctor who was alarmed at Copeland's condition. See Wittels Decl. Ex. 71 at 22-27. In 2007, Eric Baker experienced lengthy delays in treating his broken

16

United States District Court
For the Northern District of California

1  facial bones and was repeatedly denied pain medication.  See Wittels Decl. Ex. 81-88.

2       Plaintiffs also cite various newspaper articles, including one about Ryan, regarding medical

3  care at the jail that help show a triable issue of fact that the County Defendants were on notice of the

4  events at the jail.  See Wittels Decl. Ex. 72, 73.  In addition, Plaintiffs cite a 2007-2008 grand jury

5  report identifying preventable inmate deaths from alcohol withdrawal syndrome.  See Wittels Decl.

6  Ex. 100.  Plaintiffs also point to the 2009-2010 grand jury report related to Ryan's case, which

7  concludes that the Sheriff's Department failed to fully intervene in Ryan's case to prevent his

8  decline.  See Wittels Decl. Ex. 7.

9       The fact that some of these events occurred after Ryan's death do not make them

10 inadmissible.  See Henry v. County of Shasta, 132 F.3d 512, 519 (9th Cir. 1997) (". . . we reiterate

11 our rule that post-event evidence is not only admissible for purposes of proving the existence of a

12 municipal defendant's policy or custom, but is highly probative with respect to that inquiry.").  The

13 authority cited by County Defendants does not preclude later-occurring events from also establishing

14 a pattern.  See Clouthier v. County of Contra Costa, 591 F.3d 1232, 1249, 1251 (9th Cir. 2010).

15      Examining the evidence in the light most favorable to Plaintiffs, there is a triable issue of

16 fact as to a policy, practice or custom of substandard care by CFMG at MADF, the County's

17 constructive knowledge of the pattern, and the County's failure to act on this knowledge to prevent

18 injury to prisoners.  Plaintiffs have presented evidence of more than "isolated or sporadic incidents,"

19 and created a triable issue of fact as to the County's liability regarding deliberate indifference to the

20 serious medical needs of prisoners incarcerated at MADF.

21      **2.**    **Inadequate oversight of MADF medical program**

22      Plaintiffs argue that the County Defendants failed to implement adequate oversight

23 regarding the provision of medical services at the jail.  Specifically, Plaintiffs point to the 2006

24 grand jury report entitled "The Million Dollar Inmate?," which identified problems with monitoring

25 and record keeping in reference to CFMG's medical services.  The grand jury found, among other

26 things, that there were "no empirical, objective, and quantifiable standards in place for measuring

27 the success of the [medical] program," or for "determining what is the most effective and

28 economical method of handling jail medical services."  Wittels Decl. Ex. 12 at 7.  The grand jury

United States District Court
For the Northern District of California

1   concluded that: "Changing circumstances mandate close attention to inmate medical care, especially

2   in light of the past several years of cost overruns.  Expert monitoring and oversight by the county

3   have become mandatory."  Id. at 8.  In a subsequent grand jury report on Ryan's death, the grand

4   jury recommended that: "CFMG undergo regular independent peer review of medical care provided

5   to jail facilities."  Wittels Decl. Ex. 7 at 7.

6           Plaintiffs also point to various deposition testimony to establish a triable issue of fact as to

7   this policy.  For example, Michael Dagey, the CFMG Program Manager for the MADF, testified that

8   he was not aware whether the issue of how an inmate gets access to medical care through the

9   reporting of custody staff was discussed in the monthly quality assurance meetings.  Wittels Decl.

10  Ex. 40 at 50.  He also testified that he was not aware of any actions taken or changes made by

11  CFMG based solely on statistical summaries that were provided during the meetings.  Id. at 60.  He

12  also testified that there have been no changes in policies or practices after what happened to Ryan.

13  Id. at 104.

14          As another example, Plaintiffs cite the testimony of Earlene DeBeni, who was the director

15  of nursing at CFMG.  She testified that there was no audit that occurred with respect to inmate

16  Duarte's case of appendicitis in 2004, and that she was not aware of any changes there were made in

17  policies as a result of Duarte's allegations.  Wittels Decl. Ex. 50 at 11-13.  She also testified that the

18  staff discussed being more aware of when an inmate is in pain (Wittels Decl. Ex. 50 at 13), but that

19  does not necessarily mean that there is no triable issue of fact raised by her other testimony that no

20  changes were made as a result of Duarte's case.

21          As another example, Plaintiffs point to the testimony of two CFMG nurses, Pat Stanley and

22  Joyce Homenko.  Stanley testified that she did not recall any monthly meetings involving Ryan.

23  Wittels Decl. Ex. 46 at 16.  She also testified that she does not go to many meetings because she

24  works the late shift.  Supp. Sterling Decl. Ex. J at 15.  Homenko testified that there had been no

25  meetings since Ryan's death about lessons to be learned as a consequence of his death.  Wittels

26  Decl. Ex. 45 at 42.  Nor were there any training sessions about sickle cell amenia following his

27  death.  Id. at 43.  Plaintiffs also point to Sheriff Cogbill's prior deposition testimony in which he

28  stated that none of the quarterly quality assurance meetings resulted in Dr. Luders doing anything

United States District Court
For the Northern District of California

1   differently at the jail.  Wittels Decl. Ex. 37 at 44.

