IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE GEORGE,<br><br>             Plaintiff,<br><br>     v.<br><br>SONOMA COUNTY SHERIFF'S DEPT.,<br>et al.,<br><br>             Defendants.            / | No. C-08-2675 EDL<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW** |

On March 18, 2011, Defendant Sutter Medical Center filed a Motion for Judgment as a Matter of Law as to Plaintiffs' claims for abuse of a dependent adult under California Welfare and Institutions Code section 15657 and for deliberate indifference pursuant to 42 U.S.C. § 1983 based on failure to train. The matter was fully briefed and the Court held a hearing on May 19, 2011. At the hearing, the Court permitted the parties to file supplemental briefs regarding whether Dr. Richard Flinders was an employee and managing agent of Defendant Sutter for purposes of Plaintiffs' section 15657 claim. Briefing was complete on May 27, 2011. For the reasons stated at the hearing and in this Order, Defendant's Motion for Judgment as a Matter of Law is denied.

**Legal standard**

In reviewing Defendant's renewed motion for judgment as a matter of law, the Court must view the evidence in the light most favorable to Plaintiff and draw all reasonable inferences in its favor. See Josephs v. Pacific Bell, 443 F.3d 1050, 1062 (9th Cir.2006); see also Bell v. Clackamas County Sheriff, 341 F.3d 858, 865 (9th Cir.2003) (citing Fed. R. Civ. P. 50(a)); EEOC v. Go Daddy Software Inc., 581 F. 3d 951, 961 (9th Cir. 2009). However, a reasonable inference "cannot be supported by only threadbare conclusory statements instead of significant probative evidence." Lakeside-Scott v. Multnomah County, 556 F.3d 797, 802 (9th Cir. 2009) (quoting Barnes v. Arden

1  Mayfair, Inc., 759 F.2d 676, 680-81 (9th Cir.1985) (internal quotation marks omitted)). Judgment as
2  a matter of law is proper only if the evidence, construed in the light most favorable to the non-
3  moving party, could lead a reasonable person to only one conclusion, that is, that the moving party is
4  entitled to judgment. White v. Ford Motor Co., 312 F.3d 998, 1010 (9th Cir. 2002). Weak evidence
5  does not itself justify judgment as a matter of law; a court must not weigh the credibility of
6  witnesses or consider the weight of the evidence. See Settlegoode v. Portland Pub. Schools, 371
7  F.3d 503, 510 (9th Cir. 2004).

**Discussion**

**1.     Abuse of dependent adult**

The Elder Abuse and Dependent Adult Civil Protection Act ("EADACPA"), Cal. Welf. & Inst. Code § 15600, et seq., excludes liability for acts of professional negligence (see Cal. Welf. & Inst. Code § 15657.2; Delaney v. Baker, 20 Cal.4th 23, 32 (1999)), and does not apply to simple or gross negligence by health care providers (Sababin v. Superior Court, 144 Cal.App.4th 81, 88 (2006)). To obtain the remedies provided by EADACPA, "'a plaintiff must demonstrate by clear and convincing evidence that defendant is guilty of something more than negligence; he or she must show reckless, oppressive, fraudulent, or malicious conduct.'" Sababin, 144 Cal.App.4th at 89 (quoting Delaney, 20 Cal.4th at 31). Recklessness refers "'to a subjective state of culpability greater than simple negligence, which has been described as a "deliberate disregard" of the "high degree of probability" that an injury will occur.'" Id. Oppression, fraud and malice involve intentional or conscious wrongdoing of a despicable or injurious nature. Id.

The Sababin court further stated:

> Our Supreme Court teaches that neglect under the Act "refers not to the substandard performance of medical services but, rather, to the 'failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations.' [Citation.] Thus, the statutory definition of 'neglect' speaks not of the undertaking of medical services, but of the failure to provide medical care. [Citation.]" (Covenant Care, supra, 32 Cal.4th at p. 783, 11 Cal.Rptr.3d 222, 86 P.3d 290.)