2         Accordingly, viewing the evidence in the light most favorable to Plaintiffs, there is a triable

3   issue of fact that there was a policy of inadequate oversight at the jail.

4         **3.     Cost containment**

5         Plaintiffs argue that there is a triable issue of fact as to a policy of limiting inpatient

6   hospital stays in order to cut costs.  Plaintiffs point to the grand jury report entitled, "The Million

7   Dollar Inmate?," which stated that close attention should be paid to inmate medical care in light of

8   severe cost overruns.  Wittels Decl. Ex. 12 at 8.  The response from Sonoma County to that grand

9   jury report states that the County is reimbursed at 55% of Sutter's customary billing rates under the

10  contract.  Wittels Decl. Ex. 2 at 4.  The contract between the County and CFMG requires CFMG to

11  provide certain cost information to enable the County to calculate the annual jail daily rate for

12  inmate housing, and required CFMG to provide a percentage figure which represents the portion of

13  the total contract compensation attributable to an inmate patient's individual medical care.  Wittels

14  Decl. Ex. 36 at § 35.  Further, the contract states that:

15        [CFMG's] responsibility to pay for medical treatment in cases where extensive
          medical treatment is necessary shall be limited to $15,000 net liability per individual
16        inmate medical/surgical inpatient episode.  Episode means a single admission and
          discharge from a hospital.

17  Id. at § A(1)(j).  Plaintiffs' correctional expert Vasquez also opines that it is preferable from the

18  County's financial perspective that an inmate return to the MADF and then be sent back to the

19  hospital because of medical need.  Wittels Decl. Ex. 14 at 7-8.  Plaintiffs also point to evidence of

20  medical treatment of other inmates such as Copeland.

21        County Defendants argue that there is no cost containment policy.  They dispute Plaintiffs'

22  interpretation of the CFMG-County contract, but do not offer any evidence to contradict the plain

23  language of the contract, which requires CFMG to provide cost information to the County.  County

24  Defendants also dispute the import of the contract provision imposing a cap on CFMG's

25  responsibility for expenses.  While there is no direct evidence that costs were a concern for the

26  County in Ryan's case, or in any of the other inmates' cases cited by Plaintiffs, the contract is

27  evidence that the County agreed to a cap on medical care by CFMG.  While the contract by itself is

28  not sufficient to raise a triable issue of fact, viewing the evidence in the light most favorable to

1   Plaintiffs, there is a triable issue of fact that includes the cost containment policy when taken

2   together with other evidence as discussed in this decision.

3      **4.  Sutter as the default facility for outside care and treatment**

4      The contract between the County and Sutter obligates Sutter to provide "inpatient care for

5   inmates in the custody of the Sonoma County Sheriff's Department" and cannot terminate those

6   services without County approval.  Wittels Decl. Ex. 1 at 15.  Also, discounting billing for medical

7   services to inmates requires County approval.  Id. at § 10.11.4(b)(i).  Sutter provides annual

8   operational reports regarding inmate medical services as well as annual financial reports.  Id. at §

9   6.1, 6.2.  The County's reimbursement obligation under the contract is 55%.  Id. at § 10.5(d)(i)

10  (contract says 80%); Ex. 2 at 4 (noting reduction to 55%). Sutter is the default hospital for treatment

11  of inmates.  Wittels Decl. Ex. 2, 3; Ex. 40 at 38-39 (Dagey depo); Ex. 43 at 126-27 (Toby depo); Ex.

12  113 (Terry decl) ¶ 11.  Christine Bartel, a Sutter administrator, testified that if an inmate wanted to

13  be transferred to another hospital after arriving at Sutter, Sutter would have to find an accepting

14  hospital and accepting physician, and "would probably have to have the permission of the jail."

15  Wittels Decl. Ex. 9 at 15.

16     Dr. Hard testified to a default policy that inmates are treated at Sutter Medical Center and

17  that transfer to other hospitals is discouraged.  See Wittels Decl. Ex. 10 at 94-95.  However, Dr.

18  Hard testified that Sutter Medical Center is the receiving hospital for inmates, but that if there were

19  extraordinary circumstances such that the Sutter doctors could not treat an inmate or the jail wanted

20  him transferred elsewhere, the inmate would be transferred.  He also testified that a transfer at the

21  request of a family member would probably require jail approval.  Wittels Decl. Ex. 10 at 95.  In

22  addition, Dr. Matheson testified that did not pursue a transfer for Ryan, but that he would not have

23  been "adverse to transfer."  Wittels Decl. Ex. 6 at 172.

24     County Defendants  argue that Dr. Hard's testimony regarding transfer of inmate patients is

25  only speculative because he had never transferred a patient based on the patient's convenience.

26  Wittels Decl. Ex. 10 at 95.  County Defendants point out that Matheson had only worked at Sutter

27  for four days, so his testimony must be considered in light of that.  Supp. Sterling Decl. Ex. K at 21-

28  14.  The Court, however, cannot weigh the evidence on summary judgment.  Viewing the evidence

United States District Court
For the Northern District of California

1  in the light most favorable to Plaintiffs, there is a triable issue of fact as to a policy that Sutter is the

2  default hospital for inmates and that transfers require County approval.