Sababin, 144 Cal.App.4th at 89; see also Wolk v. Green, 516 F. Supp. 2d 1121, 1133 (N.D. Cal. 2007) ("A civil cause of action under the Elder Abuse statute is governed by the California Welfare and Institutions Code section 15657, which requires that a plaintiff demonstrate 'by clear and

2

convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63, or neglect as defined in Section 15610.57, and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse . . . .'") (internal citation omitted).

In this motion, Defendant argues that there has been no showing of any evil intent on the part of Ryan George's caregivers, so the state of mind element for violation of section 15657 cannot be met. However, there is evidence from which a reasonable person could infer that Defendant engaged in reckless neglect of Ryan: (1) the failure to explain Ryan's inability to communicate, ambulate, or urinate or defecate on his own prior to leaving the hospital; (2) the failure of Defendant's nurses to consult with a doctor about Ryan's continued inability to eat and drink, and his incontinence; (3) the malingering diagnosis and the effect it had on Ryan's treaters; and (4) the decision to discharge Ryan when he was in a "catatonic-like" state. Also, Ryan's family testified that they tried to intervene on numerous occasions to inquire about Ryan's treatment. See Delaney v. Baker, 20 Cal.4th 23, 31-32 (1999) ("There is also substantial evidence to support the jury's finding that the conduct was reckless, given defendants' knowledge of Wallien's deteriorating condition and plaintiff's repeated effort to intervene in her mother's behalf."). Further, Plaintiffs' expert Vichinsky testified that he did not believe that any hospital would have treated one of his family members in the same way that Ryan was treated. In addition, Plaintiffs' correctional medicine expert Saylor testified that the malingering diagnosis was the "kiss of death." Viewing the evidence in the light most favorable to Plaintiffs, as the Court is required to do in ruling on Defendant's motion, this evidence could form the basis for a reasonable jury to conclude that Defendant acted with recklessness.

Liability under the EADACPA can be based on the negligence of "any person having the care or custody of an elder or a dependent adult," not only of an employee. Cal. Wel. & Inst. Code § 15610.57. However, an award of enhanced damages under California Welfare and Institutions Code section 15657, as sought by Plaintiffs, must meet the standards of California Civil Code section 3294(b), which states in relevant part:

> An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer. . . authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance

3

1  knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.

Cal. Civil Code § 3294(b).  Thus, an employer may be liable for enhanced damages based on the acts of an employee if the employer, through, for example, a managing agent, authorized or ratified the conduct of an employee.  The jury instructions in this case defined "managing agent" as follows:

> An employee is a "managing agent" if he or she exercises substantial independent authority and judgment in his or her corporate decision-making such that his or her decisions ultimately determine corporate policy.

See also Roby v. McKesson, 47 Cal.4th 686, 714-15 (2009) ("When we spoke in White about persons having 'discretionary authority over ... corporate policy.' we were referring to formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership. It is this sort of broad authority that justifies punishing an entire company for an otherwise isolated act of oppression, fraud, or malice.") (internal citation omitted). Defendant argues that there was no evidence at trial of authorization, ratification or action by an officer, director or managing agent of Defendant of any neglectful conduct under the statute.

Plaintiffs argue that there is evidence to support a finding that Dr. Flinders, Discharge Planner Romano and Sutter's corporate representatives were managing agents and approved or ratified the conduct of Defendant's employees at issue, that is, the discharge of Ryan in an unstable condition.  First, Plaintiffs point to the testimony that Dr. Flinders was the Medical Director of the Family Residency Program and the Chief of the Adult Inpatient Medical Service.  Flinders testified that he worked exclusively within Sutter, and that he was responsible for the residency program. Flinders also testified that he gives residents, who are employees of Sutter, "guidelines and instructions on what they can and cannot do as interns and residents." Tr. at 646.  Flinders testified that with the input of his team, specialists and all physicians involved, he had decision-making authority regarding the discharge of patients.