3       **5.**     **Lack of communication**

4         Plaintiffs argue that the County Defendants have a policy of lack of communication and

5  coordination along with deficient institutional culture and training.  Plaintiffs point to grand jury

6  reports and expert reports that they say show the policy of inadequate communication.  See, e.g.,

7  Wittels Decl. Ex. 14 at 12-13 (Plaintiffs' correctional expert stated that the "disconnection and

8  unresponsiveness" between jail staff, CFMG and the Sutter Defendant contributed to Ryan's death);

9  Ex. 62 at 5-6 (Plaintiffs' correctional expert stated that County failed to hold CFMG accountable).

10  Plaintiffs' correctional expert Saylor also testified that this was a case in which jail staff watched

11  Ryan deteriorate, yet did nothing about it.  Wittels Decl. Ex. 67 at 205, 220-21.  Further, the grand

12  jury addressed indifference of guards and bias towards inmates.  Wittels Decl. Ex. 100 (grand jury

13  noting indifference by guards to inmates with alcohol withdrawal syndrome); Ex. 12 (2006 grand

14  jury report stating that "no clear demarcation of responsibilities between corrections and the medical

15  provider except to state that detention does not make medical decisions").  Further, CFMG's Dagey

16  testified that he could not say whether it was possible under the MADF Medical Autonomy policy

17  for County employees to question medical treatment or care, which Plaintiffs argue shows a bar to

18  communication. Wittels Decl. Ex. 40 at 58-59.

19         Plaintiffs cite further evidence of a lack of integration between the County and CFMG

20  regarding deficiencies in jail procedures for processing and scheduling outside referrals ordered by

21  CFMG that caused delay in care.  Specifically, Dr. Luders testified that it would take jail officials

22  two weeks to arrange a regular appointment, so he intended to send Ryan to the Kaiser emergency

23  room to avoid that delay.  Wittels Decl. Ex. 40 at 188.  Further, it took five days to get an x-ray and

24  eight days to get a CT scan for another inmate's broken facial bones.  Wittels Decl. Ex. 81 at 15-16,

25  36-37, 82-83.  Plaintiffs argue that this shows a breakdown in the appointment policy application

26  and implementation.  Wittels Decl. Ex. 68 at 5.  In addition, Lieutenant Toby did not personally

27  observe Ryan during the week before he died and did not meet with anyone to discuss his status.

28  Wittels Decl. Ex. 43 at 65-66.  Toby stated that he did not see a need to check on Ryan in the week

after he returned from the hospital.  Id. at 95.  Toby did not regularly read the report and activity

logs in which guards were reporting on incidents with Ryan.  Id. at 109-115.  There is no procedure

for anyone to check the I-Mod logs; instead, the logs were only for the benefit of the incoming shift.

Id. at 130-31.  Toby did not receive Merchen's email regarding Ryan until the day after Ryan's

death.  Wittels Decl. Ex. 43 at 48-49.   The delay apparently occurred because no watch commander

was on duty the night that Merchen wrote the email, so he sent it to the next watch commander.

Wittels Decl. Ex. 54 at 67-68, 104-05.  Further, Dagey testified that there was no policy permitting

CFMG medical staff to review incident reports by jail staff.  Wittels Decl. Ex. 40 at 47.  There is a

Notification Procedures policy that was apparently not followed because Plaintiffs point to evidence

from jail staff that doctors are called only in life-threatening situations.  Wittels Decl. Ex. 55 at 139-

40.

County Defendants argue that they have policies governing the relationship between the

County and CFMG.  Toby Decl. Ex. B-S.  Those include a policy called "Emergencies - Medical,"

which described how jail staff should respond to medical emergencies, and one called "Medical -

Scheduling and Movement," which described medical care that shall be provided by medical experts

when necessary.  Another policy called "Hospital Guard Responsibilities" describes how jail

personnel should transport inmates to the hospital.  County Defendants argue that even if there are

deficiencies in the policies, Plaintiffs have not shown that the policies were developed or maintained

with deliberate indifference to inmate health.  However, Plaintiffs have raised a triable issue of fact

as to a policy of a lack of communication between the County and CFMG.

### 6. Deficiencies in hunger strike policies/lack of policies regarding IV nutrition and hydration

Plaintiffs argue that there is a lack of a policy to deal with inmates who refuse to eat or

drink, but who are not on a hunger strike.  MADF has a hunger strike policy.  See Toby Decl. Ex. M.

Here, however, Ryan was asked if he was on a hunger strike and he did not initially respond, but

then said that he wanted a meal, indicating that he was not on a hunger strike, so the County

Defendants did not apply the hunger strike policy.

Nurse DeBeni from CFMG testified that there is no policy for dealing with inmates like

Ryan who are not eating and drinking, but who are not on a hunger strike, but that medical staff

would put an inmate who is not eating or drinking on a sick call for a doctor's evaluation.  Wittels Decl. Ex. 50 at 30-31.  Toby testified that if an inmate refuses to eat, but is not on a hunger strike, correctional staff will treat the inmate as a possible medical or mental issue.  Supp. Toby Decl. ¶ 4.  County Defendants argue that correctional staff complied with this policy by housing Ryan in I-Mod, reporting his failure to eat or drink, and arranging for a mental health consultation.