Defendant argues that Dr. Flinders was an independent contractor, and therefore was not a managing agent for purposes of liability under the statute. Defendant points to evidence that Flinders' job title was provided by the residency program, which is supported and maintained by the

4

County. Defendant also notes that Flinders serves as a Professor in the University of California, San Francisco School of Medicine and the hospital serves as an affiliate campus of the medical school.

Flinders' position at the hospital is somewhat unusual in the context of liability for violation of the EADACPA. Based on his job description, he functioned as a high level employee, but in a technical sense, he was not an employee of the hospital. Defendant's liability for enhanced damages under the EADACPA based on Flinders' conduct would rest on a finding that Flinders was a managing agent who authorized or ratified Defendant's employee's decision to discharge Ryan. Neither party cites any caselaw that a managing agent for purposes of the EADACPA must also be an employee. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Flinders' role within the hospital, which included approving Ryan's discharge, was that of a managing agent, even though he was technically not Defendant's employee. A reasonable jury could also conclude that Flinders ratified or authorized Ryan's discharge, and therefore Defendant could be liable for enhanced damages.

Second, Plaintiffs argue that discharge planner Romano was a managing agent. She testified that she was responsible for overseeing the discharge planning of patients from the Cardiac Telemetry unit and both intensive care units at Sutter, and she authorized Ryan's discharge. Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could find that she was a managing agent.

Third, Plaintiffs note that several of Sutter's corporate representatives, Kim Sparacio (Patient Care Director), Lisa Amador (former Administrative Director of Support Services), and Christine Bartel (Director of Clinical Effectiveness), testified as to Defendant's lack of policies and training to guide Defendant's employees in the discharge of inmates. While Plaintiffs did not present any evidence of the chain of command, viewing all of the evidence in the light most favorable to Plaintiffs, the Court concludes that a reasonable jury could find that these individuals, because of their positions at Sutter Medical Center, were managing agents.

Accordingly, Defendant's motion for judgment as a matter of law as to the claim for abuse of a dependent adult is denied.

5

### 2.     Failure to train

To impose liability for failure to adequately train employees, the omission must amount to "deliberate indifference" to a constitutional right. Clouthier v. County of Contra Costa, 591 F.3d 1232, 1249 (9th Cir. 2010). This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality - a 'policy' as defined by our prior cases - can a city be liable for such a failure under § 1983." Clouthier, 591 F.3d at 1250 (quoting Canton, 489 U.S. at 389). And only under such circumstances does the failure to train constitute "a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." Id. (quoting Canton, 489 U.S. at 390).

After the trial in this case, the Supreme Court addressed failure to train in Connick v. Thompson, 131 S.Ct.1350 (Mar. 29, 2011). In Connick, a former state prisoner sued county prosecutors and the prosecutor's office, asserting claims under § 1983 and state law, based on wrongful conviction for armed robbery and murder. The prosecutor had withheld an exculpatory lab report regarding blood evidence. The plaintiff spent fourteen years in prison and was within a month of his scheduled execution when the court vacated the convictions based on the Brady violation. A jury awarded the former prisoner $14 million and the Fourth Circuit affirmed. The Supreme Court reversed, holding that prior, unrelated Brady violations by attorneys in the county prosecutor's office were insufficient to put the district attorney on notice of need for further training, and that the need for training was not so obvious that the district attorney's office was liable on a failure to train theory. The Connick Court noted that:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bryan Cty., 520 U.S., at 410, 117 S.Ct. 1382. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. Id., at 407, 117 S.Ct. 1382. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." Canton, 489 U.S., at 395, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of

6

       fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities ...." Id., at 392, 109 S.Ct. 1197; see also Pembaur, supra, at 483, 106 S.Ct. 1292 (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ...").