However, Plaintiffs argue that there was a policy confusion about the meaning of the term "refuse" that is used by jail staff in this case.  As a matter of policy, "inmates have a right to refuse treatment."  Wittels Decl. Ex. 103 at § I(D).  Plaintiffs argue that the practice at MADF shows that the term is susceptible to a multiplicity of meanings.  "Refusal" is used as a medical term indicating that an inmate actually waives particular care.  See, e.g., Wittels Decl. Ex. 50 at 84.  But "refusal" was also used by jail staff to mean that an inmate is not following a directive, such as food that is left with an inmate but not eaten is considered to be "refused."  See Wittels Decl. Ex. 50 at 29.  In fact, Ryan's records show that he "refused" breakfast at 6:17 on the morning that he died, and he had been undergoing CPR since 6:05 that morning.  Wittels Decl. Ex. 59.  Plaintiffs' expert opines that the failure to define "refusal," or to provide direction in educating inmates on what treatment is being provided and why as well as the consequences of refusing makes the Health Care Philosophy Policy deficient.  See Wittels Decl. Ex. 103 (Health Care Philosophy policy); Ex. 67 at 4.

County Defendants argue that there is no confusion as to the term "refuse," because here there is consistent testimony that when an inmate refuses to eat or drink, that means that he did not eat or drink.  Reply at 22.  However, there is no dispute that there is no policy on how to use the term "refuse," or on what to do with an inmate who refuses to eat or drink.  Plaintiffs have raised a triable issue of fact as to the lack of policies to handle inmates who "refuse" to eat or drink but who are not on a hunger strike.

### 7.  Inadequate mental health services, facilities, policies and practices

Plaintiffs argue, for the first time to the Court in opposition to the motions for summary judgment, that the County's mental health services are inadequate.  However, much of the evidence that Plaintiffs rely on to show a  triable issue of fact as to mental health policies is excluded as irrelevant and too late as described in the Court's contemporaneous order regarding the County

Defendants' objections to Plaintiffs' evidence.  Plaintiffs point to an admissible 2010 grand jury report indicated that little had been done to correct deficiencies in mental health services: "The issue of mental health inmates was addressed at length in the 2003-2004 Grand Jury Report and little has been done to correct the problem."  Wittels Decl. Ex. 7 at 22.

Even viewing this evidence in the light most favorable to Plaintiffs, there is no triable issue of fact as to inadequate mental health services.  Plaintiffs' case has never focused on mental health services, and even if there were inadequate mental health services, Ryan's physical condition, which has always been the focus of this case and was the undisputed cause of his death, would not have been alleviated by even the best mental health services.

### 8.       Chronic understaffing

Plaintiffs argue there is a policy of understaffing at MADF.  However, the evidence that Plaintiffs cite has been excluded in the Court's contemporaneous order regarding the County Defendants' objections to Plaintiffs' evidence.  Plaintiffs have never before made an understaffing argument, nor have they shown any evidence of staffing levels when Ryan was there.  Thus, Plaintiffs have not raised a triable issue of fact as to the existence of an understaffing policy.

### 9.       Ineffective employee supervision and discipline

Plaintiffs argue that there is a policy of ineffective supervision and discipline, but the evidence that Plaintiffs cite for this policy has been excluded in the Court's contemporaneous order regarding the County Defendants' objections to Plaintiffs' evidence.  Further, Plaintiffs have not previously made the argument about the existence of such a policy.  Accordingly, Plaintiffs have not created a triable issue of fact as to ineffective employee supervision and discipline.

### 10.      Deficiencies in grievance procedures

Plaintiffs argue that under jail policy, the verbal and written complaints by Ryan's family were not considered grievances that had to be resolved through a formal grievance procedure.  Instead, to trigger that procedure, an inmate had to file a grievance form through the Sheriff's Department.  See Wittels Decl. Ex. 40 at 95-96.  Plaintiffs argue that this was plainly insufficient given the gravity of the family's concerns.

County Defendants, however, argue that Plaintiffs make this argument for the first time in

United States District Court
For the Northern District of California

1   the opposition to this motion.  Further, County Defendants note that there is no evidence that the

2   family's complaints were not reviewed and considered.  Moreover, Dagey testified that he discussed

3   Ryan's family's complaints with Dr. Luders.  Wittels Decl. Ex. 40 at 44, 68-69.

4         This issue is raised for the first time in opposition to the motion for summary judgment,

5   and Plaintiffs have not raised a triable issue of fact that Ryan's family's grievances were not

6   considered.

7         **11.     Visitation and inmate dressing policies**

8         Plaintiffs argue that after Ryan returned to the jail, he was improperly denied visits with

9   family because he would not get dressed.  Wittels Decl. Ex. 55 at 72-73 (Officer Skinner stated that

10  standard practice was not to dress inmates); Ex. 53 at 57 (Officer Williams stated that there are rules

11  about getting dressed for visitations).  Plaintiffs have shown that this policy deprived him of familial

12  relationships because there is no evidence that he saw his family after July 1.  Accordingly, Plaintiffs

13  have raised a triable issue of fact as to a visitation policy.

14        At the hearing, the County Defendants cited a recent Ninth Circuit case that addressed an

15  inmate's constitutional right to visitation.  See Dunn v. Castro, 2010 WL 3547637 (9th Cir. 2010).