Connick, 131 S. Ct. at 1360. Further, the Connick Court stated that a pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for failure to train. Id. at 1360 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."). The Court determined that a showing that four convictions had been overturned in ten years due to Brady violations was not enough to show that training was inadequate with respect to the sort of Brady violation at issue there. See id. ("Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation.").

       The former prisoner in Connick relied on a single incident theory of liability. He contended that the Brady violation was the "obvious" consequence of failing to provide specific Brady training, and that the showing of obviousness substituted for the pattern of violations ordinarily necessary to establish Monell liability. Connick, 131 S.Ct. at 1360-61. The Connick Court distinguished the hypothetical set forth in Canton under which a single incident could show deliberate indifference:

> Failure to train prosecutors in their Brady obligations does not fall within the narrow range of Canton's hypothesized single-incident liability. The obvious need for specific legal training that was present in the Canton scenario is absent here. Armed police must sometimes make split-second decisions with life-or-death consequences. There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances there is an obvious need for some form of training. In stark contrast, legal "[t]raining is what differentiates attorneys from average public employees." 578 F.3d, at 304–305 (opinion of Clement, J.).
>
> Attorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment. Before they may enter the profession and receive a law license, all attorneys must graduate from law school or pass a substantive examination; attorneys in the vast majority of jurisdictions must do both. . . . These threshold requirements are designed to ensure that all new attorneys have learned how to find, understand, and apply legal rules. . . .
>
> Most jurisdictions require attorneys to satisfy continuing-education requirements. . . .
>
> Attorneys who practice with other attorneys, such as in district attorney's offices, also train on the job as they learn from more experienced attorneys. . . .

7

> In addition, attorneys in all jurisdictions must satisfy character and fitness standards to receive a law license and are personally subject to an ethical regime designed to reinforce the profession's standards. . . .
>
> In light of this regime of legal training and professional responsibility, recurring constitutional violations are not the "obvious consequence" of failing to provide prosecutors with formal in-house training about how to obey the law. Bryan Cty., 520 U.S., at 409, 117 S.Ct. 1382. Prosecutors are not only equipped but are also ethically bound to know what Brady entails and to perform legal research when they are uncertain. A district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations in "the usual and recurring situations with which [the prosecutors] must deal." Canton, 489 U.S., at 391, 109 S.Ct. 1197. A licensed attorney making legal judgments, in his capacity as a prosecutor, about Brady material simply does not present the same "highly predictable" constitutional danger as Canton's untrained officer.

Connick, 131 S. Ct. at 1361-63 ("A second significant difference between this case and the example in Canton is the nuance of the allegedly necessary training. The Canton hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force. But it is undisputed here that the prosecutors in Connick's office were familiar with the general Brady rule. Thompson's complaint therefore cannot rely on the utter lack of an ability to cope with constitutional situations that underlies the Canton hypothetical, but rather must assert that prosecutors were not trained about particular Brady evidence or the specific scenario related to the violation in his case. That sort of nuance simply cannot support an inference of deliberate indifference here."). Finally, the Connick Court stated that: ". . . failure-to-train liability is concerned with the substance of the training, not the particular instructional format. The statute does not provide plaintiffs or courts carte blanche to micromanage local governments throughout the United States." Id. at 1363.

Here, there is no evidence of a prior history of violations of the kind alleged by Plaintiffs, so Plaintiffs must rely on the single incident theory. Defendant argues that the same reasoning applied in Connick should apply to the medical professionals in this case and in light of the extensive professional training of the doctors and nurses, Defendant cannot be liable for a failure to train. Plaintiffs argue that the fact that treatment and discharge of inmates was a common occurrence and involved unique issues demonstrates that the need to train was obvious within the meaning of Canton and the lack of training or policies constituted deliberate indifference.