16  The County Defendants argue that Dunn precludes Plaintiffs' § 1983 claim based on an inadequate

17  visitation policy.  Although Dunn contains general language that there is no absolute right to

18  visitation, even from family members, in prison (Dunn, 2010 WL 3547637, at *4), the court's

19  holding was made in the context of qualified immunity in which the court opined on the proper

20  scope of the rights to be examined under a qualified immunity analysis, and determined that the right

21  of a prisoner to receive visits from his children in the factual circumstances of that case was not

22  clearly established in 2004 when the restriction was imposed.  However, neither Dunn nor the cases

23  cited therein hold that prisoners have an absolute constitutional right to visitation while in prison.

24  Thus, Dunn does not preclude Plaintiffs' § 1983 claim based on a the lack of a visitation policy.

25        **12.     Conclusion**

26        Plaintiffs have raised a triable issue of fact as to many of these policies as they relate to

27  deliberate indifference.  Thus, County Defendants are not entitled to summary judgment on

28  Plaintiffs' first, third or sixteenth claims.

**C.  Liability based on failure to provide necessities of life**

Plaintiffs argue that the County Defendants failed to meet their responsibilities to provide the necessities of life to Ryan because jail personnel simply delivered meals, and gave him a cup to fill with water from his sink.  Plaintiffs argue that the County Defendants should have done more to make sure Ryan ate and drank because he was confined to bed and repeatedly failed to eat or drink, even though he was supposed to receive fluids.  There is no evidence that Ryan had intravenous fluids in jail.  Further, Plaintiffs note that Ryan lost forty-four pounds in the last week of his life.

County Defendants argue that food and water were provided, so there was no denial of the basic necessities of life.  There is no evidence that correctional staff were aware that by giving Ryan food and water that they were not giving him meaningful access to nutrition and hydration, and Ryan did eat and drink sometimes.

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that County Defendants were deliberately indifferent to the provision of the basic necessities of life.  While there is no dispute that Ryan was given food and water, there is evidence that he was not able to eat and drink, which would mean that the provision of food and drink was not meaningful.  The evidence of Ryan's dramatic weight loss is particularly telling.  Thus, County Defendants' motion for summary judgment with respect to Plaintiffs' second claim is denied.

**D.  Liability based on bodily privacy**

The right to bodily privacy has been established in the Ninth Circuit.  York v. Story, 324 F.2d 450 (9th Cir.1963) ("The desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.").  The Ninth Circuit extended this right to prison inmates in 1985.  Grummett v. Rushen, 779 F.2d 491 (9th Cir.1985).  Plaintiffs argue that there are repeated notations that Ryan was lying naked in his cell.  See, e.g., Wittels Decl. Ex 41 at 140.  He was housed in I-Mod, where there are female nurses and guards present.  Wittels Decl. Ex. 55 at 73-75 (Officer Skinner stated that one of the deputies there at a time when Ryan missed a visit because he was naked was a woman).  MADF had a rule that inmates had to dress themselves.  See, e.g., Wittels Decl. Ex. 55 at 76.  Plaintiffs argue that there was no reason to allow Ryan to lie around naked.  See Sepulveda v. Ramirez, 967

26

United States District Court
For the Northern District of California

F.2d 1413 (9th Cir. 1992) (finding a fact question about whether a single viewing of a female

parolee by a parole officer as she was providing a urine sample).

County Defendants argue that there is no evidence that Ryan was denied clothing.  Further,

they argue that there is no support for the argument that officers had an obligation to dress Ryan.  In

addition, if an inmate is occasionally seen by a member of the opposite sex while naked during

normal jail procedures, there is no constitutional violation.  See, e.g., Michenfelder v. Sumner, 860

F.2d 328, 334 (9th Cir. 1988) ("Our circuit's law respects an incarcerated prisoner's right to bodily

privacy, but has found that assigned positions of female guards that require only infrequent and

casual observation, or observation at distance, and that are reasonably related to prison needs are not

so degrading as to warrant court interference."). Here, Plaintiffs cite no evidence that if any female

guard or nurse saw Ryan naked, it was not during normal jail procedures.  This case is different from

Sepulveda, in which there was evidence that the parole officer purposefully entered the restroom to

observe the parolee providing the urine sample while she was on the toilet.  Here, there is no

evidence that any female guard even saw Ryan naked, let alone purposefully or repeatedly saw him

in that state.  Therefore, County Defendants' motion for summary judgment as to Plaintiffs' fourth

claim is granted.

**4.      Conclusion**

County Defendants' motion for summary judgment is granted with respect to Plaintiffs'

fourth, seventh, twelfth and seventeenth claims, and denied with respect to Plaintiffs' first, second,

third, sixth and sixteenth claims.

**Cogbill's Motion for Summary Judgment**

Plaintiffs alleged five claims against Cogbill for violation of 42 U.S.C. § 1983: (1)

deprivation of adequate medical care by acting with deliberate indifference to his serious medical

need (first claim); (2) deprivation of the basic necessities of life (second claim); (3) deprivation of

life with due process (third claim); (4) deprivation of bodily privacy (fourth claim); and (5)

deprivation of familial relationship with Ryan (sixteenth claim).