8

It is undisputed that Sutter was the primary hospital for inmates, and there is evidence of a lack of applicable training regarding the treatment and discharge of inmates. Dr. Hard was unable to recall training on policies regarding inmates. Dr. Matel testified that no one had trained him on discharge policies. Nurse Douglass was unaware of policies dictating certain discharge procedures to be followed under the circumstances of this case. Nurse Shaw was unable to recall policies or training on discharge of inmates. Further, Ms. Sparacio testified that there was no training on treatment of patients who were suspected of malingering. Plaintiffs' expert, Saylor, testified to certain discharge policies and employee training that should have been in place because Sutter was the exclusive provider of hospital care to inmates. A reasonable jury could conclude that the lack of policies and training was inadequate and that Defendant was liable for deliberate indifference based on a failure to train. See Long v. County of Los Angeles, 442 F.3d 1178, 1182-83 (9th Cir. 2006) (stating that "the County's policy of hiring trained medical professionals does not insulate it from municipal liability as a matter of law," and finding questions of fact as to whether there was a failure to implement policies to handle a certain type of patient).

Connick is distinguishable because the lack of training about which Plaintiffs complain here is not as specific as that rejected in Connick. In Connick, the lack of training that plaintiff based its theory on concerned particular Brady evidence or the specific scenario related to the violation in that case. The Court noted that the prosecutors were familiar with the general Brady rule, but that the lack of training in a specific kind of Brady violation could not support a finding of deliberate indifference. Here, however, the lack of policies and training focused on discharge of inmates in general, not just those with sickle cell anemia (although there was evidence of the importance of discharge planning for sickle cell patients from Dr. Vichinsky). Medical care of inmates who are discharged to a jail environment is quite different from that of the unincarcerated who can seek medical care on their own or get help from family and friends, and Defendant does not contend that such training is a standard part of the curriculum at medical school, in contrast to the teaching of the Brady obligation at law school. There was evidence from Dr. Hard and Plaintiffs' expert Saylor about the lack of training on malingering and how such a diagnosis effects an inmate's treatment.

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could

conclude that the single incident of a constitutional violation here was a "highly predictable" consequence of the failure to train because Defendant treats all inmates from the prison and there were *no* policies or training on how to handle their discharge.  Defendant argues that one incident out of 1,500 instances of treating inmates at Sutter over a thirty-year period does not constitute a highly predictable consequence.  However, hindsight is not the proper measure for predictability. As other courts have held, Connick did not foreclose liability based on a single incident as set forth in Canton.  See Ramirez v. Ferguson, 2011 U.S. Dist. LEXIS 34625, at * 72-73 (W.D. Ark., Mar. 29, 2011) (finding that Sheriff and Captain supervisors of correctional officers were liable for a "woeful" failure to train on the handling of inmates with mental health needs: "The Court finds that the above testimony demonstrates a lack of training on BCDC's booking/intake policy which constitutes deliberate indifference to the mental health needs of inmates booking into the BCDC. . . . Further, the Court finds that the violation of Plaintiff's rights in this case gives rise to the single-violation theory of liability discussed in Connick, as the violation was a 'highly predictable consequence' of the failure to train deputies on BCDC's written booking/intake policy regarding when to alert medical staff of an inmate's mental health needs."); Meogrossi v. Aubrey, 2011 U.S. Dist. LEXIS 35254, at *36 (W.D. Ky, Mar. 31, 2011) (noting recent Connick decision regarding single incident liability for deliberate indifference and denying summary judgment where training on search and seizure may have been inadequate even though there was a manual given to officers about that subject; while there was evidence of some training, "On the other hand, a jury could find that merely distributing a manual, and nothing more, is the functional equivalent of no training at all, and that there was an obvious and predictable need for even Sheriff's deputies to know how to properly conduct a warrantless search or seizure of evidence.").

**Conclusion**

Accordingly, Defendant's Motion for Judgment as a Matter of Law is denied.

**IT IS SO ORDERED.**

Dated: July 21, 2011

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge

10