**1.      Summary judgment is denied as to Plaintiffs' § 1983 claims against Cogbill in his individual capacity**

In  general, to be liable under § 1983 in his individual capacity, Cogbill must have had

knowledge of Ryan's serious medical need and the substantial risk of harm resulting from the failure to treat Ryan. There is no evidence that Cogbill had knowledge of Ryan's condition, let alone the seriousness of it. Cogbill was not deposed in this case, and Plaintiffs have not pointed to any evidence that he personally knew about Ryan. See Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003) (affirming summary judgment of medical needs claim against sheriff because there was insufficient evidence that sheriff knew of plaintiff's diabetic condition).

However, Plaintiffs argue that Cogbill is individually liable as a supervisor. "'A supervisor may be liable if there exists *either* (1) his or her personal involvement in the constitutional deprivation, *or* (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (quoting Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989)) (emphasis added in Redman); Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (approving jury instruction that police chief would be "liable in his individual capacity if he "set[ ] in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n], would cause others to inflict the constitutional injury." Supervisory liability is imposed against a supervisory official in his individual capacity for his "own culpable action or inaction in the training, supervision, or control of his subordinates," for his "'acquiesce [nce] in the constitutional deprivations of which [the] complaint is made'"; or for conduct that showed a " 'reckless or callous indifference to the rights of others. ") (internal citations omitted). Further:

> Supervisory liability exists even without over personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.

Hansen, 885 F.2d at 646. In Redman, the plaintiff was a pretrial detainee who sued the county and county personnel, including the sheriff, under 42 U.S.C. § 1983 after he was placed in a holding cell with a homosexual prisoner resulting in the plaintiff's rape. The court determined that there was a jury question as to whether the sheriff was deliberately indifferent to the plaintiff's personal security rights and therefore, was liable for constitutional violations in a supervisory capacity where there was evidence of overcrowding at the jail and of the sheriff's ultimate direction of operations at the jail.

28

United States District Court
For the Northern District of California

The causal connection between the supervisor's wrongful conduct and the constitutional violation can be shown where an official authorized or approved practices that caused injury (see Redman, 942 F.2d at 1147-48); performed inadequate training (see Preschooler II v. Clark County School Bd. of Trustees, 479 F.3d 1175, 1183); acquiesced in longstanding policy (see Los Angeles Police Protective League v. Gates, 907 F.2d 879, 894 (9th Cir. 1990)); or condoned actions of subordinates (see Blankenhorn v. City of Orange, 485 F.3d 463, 485-86 (9th Cir. 2007)).  However, liability cannot be based on an allegation that an individual merely ratified a subordinate's decision. See Williams v. City of Oakland, 2008 WL 268985 (N.D. Cal. 2008) ("A policymaker's deferential review of a subordinate's discretionary decision is not the basis for Section 1983 liability, unless a subordinate's decision is cast in the form of a policy statement and expressly approved by a policymaker or if a series of decisions by a subordinate official show a custom of which a supervisor must have been aware.") (citing Gillette v. Delmore, 979 F.2d 1342, 1348 (9th Cir.1992)).  A supervisor is liable for constitutional violations by his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). There is no respondent superior liability under § 1983.  Id.

In Larez, alleged victims of police officers' use of excessive force brought a civil rights action against the officers, the chief of police and the city.  On appeal after a judgment in favor of the victims, the Ninth Circuit held, among other things, that the evidence was sufficient to hold the police chief liable in his individual capacity as a supervisor.  Specifically, although there was no evidence that the police chief disciplined the individual officers or established new procedures for averting similar incidents in the future, both courses of action advocated by the experts in the case, there was evidence that the police chief had personally signed a letter informing a victim that none of his many complaints regarding the excessive force would be sustained, thereby ratifying the investigation into the victim's complaint and providing a basis for individual liability as a supervisor.

By contrast, in Estate of Abdollahi, 405 F. Supp. 2d 1194, 1210-11 (E.D. Cal. 2005), the court held that there was no triable issue of fact as to the individual liability of a sheriff.  There, the plaintiffs, who represented inmates who had committed suicide while in jail cells, brought a civil

rights action against the county, the sheriff, jail commander, and employees having contact with the decedents.  With respect to the sheriff, the plaintiffs argued that their personal liability was based on the "failure to take any remedial steps after the constitutional violations related to the jail suicides, either through correction of policy, discipline or adequate investigation."  Abdollahi, 405 F. Supp. 2d at 1210.  However, the plaintiffs failed to present evidence of "significant personal contact and ratification" as was presented in Larez.  Id..  Instead, the defendants produced evidence that in response to suicides in jail, the sheriff impaneled a Suicide Prevention Task Force, which sought to improve training, policies, practices and procedures relating to suicides.  Further, there was no evidence, unlike in Larez, that the sheriff in Abdollahi was the direct supervisor of the offending officers.  Instead, the basis for the individual liability claim against the sheriff rested on a captain's ratification of his subordinate's conduct through a failure to discipline.  Because there was no authority for maintaining a claim for individual liability based solely on the failure to discipline, and because the plaintiffs failed to raise a triable issue of fact as to the sheriff's individual liability, the district court granted summary judgment in favor of the sheriff as to his individual liability.

Here, Plaintiffs point to evidence of inadequate medical treatment of other inmates that they believe should have put Cogbill on notice problems with the medical treatment provided by CFMG, coupled with the lack of evidence that Cogbill took any corrective action or made any changes to jail policies in response to Ryan's death.  Further, the County renewed the CFMG contract in 2008, after Ryan's death.  Wittels Decl. Ex. 43 at 42-43.  Also, there is evidence that in response to a 2008 grand jury report regarding the death of another inmate due to alcohol withdrawal in which the grand jury recommended more frequent and more thorough bed checks, Cogbill ratified the existing bed check procedure:

> It appears that there is a conclusion by the Grand Jury that a CD [correctional deputy] missed Mr. McDowell in distress during a rounds check or missed his death during a rounds check. . . . The expectation of staff, during a graveyard shift, is that they look in the cell window for any problems, something out of the ordinary.  They cannot absolutely identify signs of life from this position.  This is a fair balance between the mandate of providing inmates with uninterrupted sleep and the reality that there is always the chance that a sleeping inmate could go into medical distress or die and not always show readily observable indications of either.

Wittels Decl. Ex. 115 at 11.  Plaintiffs argue that a change to the bed check policy may have saved Ryan's life.  Although there is no evidence that Cogbill explicitly ratified the conduct of the

correctional officers in Ryan's case like the police chief in <u>Larez</u>, there is also no evidence that Cogbill implemented any corrective measures in response to Ryan's death, unlike the sheriff in <u>Abdollahi</u>.  Viewing the evidence in the light most favorable to Plaintiffs, there is a triable issue of fact as to Cogbill's individual liability based on his supervisory role, particularly given his ratification of the bed check policy in 2008 after Ryan's death and the 2008 renewal of the CFMG contract.

**3.      Summary judgment is granted as to Plaintiffs' § 1983 claims against Cogbill in his official capacity**

County Defendants argue that the claims brought against Cogbill in his official capacity are duplicative of Plaintiffs' claims against the County.  <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 167, n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under <u>Monell</u>, . . ., local government units can be sued directly for damages and injunctive or declaratory relief.").  Where both the public entity and a municipal officer are named in a lawsuit, a court may dismiss the individual named in his official capacity as a redundant defendant. <u>See</u> <u>Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff's Department</u>, 533 F.3d 780, 799 (9th Cir. 1986) (" An official capacity suit against a municipal officer is equivalent to a suit against the entity. <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant.").  Plaintiffs did not address this argument in their opposition.  Because Plaintiffs have not shown that the § 1983 claims against Cogbill in his official capacity are not redundant, summary judgment is granted as to those claims.

**4.      Cogbill is not entitled to qualified immunity**

Cogbill contends that he is entitled to qualified immunity from liability for the § 1983 claims against him.  Plaintiffs counter that the right to receive adequate medical care was clearly established and there is a question of fact as to whether Cogbill acted reasonably.  Plaintiffs do not argue against qualified immunity based on any of the other § 1983 claims.  Plaintiffs argue, without citation to evidence, that Cogbill was responsible for "establishing, formulating, enforcing, implementing, ratifying, sanctioning, and/or condoning MADF's blatantly deficient policies and

procedures and neglecting to address the repeated failures of medical services."  Opp. at 21.

In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court mandated a two-step sequential process for resolving such claims.  First, a court must consider the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier, 533 U.S. at 201 ("In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.").  Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  Id.  In Pearson v. Callahan, 129 S. Ct. 808, 818 ( 2009), the Court receded from Saucier, holding "that the Saucier protocol should not be regarded as mandatory in all cases," but instead judges should exercise their sound discretion as to which of the two prongs of the analysis to address first.  Id.   In Pearson, the Court determined that the officers in that case were entitled to qualified immunity "on the ground that it was not clearly established at the time of the search that their conduct was unconstitutional" without first deciding whether the facts shown by the plaintiff constituted a violation of a constitutional right.  Id.

The standard for qualified immunity is the "'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken."  Anderson v. Creighton, 483 U.S. 635, 638 (1987) (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982)).  "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful."  Romero v. Kitsap County, 931 F. 2d 624, 627 (9th Cir. 1991)  If the defendant had a reasonable but mistaken belief that the conduct was lawful, qualified immunity applies.  Saucier, 533 U.S. at 205-6.

Here, even though the Court has excluded some evidence of allegedly inadequate medical treatment of other inmates in its contemporaneous order regarding the County Defendants' objections to evidence, Plaintiffs have presented some evidence of a policy or custom, and omission, leading to inadequate medical care of prisoners in MADF by pointing to other similar cases where

adequate medical care was not provided as well as Ryan's own repeated requests for pain

medication and other care.  A prisoner's right to constitutionally adequate medical care while

incarcerated is "clearly established."  See Estelle v. Gamble, 429 U.S. 97 (1976) ("These elementary

principles establish the government's obligation to provide medical care for those whom it is

punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if

the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may

actually produce physical "torture or a lingering death," In re Kemmler, supra, the evils of most

immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care

may result in pain and suffering which no one suggests would serve any penological purpose.").

Also, there is a question of fact as to whether Cogbill's actions and/or omissions with respect to this

right were reasonable under the circumstances.  Therefore, Cogbill is not entitled to qualified

immunity as a matter of law based on Ryan's right to receive adequate medical care.

**5.      State law claims against Cogbill**

In their complaint, Plaintiffs alleged seven state law claims against Cogbill: (1) negligence

(fifth claim); (2) failure to summon medical care in violation of California Government Code §

845.6 (sixth claim); (3) neglect of dependent adult in violation of California Welfare & Institutions

Code § 15657 (twelfth claim); (4) negligent infliction of emotional distress (thirteenth and

eighteenth claims); (5) intentional infliction of emotional distress (fourteenth and nineteenth claims);

(6) violation of the Bane Act under California Civil Code § 52.1 (fifteenth claim); and (7) wrongful

death (seventeenth claim).  On October 1, 2010, after the hearing on the motions for summary

judgment, Plaintiffs withdrew their sixth, thirteenth, fourteenth, fifteenth, eighteenth and nineteenth

claims against Cogbill.  The remaining state law claims against Cogbill are: (1) negligence; (2)

neglect of dependent adult; and (3) wrongful death.

**A.   Cogbill is entitled to immunity under California Government Code section 820.2
for the state law claims against him**

Government Code section 820.2 provides that: "Except as otherwise provided by statute, a

public employee is not liable for any injury resulting from his act or omission where the act or

omission was the result of the exercise of the discretion vested in him, whether or not such discretion

be abused."  The mere existence of discretionary choice in the act to be performed does not bring the

**United States District Court**
For the Northern District of California

act within the reach of section 820.2, as virtually all acts that a governmental employee is called upon to perform involve some degree of choice.  <u>Johnson v. State of California</u>, 69 Cal.2d 782, 788-90 (1968).  Rather, immunity should attach only to those decisions which involve "basic policy" choices which constitute an exercise of discretion.  <u>Id</u>. at 793 (a "workable definition" of immune discretionary acts draws the line between "planning" and "operational" functions of government.  Immunity is reserved for those "basic policy decisions [which have] . . . been [expressly] committed to coordinate branches of government," and as to which judicial interference would thus be "unseemly.").  However, there is no basis for immunizing "ministerial" decisions that merely implement a basic policy already formulated.  <u>See Johnson</u>, 69 Cal.2d at 795-96 (immunity applies only to deliberate and considered policy decisions, in which a "[conscious] balancing [of] risks and advantages . . . took place. The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision. [Citations]."); <u>see also Scott v. County of Los Angeles</u>, 27 Cal.App.4th 125, 142 (1994).

Cogbill argues that section 820.2 bars all state law claims against him because there is no evidence that he had any direct participation in any of the alleged wrongful acts.  Plaintiffs respond that Cogbill is not immune because the mandatory or ministerial nature of his duty to provide adequate medical services for inmates in his custody means that he was not exercising a discretionary, legislative function.  They argue that the Cogbill's "conduct in negligently supervising and monitoring the COs and medical program and in ratifying a pattern of inadequate care that included Ryan Geirge's death was ministerial rather than legislative in nature."  Opp. at 24.  Further, Plaintiffs argue that Cogbill's role in "formulating procedures was constrained; he did not make fundamental policy decisions."  <u>Id.</u> (stating that "The California Code of Regulations provides basic medical care policies for inmates that Cogbill, as the 'facility administrator' for the MADF, was responsible to implement.").  Thus, according to Plaintiffs, the claims against Cogbill are not that he improperly "legislated," but that he willfully neglected his responsibilities.

Plaintiffs' argument, however, is inconsistent with the bulk of the allegations against Cogbill.  Elsewhere, Plaintiffs argue that Cogbill "is the relevant policy maker for the County and MADF, and is ultimately responsible for policies regarding the care and custody of County

United States District Court
For the Northern District of California

inmates." Opp. at 17.  The adoption of a policy, including a medical policy, by Cogbill as the relevant policy maker for the County and MADF, would be the type of act that section 820.2 would immunize.  Therefore, Cogbill enjoys immunity under this section from liability for his discretionary actions, such as the hiring, training and supervision of officers, as well as the retention of CFMG and the creation of jail policies relating to inmate medical care.  Accordingly, summary judgment is granted as to the state law claims against Cogbill because they relate to discretionary acts that are subject to the immunity in section 820.2.

**B.  The Court need not reach the remaining arguments regarding the state law claims**

Because Cogbill is immune from liability for the state law claims against him pursuant to Government Code section 820.2, the Court need not reach the questions of whether Plaintiff's tort claims under Government Code section 910 encompass all of the legal claims against Cogbill, whether Cogbill is entitled to immunity pursuant to Government Code section 820.8, and whether Plaintiffs have raised triable issues of fact as to the state law claims.

**Conclusion**

Cogbill's motion for summary judgment is granted as to Plaintiffs' fifth, twelfth and seventeenth claims and Plaintiffs' § 1983 claims brought against Cogbill in his official capacity. Cogbill's motion for summary judgment is denied as to Plaintiffs' § 1983 claims brought against Cogbill in his individual capacity as a supervisor.

**IT IS SO ORDERED.**

Dated: October 19, 2010

_Elizabeth D. Laporte_
ELIZABETH D. LAPORTE
United States Magistrate Judge